**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES *ex rel.* CUSTOMS
FRAUD INVESTIGATIONS, LLC

               Plaintiff/Relator,

     v.

VICTAULIC COMPANY

          Defendant.

Civil Action No. 13-2983

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Suzanne Ilene Schiller
MANKO, GOLD, KATCHER, FOX LLP
401 City Ave., Suite 500
Bala Cynwyd, PA 19004
(484) 430-2359
sschiller@mgkflaw.com

Jonathan K. Tycko (admitted pro hac vice)
Anna C. Haac (admitted pro hac vice)
TYCKO & ZAVAREEI LLP
2000 L Street, N.W., Suite 808
Washington, D.C. 20036
(202) 973-0900
jtycko@tzlegal.com
ahaac@tzlegal.com

*Counsel for Relator Customs Fraud
Investigations, LLC*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................. iv

**INTRODUCTION** ................................................................................................ 1

**ARGUMENT** ...................................................................................................... 2

I.    The Department Of Justice's Election Not To Intervene Has No Relevance To Victaulic's Motion Or The Merits Of This Case ............................................... 2

II.   The Court Should Reject Victaulic's Reliance On The Public Disclosure Bar, Which Provides No Basis For Dismissing The Complaint ........................................... 3

    A.    The Public Disclosure Bar Is Not Jurisdictional; Therefore, Dismissal Under Rule 12(b)(1) Would Be Improper ...................................................... 4

    B.    Assuming That The Public Disclosure Bar Is "Jurisdictional," Dismissal Is Not Warranted Because, As A Factual Matter, Victaulic's Violations Of The FCA Were Not "Publicly Disclosed" Within The Meaning Of The FCA .................... 5

        1.    CFI Conducted An Extensive Investigation That Involved Analysis Of Data From Multiple Sources ...................................................... 5

        2.    Neither Zepol Nor eBay Fall Within The Statutory Definition Of A Public Disclosure ................................................................ 10

            a.    "News Media" Means Sources Of Information Subject To Editorial Selection Or Synthesis, Akin To Traditional Journalism .......................................................... 11

            b.    Zepol Is Not "News Media" ....................................... 18

            c.    eBay Is Not "News Media" ......................................... 20

            d.    Zepol Is Not A "Federal Report" ................................ 21

        3.    Even If Zepol Data And eBay Advertisements Are Both "Public Disclosures," The Public Disclosure Bar Still Does Not Apply Under The Third Circuit's X + Y = Z Analysis ........................................ 23

        4.    Finding That The Public Disclosure Bar Does Not Apply Here Is Consistent With The FCA's Statutory Purpose ............................... 26

    C.    Contrary To Victaulic's Argument, CFI Contributed Sufficient "Independent Knowledge" To Qualify As An Original Source ........................................... 27

III.  The Complaint States A Claim Under The False Claims Act; Therefore, Dismissal Under Fed. R. Civ. P. 12(b)(6) Is Not Warranted .............................................. 30

A.    Contrary To Victaulic's Contention, A Complaint Under The False Claims Act Need Not Plead "Facts" Beyond Those Necessary To State A Claim ................................................................................... 30

    1.    The Complaint Directly Alleges That Victaulic Imported Unmarked Pipefittings, And Plaintiff Need Not Allege All Of The Evidence In Support Of That Direct, Factual Allegation .............................................. 31

    2.    The Complaint Sufficiently Alleges That Victaulic's Failure To Mark Its Imported Pipe Fitting With Country Of Origin Was Knowing .......... 32

B.    Victaulic's Passing Argument That Marking Duties Are Not Covered By The False Claims Act Is Incorrect ....................................... 34

IV.    The Complaint Satisfies The "Particularity" Requirement Of Fed. R. Civ. P. 9(b) .......................................................... 37

**CONCLUSION** ........................................................................ 40

## TABLE OF AUTHORITIES

### CASES

*American Textile Manufacturers Inst. v. The Limited, Inc.*,
190 F.3d 729 (6th Cir. 1999) ............................................... 35

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................... 31

*Blue Line Coal Co. v. Equibank*,
683 F. Supp. 493 (E.D.Pa. 1988) ..................................... 38

*Brown v. U.S. Patent & Trademark Office*,
445 F. Supp. 2d 1347 (M.D. Fla. 2006) ........................... 16

*Christidis v. First Pa. Mortgage Trust*,
717 F.2d 96 (3d Cir. 1983) ............................................... 38

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984) .......................................................... 14

*Cox Broad. Corp. v. Cohn*,
420 U.S. 469 (1975) .......................................................... 15

*Craftmatic Secs. Litig. v. Kraftsow*,
890 F.2d 628 (3d Cir. 1989) ............................................. 40

*Eakin v. U.S. Dep't of Def.*,
SA-10-CV-0784 FB NN, 2011 WL 5925570 (W.D. Tex. Nov. 28, 2011) ........................... 16

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009) ............................................. 31

*Gould Elect. Inc. v. U.S.*,
220 F.3d 169 (3d Cir. 2000) ............................................... 5

*Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
559 U.S. 280 (2010) .................................................. 5, 26, 27

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) ............................................................. 14

*In re: the Use and Possession of Electronic Devices in the Courthouse*,
Misc. No. 03-451 (Order of Feb. 14, 2013) ...................... 16

*Judicial Watch, Inc. v. U.S. Dep't of Justice*,
185 F. Supp. 2d 54 (D.D.C. 2002) ................................... 15

*Kennard v. Comstock Res., Inc.*,
363 F.3d 1039 (10th Cir. 2004) ......................... 2, 28, 29, 30

*MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*,
   512 U.S. 218 (1994) ............................................................................ 12, 13

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*,
   331 F.3d 406 (3d Cir. 2003) ......................................................................... 37

*Nat'l Sec. Archive v. U.S. Dep't of Def.*,
   880 F.2d 1381 (D.C. Cir. 1989) .................................................................... 16

*Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*,
   Civ. No. 10-7504, 2013 WL 4441509 (S.D.N.Y. Aug. 16, 2013) ................ 4

*Repko v. Guthrie Clinic, P.C.*,
   No. 3:04-cv-1556, 2011 WL 3875987 (M.D. Pa. Sept. 1, 2011) ........... 17, 29

*Rolo v. City Investing Co. Liquidating Trust*,
   155 F.3d 644 (3d Cir. 1998) ......................................................................... 39

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
   131 S. Ct. 1885 (2011) ........................................................................... passim

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,
   742 F.2d 786 (3d Cir. 1984) .................................................................... 37, 38

*U.S. ex rel. Atkins v. McInteer*,
   470 F.3d 1350 (11th Cir. 2006) ..................................................................... 3

*U.S. ex rel. Atkinson v. PA. Shipbuilding Co.*,
   473 F.3d 506 (3d Cir. 2007) ............................................................ 24, 28, 29

*U.S. ex rel. Atkinson v. PA. Shipbuilding Co.*,
   255 F. Supp. 2d. 351 (E.D. Pa. 2002) ......................................................... 40

*U.S. ex rel. Boggs v. Bright Smile Family Dentistry, P.L.C.*,
   CIV-10-25-L, 2013 WL 1688898 (W.D. Okla. Apr. 18, 2013) ................... 21

*U.S. ex rel. Chandler v. Cook County*,
   277 F.3d 969 (7th Cir. 2002) ........................................................................ 3

*U.S. ex rel. Colquitt v. Abbott Labs.*,
   864 F. Supp. 2d 499 (N.D. Tex. 2012) ........................................................ 21

*U.S. ex rel. Dale v. Abeshaus*,
   06-CV-04747, 2013 WL 5379384 (E.D. Pa. Sept. 26, 2013) ................. 31, 39

*U.S. ex rel. Doe v. Staples*,
   No. 08-846, 2013 WL 1192982 (D.D.C. Mar. 22, 2013) .................. 19, 20, 21

*U.S. ex rel. Dunleavy v. County of Delaware*,
   123 F.3d 734 (3d Cir. 1997) .................................................................... 11, 12

*U.S. ex rel. El-Amin v. George Washington Univ.*,
   533 F. Supp. 2d 12 (D.D.C. 2008) ................................................................ 3

*U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc.*,
    No. 1:11–cv–962–WSD, 2013 WL 2303768 (N.D. Ga. May 17, 2013) ................................. 4

*U.S. ex rel. Gibbons v. Kvaerner Philadelphia Shipyard, Inc.*,
    CIV.A. 05-685, 2006 WL 328362 (E.D. Pa. Feb. 10, 2006) ......................................... 34

*U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*,
    190 F.3d 1156 (10th Cir. 1999) .................................................................... 29

*U.S. ex rel. Holmes v. Consumer Ins. Group*,
    318 F.3d 1199 (10th Cir. 2003) .................................................................... 30

*U.S. ex rel. Kirk v. Schindler Elevator Corp.*,
    601 F.3d 94 (2d Cir. 2010) ........................................................................ 17

*U.S. ex rel. Lamars v. City of Green Bay*,
    168 F.3d 1013 (7th Cir. 1999) ..................................................................... 30

*U.S. ex rel. Liotine v. CDW Gov't, Inc.*,
    Civ. No. 05-33-DRH, 2009 WL 3156704, (S.D. Ill. Sept. 29, 2009) .......................... 12, 19

*U.S. ex rel. Mistick PBT v. Hous. Auth. of City of Pittsburgh*,
    186 F.3d 376 (3d Cir. 1999) ....................................................................... 11

*U.S. ex rel. Ondis v. City of Woonsocket*,
    582 F. Supp. 2d 212 (D.R.I. 2008) ................................................................. 21

*U.S. ex rel. Paranich v. Sorgnard*,
    396 F.3d 326 (3d Cir. 2005) ............................................................... 11, 23, 27

*U.S. ex rel. Paulos v. Stryker Corp.*,
    No. 11–0041–CV–W–ODS, 2013 WL 2666346 (W.D. Mo. June 12, 2013) ......................... 4

*U.S. ex rel. Radcliffe v. Purdue Pharma, L.P.*,
    582 F. Supp. 2d 766 (W.D. Va. 2008) ........................................................... 12, 18

*U.S. ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*,
    739 F. Supp. 2d 396 (S.D.N.Y. 2010) ............................................................... 19

*U.S. ex rel. Simpson v. Bayer Corp.*,
    Civ. No. 05-3895, 2013 WL 4710587 (D.N.J. Aug. 20, 2013) .................................. 12, 18

*U.S. ex rel. Spay v. CVS Caremark Corp.*,
    913 F. Supp. 2d 125 (E.D. Pa. 2012) ......................................................... passim

*U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*,
    14 F.3d 645 (D.C. Cir. 1994) ................................................................. passim

*U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*
    944 F.2d 1149 (3d Cir. 1991) ...................................................................... 27

*U.S. ex rel. Washington v. Educ. Mgmt. Corp.*,
    871 F. Supp. 2d 433 (W.D. Pa. 2012) ............................................................... 33

*U.S. v. Chattanooga–Hamilton County Hosp. Auth.*,
  1:10–CV–322, 2013 WL 3912571 (E.D. Tenn. July 29, 2013)................................ 4

*U.S. v. Science Applications Int'l Corp.*,
  626 F.3d 1257 (D.C. Cir. 2010) ....................................................................... 33, 34

*U.S. v. Torkelsen*,
  CIV.A. 06-05674, 2007 WL 4245736 (E.D. Pa. Dec. 3, 2007)....................... 38, 40

*Wolston v. Reader's Digest Ass'n, Inc.*,
  443 U.S. 157 (1979)............................................................................................. 14

## **STATUTES AND CODES**

Patient Protection and Affordable Care Act,
  Pub. L. 111–148, 124 Stat. 119 ............................................................................. 3

United States Code
  Title 19, section 1304(c)................................................................................ 6, 7, 9

United States Code
  Title 19, section 1304(i) ..................................................................................... 35

United States Code
  Title 31, section 3729 ............................................................................................ 1

United States Code
  Title 31, section 3729(a)(1)(G) ...................................................................... 35, 37

United States Code
  Title 31, section 3729(b)(1)...................................................................... 1, 32, 34

United States Code
  Title 31, section 3729(b)(3) ................................................................................ 36

United States Code
  Title 31, section 3730(e)(4) ................................................................. 2, 3, 11, 27

United States Code
  Title 31, section 3730(e)(4)(A) ...................................................................... 10, 17

United States Code
  Title 31, section 3730(e)(4)(A)(i)........................................................................ 23

United States Code
  Title 31, section 3730(e)(4)(A)(ii) ................................................................. 21, 23

## RULES AND REGULATIONS

Code of Federal Regulations
   Title 19, section 103.31 ........................................................................................... 20

Code of Federal Regulations
   Title 32, section 286.28(e)(7)(iii) ........................................................................... 16

Federal Rules of Civil Procedure
   Rule 8 ........................................................................................................................ 30

Federal Rules of Civil Procedure
   Rule 9(b) .......................................................................................................... 1, 34, 37

Federal Rules of Civil Procedure
   Rule 12(b)(1) ......................................................................................................... 2, 4, 5

Federal Rules of Civil Procedure
   Rule 12(b)(6) ..................................................................................... 1, 4, 5, 30, 31, 32

## OTHER AUTHORITIES

5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1298 (1969).................................. 38

132 Cong. Rec. S16505 (Oct. 15, 1986)................................................................................... 16

IX Oxford English Dictionary (2d ed. 1989) .......................................................................... 14

X Oxford English Dictionary (2d ed. 1989) ........................................................................... 13

S. Rep. No. 110-507 (2008)....................................................................................................... 36

S. Rep. No. 111-10 (2009)......................................................................................... 35, 36, 37

Webster's Third New International Dictionary (1986)....................................................... 13, 14

## __INTRODUCTION__

This case is brought under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. (the "FCA"),

by relator Customs Fraud Investigations, LLC ("CFI"), based upon a multifacetted and unique

investigation that it designed and conducted.  Although CFI's investigation—which will be

described in detail herein—was complex and took many months to complete, the resulting

charge against defendant Victaulic Company ("Victaulic") is simple to resolve on its merits.

Either Victaulic marked its imported pipe fittings with their foreign country of origin, or it did

not.  If Victaulic did not, then the only other significant factual question will be whether

Victaulic paid the marking duties owed in connection with those imports.  If Victaulic imported

unmarked pipe fittings without paying marking duties, Victaulic's violation of the FCA is

essentially self-evident.  While Victaulic could, theoretically, also defend by claiming a lack of

the requisite scienter, such a defense is unlikely to succeed because the FCA defines

"knowledge" as including "reckless disregard," 31 U.S.C. § 3729(b)(1), and a jury likely would

conclude that a large, sophisticated manufacturer and importer such as Victaulic would be acting

with "reckless disregard" if it truly failed to inform itself of the country-of-origin marking

requirements; indeed, such a conclusion may flow as a matter of law.

Given the relative simplicity of this case, Victaulic's arguments under Fed. R. Civ. P.

12(b)(6) and Fed. R. Civ. P. 9(b)—all of which, at root, amount to the contention that the

Complaint does not put Victaulic on adequate notice of the claims against it—are meritless.  The

Complaint clearly puts Victaulic on notice of CFI's claims, and the theory behind those claims.

Victaulic argues, in various forms, that CFI should also be required to plead the *evidence* in

support of this case.  But nothing in the Rules or applicable case law requires such pleading.

The other question raised by Victaulic's motion is in the nature of a demurrer.  Even if

CFI's allegations of misconduct are true, Vitalic contends that CFI should be prohibited from

pursuing this case because of the so-called "public disclosure bar." 31 U.S.C. § 3730(e)(4). Victaulic argues that this issue is "jurisdictional," and thus can be decided now, as a factual matter, by the Court under Fed. R. Civ. P. 12(b)(1). That is incorrect, because a 2010 amendment to the public disclosure bar explicitly changed it from a jurisdictional matter to an affirmative defense to be pled and proven by a defendant.

Even if the Court does address the public disclosure bar as a jurisdictional matter under Rule 12(b)(1), the Motion should still be denied. CFI submits herewith the Declaration of Rebecca L. Woodings, CFI's President, in which Ms. Woodings explains in detail how CFI planned and then executed a complex and unique investigation to determine whether Victaulic was, in fact, violating the FCA. As that Declaration demonstrates, and contrary to what Victaulic contends, CFI is not engaged in a "fishing expedition." More to the point, the public disclosure bar does not apply because the information relied upon by CFI was not "publicly disclosed" within the meaning of the FCA. In addition, Victaulic's contention that CFI cannot qualify as an "original source" because it did not have sufficient "independent knowledge" is wrong because CFI uncovered Victaulic's fraud through its "independent investigation, deduction, and effort." *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1046 (10th Cir. 2004).

For these reasons, explained in detail below, the Court should deny the motion to dismiss.

## <u>ARGUMENT</u>

### I.     The Department Of Justice's Election Not To Intervene Has No Relevance To Victaulic's Motion Or The Merits Of This Case

Although not a basis for dismissal, Victaulic argues that "[t]he DOJ's rapid decision to forgo intervention is a strong indicator that CFI simply has no basis for bringing this *qui tam* suit." Def.'s Br. at 1. That contention is wrong. In a recent decision, Senior Judge Buckwalter rejected just such an argument, finding that the "overwhelming weight of authority" was against

any "per se presumption of lack of merit based solely on the government's decision to not intervene." *U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 144 n.3 (E.D. Pa. 2012). "[T]he government may have a host of reasons for not pursuing a claim," *U.S. ex rel. Atkins v. McInteer,* 470 F.3d 1350, 1360 n.17 (11th Cir. 2006), including "limited prosecutorial resources and confidence in the relator's attorney," *U.S. ex rel. Chandler v. Cook County,* 277 F.3d 969, 974 n.5 (7th Cir. 2002). "Indeed, assuming the government looked unfavorably upon each *qui tam* action in which it did not intervene would seem antithetical to the purpose of the *qui tam* provision—to encourage private parties to litigate on behalf of the government." *U.S. ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 21 (D.D.C. 2008). Accordingly, the Government's decision is irrelevant to the pending motion and the merits of this case.

## II.  The Court Should Reject Victaulic's Reliance On The Public Disclosure Bar, Which Provides No Basis For Dismissing The Complaint

The Complaint alleges that it "is not based on a public disclosure" and that CFI "has direct and independent knowledge of the information on which the allegations contained [in the Complaint] are based and/or knowledge that is independent of and materially adds to any allegations or transactions that were publicly disclosed." Compl., ¶ 8. Victaulic argues, however, that these allegations are not sufficient to demonstrate that the public disclosure bar does *not* apply, and that such negating allegations are a jurisdictional prerequisite. But the public disclosure provision of the FCA was amended in 2010, as part of the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. 111-148, § 10104(j)(2), 124 Stat. 119 (Mar. 23 2010). Under the post-PPACA version of that provision, *see* 31 U.S.C. § 3730(e)(4), the public disclosure bar is no longer jurisdictional. Accordingly, it does not provide a basis for dismissal under Fed. R. Civ. P. 12(b)(1). In the alternative, the Court should find, as a factual matter, that the public disclosure bar does not apply.

**A.      The Public Disclosure Bar Is Not Jurisdictional; Therefore, Dismissal Under Rule 12(b)(1) Would Be Improper**

Neither the Third Circuit, nor any reported decision of this Court, has squarely addressed whether the PPACA changed the jurisdictional nature of the public disclosure bar.  A number of courts have held, however, that by eliminating the reference to "jurisdiction," the public disclosure bar is no longer an issue of subject matter jurisdiction, but rather now constitutes an affirmative defense, which must be alleged and proven by Victaulic, and which thus cannot be resolved on a motion to dismiss under Fed. R. Civ. P. 12(b)(1).  *See Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, Civ. No. 10-7504, 2013 WL 4441509, at *9 (S.D.N.Y. Aug. 16, 2013) ("the public disclosure provision is no longer jurisdictional in nature"); *U.S. ex rel. Paulos v. Stryker Corp.*, No. 11–0041–CV–W–ODS, 2013 WL 2666346, at *3 (W.D. Mo. June 12, 2013) ("After the 2010 amendment, the bar does is [sic] not described as jurisdictional in nature."); *U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, No. 1:11–cv–962–WSD, 2013 WL 2303768, at *8 n.15 (N.D. Ga. May 17, 2013); *U.S. v. Chattanooga–Hamilton County Hosp. Auth.*, 1:10–CV–322, 2013 WL 3912571, at *7 n.6 (E.D. Tenn. July 29, 2013).

This is the better reasoned approach.  As a recent Southern District of New York opinion explained, "Congress deliberately *removed* such clear language [on jurisdiction] from the provision when it could have kept it in."  *Ping Chen*, 2013 WL 4441509 at *9.  Consequently, the current version of the public disclosure bar merely provides a potential basis for dismissal under Rule 12(b)(6).  *Id.*  As such, Victaulic bears the burden of proving that this case falls within the public disclosure bar, with all of CFI's allegations accepted as true and all inferences drawn in Plaintiff's favor.  *Id.*; *see also Gould Elect. Inc. v. U.S.*, 220 F.3d 169, 178 (3d Cir. 2000) (discussing the different standards of review under Rules 12(b)(1) and 12(b)(6)).

**B.  Assuming That The Public Disclosure Bar Is "Jurisdictional," Dismissal Is Not Warranted Because, As A Factual Matter, Victaulic's Violations Of The FCA Were Not "Publicly Disclosed" Within The Meaning Of The FCA**

The public disclosure bar was enacted to prevent parasitic lawsuits by relators who simply copied information from pending Government indictments without adding any value. *Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 293-94 (2010). CFI's Complaint, however, is not a mere regurgitation of publicly disclosed information readily available to the Government. Rather, CFI uncovered Victaulic's otherwise undetected customs fraud through analysis of multiple sources that did not themselves reveal the fraud. Because the allegations and transactions alleged in CFI's Complaint cannot be found in "public disclosures" as that term is defined under the FCA, the public disclosure bar is not triggered.

**1.  CFI Conducted An Extensive Investigation That Involved Analysis Of Data From Multiple Sources**

CFI's principals have represented U.S. companies and industries in international trade matters before administrative agencies, courts, international tribunals, and Congress, as well as provided direct support to senior officials at the U.S. International Trade Commission and U.S. Department of Commerce. (Decl., ¶ 2.) Based on CFI's experience in the international trade arena, personal observations of Victaulic pipe fittings, and knowledge of the pipe fittings industry, Victaulic itself, and the laws regarding marking duties, CFI learned that Victaulic had sent considerable production capacity offshore over the last decade, had reduced its U.S. manufacturing operations sharply, and was selling at least some pipe fittings with no country-of-origin markings. (*Id*. at ¶¶ 3-5.)

For many products, it is permissible to mark the country of origin on packaging or to obtain an exception to country-of-origin labeling requirements. (*Id*. at ¶ 4.) Thus, the absence of visible markings on most imported products does not necessarily signify that they were

improperly marked upon importation.  (*Id.*)  Victaulic's products, however, are steel, cast, or malleable iron pipe fittings for tariff classification purposes.  (*Id.*)  These are among the few types of products that must be marked permanently on the product itself using one of five methods specified in 19 U.S.C. § 1304(c), which was enacted in the 1980s due to particular problems with fraud in the steel pipe industry.  (*Id.*)

Thus, the absence of any of these specific types of county-of-origin markings on Victaulic's pipe fittings themselves, and Victaulic's offshoring of its manufacturing to China, Mexico, and Poland, raised the possibility that Victaulic was failing to mark its imported pipe fittings.  (*Id.* at ¶ 5.)  This information, however, was not conclusive in the case of Victaulic, which maintains some U.S. production operations.  (*Id.*)  It was possible, for example, that Victaulic had manufactured the observed, unmarked fittings at its remaining United States facilities, so that no country-of-origin markings were required.  Thus, if all CFI had known was that Victaulic made some fittings in foreign countries and some in the United States, and that some were not marked with country of origin, then CFI would not have had a strong basis to allege that Victaulic had violated the marking duty statute.

Accordingly, CFI conceived of and implemented a multi-faceted investigation to determine whether its suspicions had merit.  (*Id.* at ¶ 6.)  CFI's allegation that Victaulic is committing fraud on the Government by not paying marking duties is based primarily upon a comparison of two sets of data.  (*Id.* at ¶ 7.)  First, CFI compiled and analyzed customs import data using a fee-based subscription service, Zepol.  (*Id.* at ¶¶ 7, 12, 14-20.)  Services like Zepol collect raw ship manifest data in 24-hour cycles, and provide this data only to registered users who pay a significant fee.  (*Id.* at ¶ 12.)  Zepol's annual professional subscription fee, for

example, is $5,995.  (*Id.*)  This is the cheapest option available that will allow users to download customs import data dating back more than thirteen months.  (*Id.*)

Upon obtaining access to Zepol's database, CFI then had to formulate a search query that would provide meaningful results, which requires sophisticated knowledge of bills of lading and the fields populated therefrom, as well as an understanding of the U.S. tariff code classification system.  (*Id.* at ¶¶ 14-16.)  Only someone who has worked with customs import data over an extended period would know how to manipulate and interpret ship manifest data and understand what conclusions can properly be drawn from the same.  (*Id.* at ¶ 14.)  CFI has gained such knowledge from years of experience in the international trade field.  (*Id.*)  CFI's initial search resulted in a large database of Victaulic import entries that CFI then culled through line-by-line to eliminate shipments that likely were not iron or steel pipe fittings for purposes of 19 U.S.C. § 1304(c), a step that again required CFI to apply its specialized knowledge.  (*Id.* at ¶¶ 17-18.) This database can be found at Exhibit C.[1]

Only upon completing the above multi-step process was CFI able to obtain a usable database from which Victaulic's imports could then be segregated and tabulated by country and from which CFI could draw reliable conclusions.  (*Id.* at ¶ 19.)  These segregated databases can be found at Exhibits D-G.  Ultimately, CFI's analysis (hereinafter referred to as "CFI's import analysis") showed that, at least since the mid-2000s, Victaulic has been importing a huge quantity of pipe fittings manufactured in its foreign plants.  (*Id.* at ¶ 20.)  Specifically, CFI determined that Victaulic imported approximately 83 million pounds of fittings from China and Poland during the years 2003-2012 and that in recent years (2010-2012), Victaulic has imported an annual average of approximately 15.2 million pounds.  (*Id.* at ¶¶ 20-22.)

---

[1]    All lettered exhibits referenced are attached to the Declaration of Rebecca L. Woodings, being filed herewith.

Based on these findings, one would expect to see Victaulic pipe fittings sold in the U.S. and manufactured in recent years bearing "Made in China" or "Made in Poland" country-of-origin markings.[2]  CFI thus next designed and conducted a study of the secondary market for Victaulic pipe fittings (hereinafter referred to as "CFI's product study").  (*Id.* at ¶¶ 8, 30-44.) This consisted of identifying Victaulic pipe fittings for sale on eBay[3] over a period of almost six months, using search and exclusion criteria specifically designed to capture Victaulic pipe fittings that were likely sold during the time period in question.  (*Id.* at ¶¶ 35-39.)  CFI then reviewed a substantial number of these eBay listings to determine whether the product had been marked with a country of origin.  (*Id.* at ¶¶ 40-41.)  A table summarizing the eBay listings reviewed by CFI can be found at Exhibit H.  In total, CFI reviewed 221 unique eBay listings for "new" iron and steel Victaulic pipe fittings.  (*Id.* at ¶ 41.)

Further, to test whether and how often a country-of-origin marking was present but not apparent from the eBay product listing, CFI further selected a sample of Victaulic products for purchase whose accompanying photographs were limited or unclear as to whether a country-of-origin marking was present.  (*Id.* at ¶ 40.)  CFI's physical examination of these products

---

[2]     To confirm that Victaulic's Chinese and Polish imports actually comprised a significant amount of Victaulic's annual U.S. sales, CFI further devised and executed a price analysis of Victaulic's pipe fittings for purposes of estimating the retail value per pound of these imports. (Decl. at ¶¶ 21-29.)  Using Victaulic's 2011 price list, CFI compiled a total of 147 separate price observations for 49 different products with three sizes each to arrive at an estimated per pound price of 36.40.  (*Id.* at ¶¶ 23-25.)  CFI was then able to use this price estimate (applying a discount, which is typical in the piping industry) as a rough cross-check against Victaulic's reported annual sales, which further suggested that at least a majority (and likely a large majority) of the fittings sold by Victaulic in the U.S. in recent years were indeed manufactured in China or Poland.  (*Id.* at ¶¶ 26-29.)

[3]     eBay is an active secondary sales outlet for Victaulic products.  (*Id.* ¶ 33.)  CFI determined that the eBay listings included a representative national cross-section of Victaulic iron and steel pipe fittings manufactured during the time period in question, making it a reliable evidentiary source for present purposes.  (*Id.*)

confirmed that no foreign country-of-origin markings were present.  (*Id.* at ¶ 44.)  Rather, the items were either unmarked or bore U.S. origin markings.  (*Id.*)

Based on CFI's review of the 221 eBay listings and products purchased, CFI concluded that, with three exceptions, all of Victaulic's pipe fittings either had no country-of-origin marking whatsoever or were marked as made in the U.S.A.  (*Id.* at ¶¶ 41-44.)  The majority (at least 75%) had no country-of-origin marking.  (*Id.* at ¶ 8.)  Only one Victaulic pipe fitting contained a proper foreign country-of-origin marking pursuant to 19 U.S.C. § 1304(c).  (*Id.* at ¶ 41.)  This lone Chinese pipe fitting, however, was unusual in that it was particularly large and expensive, providing no basis to assume that the proper marking could be extrapolated to other pipe fittings.  (*Id.*)  The other two pipe fittings containing a foreign country-of-origin marking were both improperly marked, which was further confirmed by a purchase and physical review of one.  (*Id.* at ¶ 42.)  In sum, of the 221 samples examined, only a single (and unusual) fitting had a proper foreign country-of-origin mark.

This wide disparity between (a) the flood of imported Victaulic pipe fittings and (b) the almost complete absence of foreign country-of-origin markings on Victaulic pipe fittings for sale in the secondary market, confirmed CFI's initial suspicion that Victaulic had been importing pipe fittings without complying with marking requirements.  (*Id.* at ¶¶ 9, 45.)  Moreover, the fact that a substantial majority of Victaulic's pipe fittings are unmarked (with a much smaller percent marked made in the U.S.A.) strongly suggests that Victaulic is engaging in an intentional practice of leaving its foreign-made pipe fittings unmarked as unmarked pipe fittings are understood in the piping industry to be American made.  (*Id.* at ¶ 45.)

Based on CFI's knowledge and expertise regarding the operations of the U.S. Customs and Border Protection Agency ("CBP"), CFI thus had reason to believe that Victaulic falsified its

entry documents and misrepresented to CBP that no marking duties were owed on these imports. (*Id*. at ¶¶ 46-48.)  Specifically, CFI knows that CBP will normally require proper marking, destruction, or re-export of mismarked or unmarked goods if it detects a marking violation within 30 days of entry.  (*Id*. at ¶ 47.)  This is true even if marking duties are paid.  (*Id*.)  Thus, importers normally pay marking duties only if CBP detects a marking violation after that 30-day period, which is an unusual circumstance.  (*Id*.)  This is because CBP physically inspects only a tiny fraction of shipments arriving in the United States, and the inspections that it does conduct necessarily tend to focus primarily on security and law enforcement matters rather than tariff requirements.  (*Id*.)  Shipments by a major manufacturer may almost never be subject to a physical inspection, and even if they are, only a tiny portion of the contents of a sealed shipping container would likely be examined.  (*Id*.)  Consequently, it is extremely unlikely that Victaulic imported the quantities of unmarked foreign goods found by CFI without also misrepresenting to CBP that it owed no marking duties.  (*Id.* at ¶ 48.)

### 2.   Neither Zepol Nor eBay Fall Within The Statutory Definition Of A Public Disclosure

The public disclosure bar applies only "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in one of three ways:

(i)    in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

(ii)   in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

(iii)  from the news media.

37 U.S.C. § 3730(e)(4)(A).

To be a "public disclosure," a disclosure must "(1) issue from a source or occur in a context specifically recognized by the Act, and (2) be sufficient to support the conclusion that the information contained therein is now public within the meaning of the Act."  *U.S. ex rel.*

*Paranich v. Sorgnard*, 396 F.3d 326, 332-33 (3d Cir. 2005).  In addition, the public disclosure

must consist of "allegations or transactions" that are "substantially the same"[4] as alleged in

Plaintiff's Complaint.  31 U.S.C. § 3730(e)(4); *see also Paranich*, 396 F.3d at 332.

> **a.**     **"News Media" Means Sources Of Information Subject To Editorial Selection Or Synthesis, Akin To Traditional Journalism**

"News media" is properly understood to involve, at a minimum, some type of editorial

selection or synthesis of information, such as that found in traditional journalistic news sources.

Neither Zepol nor eBay engages in such editorial selection or synthesis; rather, both are

platforms containing raw data that *users* can select or synthesize as they see fit.  Accordingly,

neither is part of the "news media" as that term is properly construed.

No Supreme Court or published Third Circuit opinion has directly explained the contours

of the term "news media" in the online world.  Although a number of cases from other

jurisdictions have considered the application of "news media" to materials available online, no

consistent rationale has developed and many of these cases are unpublished district court

decisions, involve little analysis, and/or are limited to their facts.  The Third Circuit has clearly

held, however, that the above statutory list is exclusive of the types of public disclosures that

trigger the bar.  *See, e.g.*, *U.S. ex rel. Dunleavy v. County of Delaware*, 123 F.3d 734, 744 (3d

Cir. 1997) (abrogated on other grounds).  Thus, contrary to the sweeping interpretation

advocated by Victaulic, the public disclosure bar does not preclude all suits based on publicly

disclosed information.

---

[4]     Although the pre-PPACA public disclosure bar applied where a complaint was "based upon the public disclosure of allegations or transactions," the Third Circuit interpreted this to mean "supported by" or "substantially similar to," such that there is no material difference between the prior and current versions of this prong of the public disclosure bar.  *U.S. ex rel. Mistick PBT v. Hous. Auth. of City of Pittsburgh*, 186 F.3d 376, 385 (3d Cir. 1999).

Rather, consistent with Third Circuit precedent, a number of courts have held that "news media" cannot simply mean *anything* posted on the Internet. *U.S. ex rel. Simpson v. Bayer Corp.*, Civ. No. 05-3895, 2013 WL 4710587, at *7 (D.N.J. Aug. 20, 2013) ("[W]hile it is certainly the case that websites may constitute news media in certain instances, not everything posted on the internet qualifies."); *U.S. ex rel. Liotine v. CDW Gov't, Inc.*, Civ. No. 05-33-DRH, 2009 WL 3156704, at *6 n.5 (S.D. Ill. Sept. 29, 2009) (refusing to find "that *any* posting on the internet constitutes 'news media'") (emphasis in original); *U.S. ex rel. Radcliffe v. Purdue Pharma, L.P.*, 582 F. Supp. 2d 766, 772 (W.D. Va. 2008) (declining "to conclude that anything posted online would automatically constitute a public disclosure") (reversed on other grounds). In the Internet age, where a limitless amount of data is available, turning anything posted on the Internet into "news media" would permit a defendant to evade liability under the FCA merely by trolling the Internet for points of data that could be pieced together in hindsight to support an allegation of fraud.

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S. Ct. 1885 (2011), which considered the meaning of "report" in the public disclosure bar, provides a template for how to ascertain the meaning of "news media." *Schindler* instructs that, because the FCA does not define the term "news media," the Court must determine "the word's ordinary meaning." *Id.* at 1891. More precisely, the issue is the "ordinary meaning" of "news media" in 1986, when the public disclosure bar—with the "news media" element—was enacted. *MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994) ("When the [statute] became law [is] the most relevant time for determining a statutory term's meaning").

In 1986, when the public disclosure bar and its reference to "news media" was adopted, the "web" was not yet in existence, at least in a form available to the public, so a construction of

12

the term "news media" that includes all of the varied sources available online could not have been intended by Congress.  That "news media" was left undefined—and not even discussed in the committee reports that accompanied the 1986 amendments—suggests that the term had a well-understood meaning at the time, namely, traditional news sources such as newspapers, magazines, and broadcast journalism.  Even today, when people say "news media," they mean sources through which journalists, or other people who gather and analyze information for purposes of reporting it to an audience, convey "the news."  Although "news" may be derived from or discovered in raw data, the raw data itself is not "news" in ordinary usage.

In *Schindler*, the first place the Court looked for "ordinary meaning" was in dictionaries. 131 S. Ct. at 1891.  Dictionary definitions demonstrate that the term "news media" is tied intimately to the concept of "reporting," particularly the type of "reporting" associated with traditional news sources, such as newspapers and broadcast media.  Webster's Third New International Dictionary at 1524 (1986), does not define "news media," but it does define "news."  The primary definition given is "a report of a recent event : new information : fresh tidings."  The secondary definition given is "what is reported in a newspaper, news periodical, or news broadcast" and a "matter that is interesting to newspaper readers or news broadcast audiences : matter that is suitable for news copy."  It defines the related word "newsworthy" as "sufficiently interesting to a general public to warrant reporting in the news."  X Oxford English Dictionary at 374-75 (2d ed. 1989), similarly does not define "news media."  But it defines "news" as "new things : novelties," and "[t]idings; the report or account of recent events or occurrences brought or coming to one as new information; new occurrences as a subject of report

13

or talk."  And IX Oxford English Dictionary at 542 (2d ed. 1989), separately defines "media" as "[n]ewspapers, radio, television, etc., collectively, as vehicles of mass communication."[5]

The "ordinary meaning" of "news media" can also be seen in decisions of the Supreme Court, which often used the term "news media" as a way of referring to the understood, traditional channels of news reporting.  *See*, *e.g.*, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 305 (1984) (Burger, C.J., concurring) ("Certainly the news media understood the significance of respondents' proposed activity; newspapers and magazines from around the Nation reported their previous sleep-in and their planned display."); *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 162 (1979) ("These events immediately attracted the interest of the news media, and on July 15 and 16, at least seven news stories focusing on petitioner's failure to respond to the grand jury subpoena appeared in New York and Washington newspapers."); *Houchins v. KQED, Inc.*, 438 U.S. 1, 3 (1978) ("The question presented is whether the news media have a constitutional right of access to a county jail, over and above that of other persons, to interview inmates and make sound recordings, films, and photographs for publication and broadcasting by newspapers, radio, and television.").  Indeed, in at least one case, the Supreme Court equated the terms "news media" and "the press":

> In the first place, in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon *the press* to bring to him in convenient form the facts of those operations.  Great responsibility is accordingly placed upon the *news media* to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by *the press* most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally.

---

[5]    Webster's Third New International Dictionary (1986), and Oxford English Dictionary (2d ed. 1989) were both cited with approval in *Schindler*, 131 S. Ct. at 1891.  The Court also looked to Black's Law Dictionary (2d ed. 1989), but Black's does not contain any definitions of "news media," "news," or "media," and thus is not helpful here.

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491-92 (1975).

Congress, although it left "news media" undefined in the FCA, has expressed its understanding of the term in another statute.  The Freedom of Information Act ("FOIA") permits agencies to charge fees for "for document search, duplication, and review," subject to a number of exceptions including when the requestor is "a representative of the *news media*."  5 U.S.C. § 552(a)(4)(A)(ii) (emphasis added).  FOIA then defines that term to mean a person or entity that applies "editorial skills" to "raw materials" to create "a distinct work," and gives as examples traditional press outlets such as television, radio and periodicals:

> In this clause, the term "a representative of the news media" means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience.  In this clause, the term "news" means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of "news") who make their products available for purchase by or subscription by or free distribution to the general public.  These examples are not all-inclusive.  Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities.

*Id*.

Courts applying this provision have found individuals or entities that make documents or information available to the public in "raw" form, without the application of editorial skill, to be outside the scope of "news media."  *See*, *e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 185 F. Supp. 2d 54, 59 (D.D.C. 2002) (plaintiff not "news media" where it "is at best a type of middleman or vendor of information that representatives of the news media can utilize when appropriate"); *Nat'l Sec. Archive v. U.S. Dep't of Def.*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) ("[I]nformation vendors, data brokers, and other second-hand disseminators of documents who do so at a price as the means of their economic self-sufficiency, should not qualify . . . under any

reasonable construction of the term 'media.'") (quoting 132 Cong. Rec. S16505 (Oct. 15, 1986) (Statement of Sen. Hatch)); *see also* 32 C.F.R. § 286.28(e)(7)(iii) ("'Representative of the news media' does not include . . . information vendors, data brokers or similar marketers of information whether to industries and businesses, or other entities").

Nor does "the presence of a website alone . . . qualify a FOIA requester as a representative of the news media." *Brown v. U.S. Patent & Trademark Office*, 445 F. Supp. 2d 1347, 1357 (M.D. Fla. 2006) *aff'd*, 226 F. App'x 866 (11th Cir. 2007); *see also Eakin v. U.S. Dep't of Def.*, SA-10-CV-0784 FB NN, 2011 WL 5925570, at *6 (W.D. Tex. Nov. 28, 2011) ("Eakin's reliance on his website memorializing 'the thousands of American servicemen who were imprisoned and died of starvation, disease and mistreatment on the Bataan Death March and in Japanese prison camps in the Philippines during World War II' does not make Eakin a representative of the news media.").

Another example comes from a standing order issued by the Chief Judge of the Western District of Pennsylvania that generally prohibits members of the public from bringing electronic devices into the courthouse, but that contains an exception for "members of the news media," defined to mean "representatives of a person or entity that regularly and customarily is engaged in the business of gathering, marketing and disseminating the news." *In re: the Use and Possession of Electronic Devices in the Courthouse*, Misc. No. 03-451 (Order of Feb. 14, 2013) (available at www.pawd.uscourts.gov/Pages/standingorders.htm).  It is self-evident that employees of Zepol or eBay would not be treated as members of the "news media" under such an order, because Zepol and eBay are not within the "ordinary meaning" of "news media."

At least three current Supreme Court Justices have also expressed the opinion that "news media," as used in the public disclosure bar, means something very similar to what the term

means in the FOIA provision quoted above.  Justice Ginsburg, joined by Justices Breyer and Sotomayor, in her dissent in *Schindler*, stated that "[d]isclosures 'of allegations or transactions . . . from the *news* media' . . . share a common core of meaning with disclosures in other sources that involve 'processes of uncovering and analyzing information or . . . the products of those processes.'"  131 S. Ct. at 1897 (quoting 31 U.S.C. § 3730(e)(4)(A) and *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 108 n.6 (2d Cir. 2010)) (emphasis in original).  The *Schindler* majority opinion, while obviously reaching a different ultimate conclusion from Justice Ginsburg, did not take issue with this point.

Thus, all of these sources—dictionaries, Supreme Court opinions, and definitions in other statutes and court orders—demonstrate that the ordinary meaning of "news media" has, as its essential core, some editorial process of selecting or synthesizing information, with the end result being "news" (i.e., something "newsworthy").  While "news media" is not today limited to traditional journalistic endeavors (newspapers, periodicals, or broadcast news programs), those endeavors are the touchstone by which newer, web-based outlets are judged, particularly given that in 1986 those traditional journalistic endeavors truly were *the* "news media."

Applying a definition of "news media" that requires, at a minimum, editorial selection or synthesis provides some meaningful consistency across cases that have considered the issue of whether materials posted online constitute public disclosures.  Defendant relies, for example, on *Repko v. Guthrie Clinic, P.C.*, No. 3:04-cv-1556, 2011 WL 3875987, at *7 (M.D. Pa. Sept. 1, 2011).  That case, however, is entirely consistent with the definition proposed here by CFI. *Repko* held only that "publicly available websites *can* be public disclosures within the meaning of the FCA" and proceeded to consider whether four such websites constituted "news media." 2011 WL 3875987, at *7-8 (emphasis added).  Three of the websites (www.2guidestar.org,

foundationcenter.org, and www.standardandpoors.com) are primarily geared toward compiling and publishing summaries of various organizations or companies, with at least two also disseminating other news articles, press releases, reports, or other relevant information.  *Id*. at *8. The other website (www.bloomberg.com) is the online news source for Bloomberg News, a well-recognized traditional news source.  *Id*.  Thus, all of these websites engaged in editorial selection or synthesis of information, which they presented to their readership as "news."  None are merely portals for searching raw data.

Other courts have considered whether the online content shares characteristics with traditional news sources.  *Simpson*, for example, refused to find that "informal message boards and community forums" on the Internet fell within the definition of "news media," distinguishing online anonymous postings from "a website maintained by a recognized news outlet, a trade journal, or even a promotional website geared toward the dissemination of information."  2013 WL 4710587, at *7.  Employing similar reasoning, *Radcliffe* considered an OxyContin package insert posted on a company web page entitled "News & What's New" to be "a public disclosure in the news media" because "other items on the page resemble press releases."  582 F. Supp. 2d at 772.  Prior to reaching this conclusion, however, *Radcliffe* reasoned that given "the vast array and varying credibility of web pages on the Internet," courts must consider whether a web page "bears any resemblance to a traditional periodical," such that it "would be updated regularly and would disseminate information to the public in a periodic manner" and identify "to the public that it is a place where news or periodical information on a particular topic can be found."  *Id*.

### b.    Zepol Is Not "News Media"

Zepol is a "data broker."  It obtains raw data, uploads that data to its servers, and then sells access to that data in combination with a search tool.  Zepol does not exercise editorial control with respect to the data it makes available.  It does not conduct analysis of the data and

then make that analysis available to the public.  It does not separate and call out the "newsworthy" data from the mass of uninteresting data it maintains.  Rather, it indiscriminately makes all ship manifest data available, and then lets its *customers* do the searching and analyzing.  Zepol is easily distinguished from "news" websites, which also may occasionally make government data or documents available, but that do so only after exercising editorial judgment about which data/documents are "newsworthy" to the readers of that website.  Thus, neither the Zepol database itself nor the type of raw, unanalyzed ship manifest data contained therein, falls within the meaning of "news media."[6]

Victaulic misleadingly characterizes PIERS (an online database similar to Zepol) as a "trade publication" or "trade journal."  *See* Def.'s Br. at 2-4, 12-13, 16, 18.  But Victaulic points to no evidence supporting its characterization of how ship manifest data is submitted to the CBP and/or can be accessed by the public.  Rather, Victaulic cites only to *U.S. ex rel. Doe v. Staples*, No. 08-846, 2013 WL 1192982 (D.D.C. Mar. 22, 2013), and 19 C.F.R. 103.31(a), for its contention that shipping information "is publicly available through a wide variety of trade publications on the internet."  Def.'s Br. at 13.  *Doe* is entitled to no weight: it is not binding on this Court, makes no attempt to define "news media," was wrongly decided, and is currently on appeal.

---

[6]      Another characteristic courts have considered in determining whether a website rises to the level of "news media" is the ease with which information can be obtained from the site.  *See, e.g.*, *Liotine*, 2009 WL 3156704, at *6 n.5 (publication on internal university website was not "news media" given that it required multiple steps to find and was thus not readily accessible); *U.S. ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*, 739 F. Supp. 2d 396, 406-07 (S.D.N.Y. 2010).  Import information like that relied on by CFI can be retrieved from Zepol only via an expensive subscription fee and only by individuals who understand how to search for the data. (Decl., ¶¶ 14-16.)  Such individuals must have sophisticated knowledge of automated ship manifest databases, including bills of lading and the fields populated therefrom, as well as an understanding of the tariff code classification system that comes from experience working with customs data.  (*Id.*)

19 C.F.R. 103.31(a), if anything, weighs against a finding that PIERS or Zepol are "news media." Like the FOIA statute discussed above, 19 C.F.R. 103.31 makes a distinction between (a) summary import/export information and vessel manifests that CBP is required to make accessible to "representatives of the press, including newspapers, commercial magazines, trade journals, and similar publications," and (b) the much more comprehensive raw manifest data acquired by Zepol, PIERS, and other servicers for a fee, which is obtained in the form of daily CD-ROMS extracted directly from the Automated Manifest System. *Compare* 19 C.F.R. 103.31(a) *with* 19 C.F.R. 103.31(e). The latter, the information to which Zepol sells access, is close to the rawest form of data imaginable. Because Zepol exercises no editorial selection or synthesis of that data, it is not "news media."

**c.       eBay Is Not "News Media"**

eBay is an electronic, automated auction platform, through which sellers offer products for sale. It is an online store that does not even select which products to advertise or sell, but rather provides a platform for *others* to act as sellers, in exchange for a cut of the transaction price. Put simply, eBay does not report "news;" all it does is charge fees for use of a platform that others use to sell stuff. Accordingly, eBay is arguably even farther removed from "news media" than Zepol (which at least sells information, even if it does not sell "news").

Nor are the eBay advertisements themselves "news media." A number of cases from other jurisdictions have considered the issue of whether advertisements constitute public disclosures. Most have involved advertisements published in traditional news media sources, such as newspapers or other periodicals. These cases have held that such advertisements are "*from* the news media" and thus public disclosures, reasoning that the FCA "does not require that the information appear in any particular form or section of a newspaper." *U.S. ex rel. Ondis v. City of Woonsocket*, 582 F. Supp. 2d 212, 217 (D.R.I. 2008) (emphasis added); *U.S. ex rel.*

20

*Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 518 (N.D. Tex. 2012) (holding that advertisement appearing in scholarly periodical was public disclosure, but noting that this was a close question and that "this Court is not inclined to conclude that in the age of basement blogging and ease of publishing, *any* medium that disseminates information to the public in a periodic manner is part of the 'news media'"); *U.S. ex rel. Boggs v. Bright Smile Family Dentistry, P.L.C.*, CIV-10-25-L, 2013 WL 1688898, at *6-7 (W.D. Okla. Apr. 18, 2013) (advertisements appearing in magazines are public disclosures).  Because eBay is not itself "news media," the individual advertisements posted by individual sellers on the eBay platform are not *from* a "news media" source like those at issue in these cases.  Accordingly, the information that CFI obtained from eBay was not from "news media."

### d.        Zepol Is Not A "Federal Report"

Contrary to Victaulic's argument, the information that CFI accessed through Zepol was not a "Federal report" within the meaning of 31 U.S.C. § 3730(e)(4)(A)(ii).  Victaulic's theory is that any information submitted by a private party *to* the Government becomes a "Federal report" if that information is then made available by the Government to the public.  *See* Def.'s Br. at 14. In support of that theory, Victaulic cites a single, non-binding case, *Staples*, 2012 WL 1192982.

The holding of *Staples* that the information in PIERS is an "administrative report," *see* 2013 WL 1192982, at *4, is wrong, and cannot be squared with the holding of this Court in *Spay*, in which the Court rejected the argument now made by Victaulic as "tantamount to the claim that everything the government has in its files is public information."  913 F. Supp. 2d at 183.  *Spay* distinguished FOIA accessible information, such as Victaulic's ship manifest data, from the type of official "governmental *response* to a Freedom of Information Act request" that was held in *Schindler*, 131 S. Ct. at 1885, to constitute a "federal report," reasoning:

> To now accept Defendants' theory would mean that by their very act of submitting their allegedly false claim via [reports to the Government], Defendants have effectively shielded themselves from FCA liability through the public disclosure bar.  This clearly cannot be the correct result.

913 F. Supp. 2d at 182-183.

*Schindler* also demonstrates why Victaulic is incorrect.  In *Schindler*, the Court noted that "FOIA requires each agency receiving a request to 'notify the person making such request of [its] determination and the reasons therefor.'"  131 S. Ct. at 1893 (quoting 5 U.S.C. § 552(a)(6)(A)(i)).  It was this "written response to a FOIA request" that the Court held fell "within the ordinary meaning of 'report.'"  *Id.*  The Court then separately considered whether records produced by the agency "along with its written FOIA response" would be part of that "report," and concluded that they would be, reasoning as follows:

> Nothing in the public disclosure bar suggests that a document and its attachments must be disaggregated and evaluated individually.  If an allegation or transaction is disclosed in a record attached to a FOIA response, it is disclosed "in" that FOIA response and, therefore, disclosed "in" a report for the purposes of the public disclosure bar.

*Id.*  Thus, the Court's reasoning was limited to documents produced by the government "attached to a FOIA response."  Indeed, the Court explicitly stated that it did "not decide" the separate question of whether "records released under FOIA, but not attached to a written FOIA response" would "fall within the public disclosure bar."  *Id.* at 1894-95.

In addition to being inconsistent with *Spay* and *Schindler*, Victaulic's argument proves far too much, and would lead to absurd results.  Under Victaulic's theory, for example, every pleading filed by a party in federal court would be a "Federal report" because those pleadings are made available by the Government to the public via PACER.  But that would be inconsistent with the clear statutory intent that filings in federal court are *not* to be considered "public disclosures" unless "the Government or its agent is a party."  31 U.S.C. § 3730(e)(4)(A)(i).

Under Victaulic's theory, the "Federal reports" category would swallow—and render ineffective—the explicit limitation on the "Federal criminal, civil . . . hearing" category.

Here, CFI did not make any FOIA request, and did not review any "report" as that term was defined and applied in *Schindler*. Rather, CFI only reviewed raw data made available by Zepol. Although CFI does not have first-hand knowledge of exactly how Zepol obtains that data, CFI understands that it is obtained in the form of daily CD-ROMS extracted directly from CBP's Automated Manifest System. (Decl., ¶ 12.) Accordingly, the raw data provided by the Government to Zepol, which Zepol then makes available *en masse* to its subscribers, is not a "Federal report" within the meaning of 31 U.S.C. § 3730(e)(4)(A)(ii).

> **3.  Even If Zepol Data And eBay Advertisements Are Both "Public Disclosures," The Public Disclosure Bar Still Does Not Apply Under The Third Circuit's X + Y = Z Analysis**

Even if this Court were inclined to find that the type of data CFI extracted and analyzed could constitute qualifying public disclosures under certain circumstances, they are nevertheless insufficient to trigger the public disclosure bar here because they do not broadcast Victaulic's fraud or plainly reveal its essential elements. *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994). Qualifying public disclosures bar a *qui tam* complaint only if they rise to the level of "allegations or transactions." *Paranich*, 396 F.3d at 334. This standard is expressed through an algebraic formula intended to "represent the nature and extent of the disclosure required" to trigger the bar:

> [I]f X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed. To draw an inference of fraud, both a misrepresented [X] and a true [Y] state of facts must be publicly disclosed. So, if either Z (fraud) or both X (misrepresented facts) and Y (true facts) are disclosed by way of a listed source, then a relator is barred from bringing suit under § 3730(e)(4)(A) unless he is an original source.

23

*U.S. ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 519 (3d Cir. 2007) (citing *Springfield*, 14 F.3d at 654).

Thus, Victaulic must either identify a prior publicly disclosed allegation that Victaulic committed fraud on the Government by failing to pay marking duties owed ("Z") *or* Victaulic must point to qualifying public disclosures showing *both* that Victaulic misrepresented its compliance with country-of-origin marking requirements ("X") *and* that Victaulic was not properly marking its imported fittings ("Y").  Victaulic does not assert that its knowing failure to pay marking duties (the "Z") was publicly disclosed in any medium whatsoever.  Nor does Victaulic contend that the "X" element—Victaulic's falsified entry documents—have been publicly disclosed.

To CFI's knowledge, Victaulic's entry documents are not accessible via Zepol, PIERS, or any other public source, and Victaulic does not argue otherwise.  (Decl., ¶ 13.)  Rather, it is only due to CFI's knowledge and expertise regarding CBP's operations that CFI is able to allege in good faith that Victaulic falsified its entry documents.  (*Id*. at ¶¶ 45-48.)

Victaulic simply assumes incorrectly that "CFI's only sources for the allegation that Victaulic made [false representations on its custom's entry forms] are unsupported inferences drawn from public manifest data enclosed in Exhibit A."  Def.'s Br. at 13.  Focusing solely on the ship manifest data appended to the Complaint, Victaulic discounts all of CFI's other allegations—including that Victaulic did not properly mark its imports and yet nevertheless falsified its entry documents—as "unsupported conclusory allegations."  *Id*.  At most, however, the ship manifest data discloses only part of one element (the "Y") in the above equation.  As Victaulic acknowledges, the other equally significant part of the "Y" element—that these imports were not properly marked—cannot be derived from this ship manifest data alone.  *See*

24

Def.'s Br. at 6-7 (arguing that Victaulic's failure to mark "simply does not follow" from knowledge of the Tariff Act and the amount of Victaulic's imports).  Rather, as explained above, CFI arrived at this conclusion based on CFI's multi-faceted and unique investigation revealing a significant discrepancy between Victaulic's large import amounts and the prevalence (or lack thereof) of country-of-origin markings on the Victaulic pipe fittings for sale on eBay.

A helpful analogy can be found in *Springfield*, 14 F.3d at 645, the case that first adopted the X + Y = Z test.  *Springfield* involved a company *qui tam* plaintiff, who alleged that an arbitrator appointed by a governmental agency to resolve a labor dispute between the company and its union had fraudulently billed the agency for services not actually rendered.  *Id*. at 647. The company suspected the arbitrator's fraud after reviewing his pay vouchers, disclosed in discovery, seeking compensation for days on which the company did not believe the arbitrator had worked.  *Id*. at 648.  The company confirmed its suspicions by calling several telephone numbers also listed in discovery documents, which revealed that the arbitrator had fraudulently billed the government for time the arbitrator had spent at a conference.  *Id*.  The district court dismissed the company's *qui tam* complaint under the public disclosure bar on the basis that the arbitrator's pay vouchers and telephone records had been publicly disclosed.  *Id*.

Although recognizing that the pay vouchers and phone records had been produced in discovery and that the pay vouchers were "already in the government's pocket," the D.C. Circuit reversed, reasoning that these records at most "provided a convenient vehicle by which [the company], already suspicious because of its personal experience with the arbitration, could pursue its independent investigation."  *Id*. at 656.  Cautioning that the FCA "bars suits based on publicly disclosed 'allegations or transactions,' not information," the D.C. Circuit explained:

> Many potentially valuable qui tam suits would be aborted prematurely by a
> reading of the jurisdictional provision that barred suits when the only publicly

disclosed information was itself innocuous.  In terms of the mathematical illustration, when X by itself is in the public domain, and its presence is essential but not sufficient to suggest fraud, the public fisc only suffers when the whistle-blower's suit is banned.  When X and Y surface publicly, or when Z is broadcast, however, there is little need for qui tam actions."

*Springfield*, 14 F.3d at 653-654.

As in *Springfield*, the information in the public domain here—the raw Zepol data and the eBay advertisements—did not, by themselves, "present so clear or substantial an indication of foul play as to qualify as either an allegation of fraud or a fraudulent transaction upon which a *qui tam* suit could be based."  *Id*. at 656.  Indeed, nothing about that information, in and of itself, disclosed that Victaulic falsified entry documents, or even that Victaulic imported unmarked fittings.  Victaulic, in fact, recognizes that "a review of Exhibit A [of the Complaint] plausibly supports the inference that Victaulic accurately completed its entry documents and marked its imported pipefittings."  Def.'s Br. at 4.  Thus, under the X + Y = Z formulation, there was no "public disclosure" of the "allegations or transactions" at issue in this case, *even if* Zepol or eBay could be considered "news media" or "Federal reports."

### 4.    Finding That The Public Disclosure Bar Does Not Apply Here Is Consistent With The FCA's Statutory Purpose

The Supreme Court has recognized that the purpose of the public disclosure bar is "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits."  *Graham County*, 559 U.S. at 281 (quoted in *Schindler*, 131 S. Ct. at 1894).  *Schindler* discusses what would make a lawsuit "parasitic," namely where a relator is merely alleging a fraud that "anyone could identify" from a few publicly disclosed materials.  131 S. Ct. at 1894.  In other words, as the Third Circuit has instructed, information will be considered publicly disclosed within the meaning of the FCA where is it both found in an enumerated category and sufficiently public such that it "would have been equally available to strangers to the fraud

transaction had they chosen to look for it as it was to the relator.  Whether a disclosure is 'public' is a determination influenced significantly by the specific source or context of the disclosure and the particular facts of each case."  *Paranich*, 396 F.3d at 333 (quoting *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.* 944 F.2d 1149, 1155-56 (3d Cir. 1991)).

The fraud alleged by CFI is not self-evident from either the Zepol data or the eBay advertisements.  Rather, only the synthesis of the two sources, plus the application of CFI's specialized knowledge and experience, revealed Victaulic's fraud.  Contrary to Victaulic's suggestion, no typical stranger would have been able to conduct the complex and unique analysis performed by CFI here.  This Court will not be opening the flood gates to a wave of "parasitic" litigation by finding that Zepol and eBay are outside the scope of the enumerated categories of "public disclosure."  Quite the contrary, the Court will be *encouraging* "private persons to root out fraud," which is the primary goal of the qui tam provision of the FCA.  *Graham County*, 559 U.S. at 281.

C.    **Contrary To Victaulic's Argument, CFI Contributed Sufficient "Independent Knowledge" To Qualify As An Original Source**

If the Court agrees with the above analysis, and finds that the public disclosure bar does not apply, then it need not reach this issue.  As amended by the PPACA, the original source exception requires that a relator have "knowledge that is independent of and materially adds to the publicly disclosed allegations and transactions."  31 U.S.C. § 3730(e)(4).  By eliminating the prior requirement that an original source have "direct and independent" knowledge of publicly disclosed allegations, PPACA expanded this exception.  The purpose, however, remains to achieve "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute on their own."  *Springfield*, 14 F.3d at 649.

27

Although CFI may not be a traditional corporate insider, the Third Circuit has explained that "neither the text of the FCA nor its legislative history suggests that non-insiders should never be able to bring qui tam actions." *Atkinson*, 473 F.3d at 523 n.23; *see also Kennard*, 363 F.3d at 1044-45.  Indeed, the Third Circuit has expressly "decline[d] to adopt a rigid rule that consultation with public documents automatically disqualifies a relator from being an original source," explaining that "[s]ome reliance on public records or information is acceptable and, indeed, it is hard to imagine that a non-insider could ever obtain original source status without *at least* some consultation of publicly available information." *Atkinson*, 473 F.3d at 522-23 (emphasis added).  Instead, the Third Circuit instructed:

> [I]n deciding whether a relator's reliance on public records bars him from being an original source under § 3730(e)(4)(B), courts should consider both the availability of the information and the amount of labor and deduction required to construct the claim.  The more obscure the records and the more significant the investigative input of the relator, the more likely it is that granting original source status will fulfill the FCA's twin goals of rejecting suits which the government is capable or pursuing itself, while promoting those which the government is not equipped to bring on its own.

*Id*. at 522 (internal quotations and citations omitted).

Here, the scattered nature of the numerous data points on which CFI relied, combined with the expense and time required to obtain them and the high level of industry knowledge required to discern their relationship, plainly demonstrates that this is not the type of case the Third Circuit envisioned when cautioning courts to be mindful of cases based only on "secondhand information, speculation, background information or collateral research."  *Id*. at 523 (quoting *U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.,* 190 F.3d 1156, (10th Cir. 1999)).  CFI's allegations do not merely "echo material widely available and publicly disclosed," as was the case in *Repko*.  2011 WL

3875987, at *16.  Rather, CFI's investigation is analogous to the one at issue in *Kennard*, an opinion that was cited approvingly by the Third Circuit.  *See Atkinson*, 473 F.3d at 522-23.

*Kennard* involved an individual, Mr. Wright, who speculated that an oil and gas operator on his property was underpaying royalties to him and others, including a Native American Tribe that received its payments via a U.S. government agency.  363 F.3d at 1040-41.  Mr. Wright and a colleague set out to verify their suspicions through an investigation of public records.  *Id*. at 1041.  Based on this investigation and the relators' "extensive oil and gas experience," the relators were able to conclude, after consultation with attorneys, that the operator was committing fraud in violation of the FCA.  *Id*.

Distinguishing cases "based solely on the labor of others" from the *Kennard* relators who "conducted their own investigation and crafted their own claim of the fraud on the Government," the Tenth Circuit held that Mr. Wright and his colleague "were not just assemblers of information," but rather that their case "would not exist but for Relators sniffing it out."  *Id*. at 1045-46.  The Tenth Circuit thus reasoned, "[t]hrough discovery and deduction, Relators ferreted out the alleged fraud in this case and must, therefore, qualify as an original source."  *Id*. at 46; *see also Springfield*, 14 F.3d at 657 (relator was an original source because he "started with innocuous public information [and] completed the equation with information independent of any preexisting public disclosure").

The same is true with CFI.  Like in *Kennard*, CFI's "claim did not derive from a third party's research and investigation."  *See* 363 F.3d at 1046.  Instead, CFI "sorted through relatively obscure [ship manifest data] and, together [with a review of eBay advertisements and physical Victaulic pipe fittings], used [this information] to discover and support their claim of

the alleged fraud." *See id*.  CFI did not merely "attach a legal label to a fraud already noticed in the public domain" or "translate an already publicly disclosed fraud." *See id*. at 1045-46. Importantly, as in *Kennard*, none of the sources used in CFI's import analysis or its product study independently disclosed any fraud. *See id*. at 1046.  Rather, "[i]t was only through independent investigation, deduction, and effort that [CFI] discovered [Victaulic's] fraud." *See id*.  Thus, like the relators in *Kennard*, CFI should be held to have "direct and independent knowledge of the fraud allegedly committed since [CFI is] responsible for ferreting it out in the first place." *See id*. (quoting *U.S. ex rel. Holmes v. Consumer Ins. Group*, 318 F.3d 1199, 1207 (10th Cir. 2003)); *see also U.S. ex rel. Lamars v. City of Green Bay*, 168 F.3d 1013 (7th Cir. 1999).

### III.   The Complaint States A Claim Under The False Claims Act; Therefore, Dismissal Under Fed. R. Civ. P. 12(b)(6) Is Not Warranted

#### A.   Contrary To Victaulic's Contention, A Complaint Under The False Claims Act Need Not Plead "Facts" Beyond Those Necessary To State A Claim

Victaulic asks the Court to dismiss the Complaint "because it lacks factual allegations" that "support" the allegations that Victaulic did not mark its pipe fittings with country of origin, and that Victaulic acted knowingly.  *See* Def.'s Br. at 17-21.  Victaulic concedes, as it must, that the Complaint *directly alleges* such a knowing failure to mark, but argues that such direct factual allegations—without some unspecified amount of additional *indirect* factual allegations—are not enough to satisfy the "short and plain statement" requirement of Fed. R. Civ. P. 8.

Victaulic's argument is contrary to the standards that apply to motions under Fed. R. Civ. P. 12(b)(6).  Under that rule, "a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted." *Spay*, 913 F. Supp. 2d at 142.  "Except as provided in Federal Rule of Civil Procedure 9, a complaint is sufficient if it complies with Rule 8(a)(2), which requires 'a short and plain statement of the claim showing that the pleader is

entitled to relief.'  Rule 8(a)(2) does not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *U.S. ex rel. Dale v. Abeshaus*, 06-CV-04747, 2013 WL 5379384, at *3 (E.D. Pa. Sept. 26, 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "In determining whether a complaint is sufficient, the court must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief."  *Id.* (citing *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)).  "A well-pled complaint may not be dismissed simply because 'it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id*. at *4 (quoting *Twombly,* 550 U.S. at 556).

Here, Victaulic makes two arguments under Rule 12(b)(6).  First, Victaulic argues that the Complaint fails to "allege facts supporting" the factual contention that Victaulic imported pipe fittings that were not marked with country of origin.  Def.'s Br. at 18.  Second, Victaulic argues that the Complaint fails to "plead factual allegations" sufficient to support the "knowledge" element of the claim.  Def.'s Br. at 20.  Both arguments hinge on the contention that Plaintiff has not alleged enough *evidence* in the Complaint, and thus are incorrect.

### 1.   The Complaint Directly Alleges That Victaulic Imported Unmarked Pipefittings, And Plaintiff Need Not Allege All Of The Evidence In Support Of That Direct, Factual Allegation

The central factual allegation of this case is very simple:  Victaulic has imported huge quantities of pipe fittings from its foreign factories, but has not marked those pipe fittings with country of origin.  This allegation is laid out in Paragraphs 23-25 of the Complaint.  Because this is a *factual* allegation, rather than a legal assertion, it must be accepted as true at this stage.  Thus, Victaulic is left to argue that CFI has not included "any factual allegations in support" of the contention that Victaulic did not mark its pipe fittings with country of origin.  *See* Def.'s Br.

31

at 18.  But that amounts to a request that CFI plead the *evidence* that supports the *factual allegations* already included in the Complaint.  That is contrary to the standards that apply to Rule 12(b)(6) motions to dismiss, as stated above.

Moreover, this is not a case where the connection between the factual allegations and the legal theories is complex or difficult to understand.  Either Victaulic marked its imported pipe fitting with country of origin, or it did not.  CFI claims that it did not, and if CFI proves this allegation, then it likely wins the case.  While Victualic is free to deny the allegation (if it has a good faith basis for doing so), Victaulic cannot plausibly claim that it does not understand or have fair notice of the nature of CFI's claim.

### 2.    The Complaint Sufficiently Alleges That Victaulic's Failure To Mark Its Imported Pipe Fitting With Country Of Origin Was Knowing

To prevail in this case, CFI will need to prove that Victaulic acted "knowingly" when it imported pipe fittings that were not marked with country of origin.  But CFI need not prove intentional fraud, because the FCA defines "knowingly" to mean both "deliberate ignorance of the truth or falsity of the information" and "reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1).  The FCA also explicitly states that "no proof of specific intent to defraud" is required to establish liability.  *Id.*  Accordingly, CFI need only prove that Victaulic acted with "reckless disregard" of the country-of-origin marking requirements.  By definition, a major manufacturer and importer such as Victaulic is expected to know of, and comply with, those marking requirements, which are themselves crystal clear.  (Decl. ¶ 4.)  Thus, CFI's theory of scienter in this case is straightforward and easily proven.

Yet, Victaulic argues that CFI has failed "to plead factual allegations making plausible the notion that Victaulic had the requisite scienter."  Def.'s Br. at 20.  To support that argument, Victaulic creatively invents a new rule:  that complaints under the FCA must identify, by name,

specific individuals within a company that had the requisite "knowledge." *Id.* at 20-12.  Under

that proposed new rule, a corporation would be insulated from liability for even the most blatant,

obvious fraud on the Government if the relator (or the Government itself in an intervened case)

did not know the names of the individuals within the company responsible for the fraud.  Not

surprisingly, Victaulic is unable to cite to any case that has actually applied such a rule.

Victaulic relies on *U.S. ex rel. Washington v. Educ. Mgmt. Corp.*, 871 F. Supp. 2d 433

(W.D. Pa. 2012).  But that case rejected the defendants' arguments, and held that a complaint

under the FCA need *not* allege that a "single actor" within a corporate defendant both committed

the fraudulent act and had the requisite scienter.  *Id.* at 452 (rejecting the "proposition that the

individual corporate officer making the statement must have the requisite scienter").  The court

did not hold that a complaint must allege the names of specific corporate employees involved in

the fraud.  The court did note that scienter may not be based on a "collective knowledge" theory,

which it defined as "'piecing together scraps of "innocent" knowledge held by various corporate

officials, even if those officials never had contact with each other or knew what others were

doing in connection with a claim seeking government funds.'" *Id.* (quoting *U.S. v. Science

Applications Int'l Corp.,* 626 F.3d 1257, 1275 (D.C. Cir. 2010)).  But the court then stated that

"the Complaints in this case do not attempt to establish scienter based on collective, innocent

knowledge."  *Id.*  And the court again quoted *Science Applications* for the proposition that the

FCA definition of "knowingly"—which includes "reckless disregard," 31 U.S.C. § 3729(b)(1)—

"was intended 'to capture the ostrich-like conduct which can occur in large corporations where

corporate officers insulate themselves from knowledge of false claims submitted by lower-level

subordinates.'"  *Id.* (quoting *Science Applications*, 626 F.3d at 1274).

In rejecting defendants' arguments, the court in *Education Management Corp.* also noted that "[p]ursuant to Fed. R. Civ. P. 9(b), scienter may be plead 'generally.'"  871 F. Supp. 2d at 453; *see* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").  "Thus, all elements of [a relator's] FCA claim . . . must be pleaded with particularity except the knowledge with which [defendant] is alleged to have committed the offending acts."  *U.S. ex rel. Gibbons v. Kvaerner Philadelphia Shipyard, Inc.*, CIV.A. 05-685, 2006 WL 328362, at *6 (E.D. Pa. Feb. 10, 2006).  Victaulic's argument that a relator must allege the names of particular persons inside a corporation who are responsible for FCA violations cannot be squared with this plain text of Rule 9(b).  Because a relator is permitted to allege "knowledge" under the FCA "generally," CFI's general allegations that Victaulic acted "knowingly" (an allegation that makes perfect sense in the context of the other allegations of the case) must be sufficient to survive a motion to dismiss.

**B.**   **Victaulic's Passing Argument That Marking Duties Are Not Covered By The False Claims Act Is Incorrect**

Victaulic contends that a failure to pay marking duties cannot give rise to liability under the reverse-false-claims provision of the FCA, arguing that marking duties "are potential penalties for making a false statement, not established duties that are avoided by the false statement."  Def.'s Br. at 22.  If Victaulic believed this argument had merit, one would expect it to be the lead point in Victaulic's brief, since—if correct—it would be fatal to CFI's claims.  Instead, Victaulic reaches this argument on page 22 of its brief, and devotes less than a page to it.  Why?  Because Victaulic's argument is inconsistent with the plain language of both the Tariff Act and the FCA.

The Tariff Act explicitly states that marking duties are *not* "penalties," but instead are duties.  The Tariff Act provides that goods not properly marked with their country of origin are

subject to marking duties in the amount of "10 per centum ad valorem, which shall be deemed to have accrued at the time of importation, *shall not be construed to be penal*, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause."  19 U.S.C. § 1304(i) (emphasis added).

Moreover, even if—contrary to the text of the Tariff Act—one could conclude that marking duties are "penalties," they still fall within the scope of the reverse-false-claims provision of the FCA, 31 U.S.C. § 3729(a)(1)(G).  When passing the Fraud Enforcement and Recovery Act of 2009 ("FERA"), which amended the reverse-false-claims provision, Congress reaffirmed that customs duties generally—*and marking duties specifically*—are recoverable through the FCA.  Indeed, the legislative history of FERA makes clear that the Act's reverse-false-claim provision, which Congress first added to the statute in 1986, was *always* intended to cover unpaid marking duties.  Indeed, one of FERA's purposes was to overrule *American Textile Manufacturers Inst. v. The Limited, Inc.*, 190 F.3d 729 (6th Cir. 1999) ("*ATMI*"), which incorrectly held that claims for customs duties, including unpaid marking duties, were not within the scope of the reverse-false-claims provision.  In Congress's view, the Sixth Circuit had incorrectly "narrowly defined the term 'obligation' to apply reverse false claims to only fixed obligations."  S. Rep. No. 111-10, at n.10 (2009).

With FERA, Congress expressly defined "obligation" in a way intended to overrule *ATMI*.  "Obligation" is now explicitly defined to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).  As the Senate Judiciary Committee

report accompanying FERA explained, Congress viewed *ATMI* as an aberrational, incorrect

interpretation of the FCA, as it had stood since 1986:

> The term "obligation" is now defined . . . and includes fixed and contingent duties owed to the Government—including fixed liquidated obligations such as judgments, and fixed, unliquidated obligations such as tariffs on imported goods. It is also noteworthy to restate that while the new definition of "obligation" expressly includes contingent, non-fixed obligations, the Committee supports the position of the Department of Justice that current section 3729(a)(7) "speaks of an 'obligation,' not a 'fixed obligation.'" By including contingent obligations such as, "implied contractual, quasi-contractual, grantor-grantee, licensor-licensee, fee-based, or similar relationship," this new section reflects the Committee's view, held since the passage of the 1986 Amendments, that an "obligation" arises across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that "results in a duty to pay the Government money, whether or not the amount owed is yet fixed."

S. Rep. No. 111-10, at 14 (2009).

An earlier draft of FERA, in fact, expressly included "customs duties for mismarking

country of origin" within that definition.[7]  S. Rep. No. 110-507, at 18, 34 (2008) ("The new

'obligation' also includes 'customs duties for mismarking country of origin,' a singular type of

obligation that is specific and not a general class of obligations.  The Committee included this

provision in response to the decision in [*ATMI*]").  "After subsequent discussion with the

Department of Justice," however, "the Committee decided to remove the 'customs duties'

language," explaining that it "believ[ed] that customs duties clearly fall within the new definition

of the term 'obligation' absent an express reference and any such specific language would be

---

[7]     This earlier draft defined the term "obligation" to mean "a fixed duty, or a contingent duty arising from an express or implied contractual, quasi-contractual, grantor-grantee, licensor-licensee, fee-based, or similar relationship, including customs duties for mismarking country of origin, and the retention of any overpayment."  S. Rep. No. 110-507, at 34 (2008).

unnecessary." S. Rep. No. 111-10, at n.10 (2009). In other words, Congress intended the new statutory definition of "obligation" to include marking duties and expressed its view that this definition had been the proper interpretation of the reverse false claims provision since it was enacted in 1986.

Thus, pursuant to the plain language of the Tariff Act, and the plain language and legislative history of the FCA, evasion of marking duties is actionable under 31 U.S.C. § 3729(a)(1)(G). Victaulic's argument to the contrary is meritless.

## IV.   The Complaint Satisfies The "Particularity" Requirement Of Fed. R. Civ. P. 9(b)

A complaint alleging a claim under the FCA "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). From that general requirement to plead "circumstances," Victaulic attempts to draw a series of other, more specific, requirements—which it casts as hard-and-fast rules of pleading. In so doing, Victaulic relies upon a small number of carefully selected, non-binding, decisions from other courts.

What Victaulic ignores is the well-developed body of case law from *this* Court, addressing the meaning of Rule 9(b) in the context of FCA cases. The Third Circuit has stated that "[t]he purpose of Rule 9(b) is to provide notice, not to test the factual allegations of the claim." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.,* 331 F.3d 406, 414 n.2 (3d Cir. 2003). And in numerous cases, various Judges of this Court have emphasized the flexible nature of a Rule 9(b) analysis, and focused on the fundamental question of whether the complaint gives a defendant sufficient notice of the misconduct with which it is charged.

For example, in *U.S. v. Torkelsen*, CIV.A. 06-05674, 2007 WL 4245736, at *5 (E.D. Pa. Dec. 3, 2007), the Court rejected precisely the formulaic approach advocated by Victaulic, describing the correct approach as follows:

Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead, with particularity, the circumstances of the alleged fraud, in order to place the defendants on notice of the precise misconduct with which they are charged. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir. 1984). Allegations of "date, place, or time fulfill these functions but nothing in the rule requires them." *Id.* Furthermore, courts must be sensitive to situations in which sophisticated defrauders may successfully conceal the details of their alleged fraud. *Id.* Courts should not focus exclusively on Rule 9(b)'s particularity language because this is "too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." *Christidis v. First Pa. Mortgage Trust,* 717 F.2d 96, 100 (3d Cir. 1983) (citation omitted).

Similarly, in *Spay v. CVS Caremark Corp.*, the Court again rejected a "date, time, and place" requirement, instead opting for "simplicity and flexibility" in applying Rule 9(b):

> The standard for 9(b) is a generous one in this Circuit, *Blue Line Coal Co. v. Equibank,* 683 F. Supp. 493, 497 (E.D.Pa. 1988) (quotations omitted), and the Third Circuit Court of Appeals has cautioned that "focusing exclusively on [Rule 9(b)'s] particularity language "is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." *Christidis v. First Pa. Mortgage Trust,* 717 F.2d 96, 100 (3d Cir. 1983) (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1298, at 407 (1969)). Rule 9(b) does not require date, time, and place allegations, provided that the plaintiff gives the defendants other means of precision and substantiation. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir. 1984).

913 F. Supp. 2d at 174.

And just last month, yet another Judge of this Court explained that "[g]enerally, the heightened standard of pleading requires specifying the time, place and substance of the defendant's alleged misconduct," but that "[a]lternately, a plaintiff may 'use an alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Dale*, 2013 WL 5379384 at, *10-11 (E.D. Pa. Sept. 26, 2013) (quoting *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir. 1998)).

Under these standards, CFI's Complaint complies with Rule 9(b). The Complaint does not have hundreds of paragraphs of detailed allegations. But that is because the fraudulent scheme that CFI is alleging is so simple and easily described. The Complaint alleges that

Victaulic has imported vast quantities of pipe fitting from various countries, and with respect to the two countries of origin accounting for the majority of those imports—China and Poland—the Complaint even provides a detailed listing of the dates and amounts of those imports. *See* Compl., ¶¶ 23-24 & Exhibit A thereto. The Complaint alleges that, in connection with those imports, Victaulic violated the False Claims Act by, among other things, falsifying entry documents. Compl., ¶ 26. And the Complaint identifies at least one of those entry documents, namely, CBP Form 7501, *see id.*, ¶ 20, which Victaulic necessarily would have submitted in connection with each of its imports, including the ones identified in Exhibit A of the Complaint.

The details that Victaulic argues are missing from the Complaint are simply window-dressing that Victaulic itself can easily determine without CFI's help. For example, Victaulic suggests that it should be fatal to CFI's claim that the Complaint does not include "the name of Victaulic's shipping agent, much less the name of an individual that was involved in completing or submitting the CBP forms at issue." Def.'s Br. at 25. But those details go beyond even what CFI would need to *prove at trial*, let alone what is needed at the pleading stage. If Victaulic's CBP forms were falsified, and if that falsification led to Victaulic avoiding the payment of marking duties, then it makes no difference who Victaulic's shipping agent was, or which individual completed the CBP forms.

And, in any event, those details surely are within Victaulic's knowledge already. In this regard, the following passage from *U.S. ex rel. Atkinson v. PA. Shipbuilding Co.*, is apt:

> As has been recognized by our Court of Appeals . . . most purveyors of fraud—and especially those who engage in fraudulent activities within the corporate sphere—are consciously and vigilantly engaged in an effort to disguise the nature of their endeavors. *See Craftmatic Secs. Litig. v. Kraftsow,* 890 F.2d 628, 645 (3d Cir. 1989) (explicitly noting that "sophisticated defrauders" can be expected to attempt to "conceal the details of their fraud"). Accordingly, in order to legally account for this facet of real world experience, Rule 9(b)'s particularity requirement is properly

relaxed "when factual information [regarding the defendant's conduct] is peculiarly within the defendant's knowledge or control." *Id.*

255 F. Supp. 2d 351, 407 (E.D. Pa. 2002).

Accordingly, even if the name of Victaulic's shipping agent, or the names of Victaulic's employees who completed the falsified CBP forms, were facts necessary to prove CFI's case (which they are not), because such facts are peculiarly within Victaulic's control, they would not need to be alleged in the Complaint.  In short, Victaulic's Rule 9(b) arguments are a smoke screen.  Victaulic is "on notice of the precise misconduct" with which it is charged.  *Torkelsen*, 2007 WL 4245736, at *5.  It cannot demand more at the pleading stage.

## CONCLUSION

For all the reasons stated above, the Court should deny the Motion to Dismiss.


Dated:  October 24, 2013                          Respectfully submitted,


                                                   /s/ Suzanne Ilene Schiller
                                                  Suzanne Ilene Schiller
                                                  Manko, Gold, Katcher, Fox LLP
                                                  401 City Ave., Suite 500
                                                  Bala Cynwyd, PA 19004
                                                  (484) 430-2359
                                                  tkantorczyk@mgkflaw.com

                                                  Jonathan K. Tycko (*admitted pro hac vice*)
                                                  Anna C. Haac (*admitted pro hac vice*)
                                                  Tycko & Zavareei LLP
                                                  2000 L Street, N.W., Suite 808
                                                  Washington, D.C. 20036
                                                  (202) 973-0900
                                                  (202) 973-0950 (fax)
                                                  jtycko@tzlegal.com
                                                  ahaac@tzlegal.com

                                                  *Counsel for Relator Customs Fraud
                                                  Investigations, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing Plaintiff's Memorandum of Points and Authorities in

Opposition to Defendant's Motion to Dismiss and attached Declaration of Rebecca L. Woodings

with exhibits were served on all counsel of record via the Court's electronic filing system on

October 24, 2013.


  /s/ Jonathan K. Tycko
Jonathan K. Tycko