IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :     CIVIL ACTION
*ex rel.* CUSTOMS FRAUD        :
INVESTIGATIONS, LLC           :
                              :
        v.                    :
                              :
                              :
VICTAULIC COMPANY             :     NO. 13-2983


MEMORANDUM

McLaughlin, J.                          September 4, 2014

        The plaintiff, Customs Fraud Investigations, LLC

("CFI") brings this action against the defendant, Victaulic

Company ("Victaulic"), to recover damages and civil penalties on

behalf of the United States as a *qui tam* relator pursuant to the

False Claims Act, 31 U.S.C. §§ 3729, et seq. ("FCA").  Victaulic

is a producer of iron and steel pipe fittings manufactured in

the United States, China, Poland, and Mexico.  CFI is a company

that conducts research and analysis related to potential customs

fraud.  CFI alleges that Victaulic has violated the FCA by

failing to mark or mismarking its foreign-made pipe fittings as

required under the United States Tariff Act of 1930 ("Tariff

Act"), 19 U.S.C. §§ 1304(a) and (c), and by falsifying customs

entry documents, to avoid an obligation to pay "marking duties"

due on mismarked or unmarked foreign products under 19 U.S.C.

§ 1304(i).

CFI filed its one-count complaint in this Court on May 30, 2013.  On August 7, 2013, the United States declined to intervene or enter its appearance in the case, and the complaint was unsealed.  Victaulic has moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), on the grounds that § 3730(e)(4)(A) of the FCA requires dismissal of a private enforcement action based on publicly disclosed allegations or transactions of fraud.

Victaulic has also moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that (1) the failure to mark goods or to pay marking duties under the Tariff Act does not give rise to a claim under the FCA; and (2) even if these actions do give rise to a claim under the FCA, CFI has failed to state a claim for such a violation under either Rule 8(a) or Rule 9(b) of the Federal Rules of Civil Procedure.

Because the Court finds that CFI has failed to allege facts sufficient to support its allegations that Victaulic failed to mark its imported pipe fittings, or knowingly concealed or avoided any obligation to pay marking duties, the complaint will be dismissed with prejudice.

I.   <u>Factual Background</u>[1]

   A.   <u>Marking Duties Under the Tariff Act</u>

      The Tariff Act requires that, with some exceptions,
"every article of foreign origin . . . imported into the United
States shall be marked in a conspicuous place as legibly,
indelibly, and permanently as the nature of the article . . .
will permit in such manner as to indicate to an ultimate
purchaser in the United States the English name of the country
of origin of the article."  19 U.S.C. § 1304(a).

      The Act further provides that, with few exceptions,
". . . pipes of iron, steel, or stainless steel, to pipe
fittings of steel, stainless steel, chrome-moly steel, or cast
and malleable iron . . . shall be marked with the English name
of the country of origin by means of die stamping, cast-in-mold
lettering, etching, engraving, or continuous paint stenciling."

---

      [1]   The facts set forth herein are taken not only from the
complaint, but also from the much more detailed factual
allegations and explanations provided by the plaintiff in
connection with its briefing to the motion to dismiss and at the
January 23, 2014 hearing on the motion.  As the Court explained
at the hearing, the Court does not consider these additional
facts in assessing the sufficiency of the complaint itself, but
will consider these facts in determining (1) whether this action
should be dismissed under the public disclosure bar of the False
Claims Act; or (2) whether, having dismissed the original
complaint, the Court should grant CFI leave to file an amended
complaint containing these additional factual allegations.  Hr'g
Tr. 4, 6 (Doc. No. 28).

19 U.S.C. § 1304(c)(1).  Because imported pipe fittings should bear country-of-origin markings that conform to one of the five methods listed above, unmarked pipe fittings are generally presumed in the industry to be U.S.-made.  Woodings Decl. ¶ 45 (Doc. No. 18-1).

If imported goods are not marked with the country of origin in the prescribed manner, additional payments known as "marking duties" may be due under 19 U.S.C. § 1304(i), which states:

> If at the time of importation any article . . . is not marked in accordance with the requirements of this section, and if such article is not exported or destroyed or the article . . . marked after importation in accordance with the requirements of this section (such exportation, destruction, or marking to be accomplished under customs supervision prior to the liquidation of the entry covering the article, and to be allowed whether or not the article has remained in continuous customs custody), there shall be levied, collected, and paid upon such article a duty of 10 per centum ad valorem, which shall be deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause. Such duty shall be levied, collected, and paid in addition to any other duty imposed by law and whether or not the article is exempt from the payment of ordinary customs duties.

19 U.S.C. § 1304(i).

Despite the statutory language directing that marking duties "shall be deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not

4

be remitted wholly or in part nor shall payment thereof be
avoidable for any cause," it is not clear at precisely what
point in time marking duties become due and owing.  At the
motion hearing, the parties agreed that marking duties are not
necessarily due at the time the unmarked foreign goods cross
into the United States; instead, such duties become due if the
goods are not subsequently marked, immediately exported, or
destroyed.  Hr'g Tr. 17-18,23, 25-27.  The parties also agreed
that if the marking failure is discovered by the United States
Bureau of Customs and Border Protection ("CBP") before the goods
leave the custody of CBP, marking duties cannot be paid in lieu
of properly marking the goods; instead, marking duties generally
are levied if the goods leave CBP custody unmarked, and the
marking failure is discovered after the fact.  Hr'g Tr. 17-18,
23, 25-27; Woodings Decl. ¶ 47.[2]

---

[2]   The Court notes that other language in the Tariff Act and
related Customs regulations supports the conclusion that marking
duties – although "deemed to have accrued at the time of
importation" – do not become due until the articles leave CBP
custody unmarked, at the earliest.  Other language also suggests
that, under some circumstances, marking duties might be paid in
lieu of marking.
    For example, 19 U.S.C. § 1304(j) states that "[n]o imported
article held in customs custody for inspection, examination, or
appraisement shall be delivered until such article . . . ,
whether or not released from customs custody, shall have been
marked in accordance with the requirements of this section <u>or</u>
until the amount of duty estimated to be payable under
subsection (i) of this section has been deposited." (emphasis

B.   <u>Allegations in the Complaint</u>

The allegations in the complaint itself are limited and conclusory.  CFI alleges generally that Victaulic has knowingly failed to mark its imported pipe fittings with country-of-origin markings, in violation of the Tariff Act.  CFI also alleges that Victaulic has knowingly concealed the true origin of its pipe fittings, and falsified customs entry documents, both to avoid paying customs marking duties and so that it can pass off its foreign pipe fittings as U.S.-made, to command the higher price generally paid for domestic-made pipe fittings.  Compl. ¶ 45.[3]

---

added).  <u>See also</u> 19 C.F.R. § 134.2 ("Articles not marked as required . . . shall be subject to additional duties of 10 percent of the final appraised value <u>unless</u> exported or destroyed under Customs supervision prior to liquidation of the entry . . . .") (emphasis added); 19 C.F.R. § 134.3(a) ("Any imported article . . . held in CBP custody . . . will not be delivered until marked with its country of origin, <u>or</u> until estimated duties payable . . . or adequate security for those duties . . . are deposited.") (emphasis added).  <u>Cf.</u> 19 C.F.R. §§ 134.54(a)&(c) ("If . . . the importer does not properly mark or redeliver all merchandise previously released to him, the port director shall demand payment of liquidated damages . . . in an amount equal to the entered value of the articles not properly marked or redelivered. . . . Any relief from the payment of the full liquidated damages incurred will be <u>contingent upon the deposit of the marking duty</u> . . . and the satisfaction of the . . . Officer that the importer was not guilty of bad faith in permitting the illegally marked articles to be distributed . . . .") (emphasis added).

[3]  CFI explained at the hearing that – contrary to the language in its complaint – it does <u>not</u> allege that Victaulic

Consequently, CFI alleges, Victaulic "routinely made or used, or caused to be made or used, false and fraudulent records and statements material to Victaulic's obligation to pay marking duties to the U.S. Government, an obligation that Victaulic further knowingly concealed and knowingly and improperly avoided or decreased, in violation of the FCA, 42 U.S.C. § 3729(a)(1)(G)."  Compl. ¶ 28.

In support of these claims, CFI explains that its analysis of shipping manifests shows that Victaulic has imported approximately eighty-three million pounds of pipe fittings from foreign sources between 2003-2012, and "upon information and belief," CFI alleges these imports account for a "significant majority" of Victaulic's annual sales in the United States. Compl. ¶ 23.  CFI also asserts that "almost all" of Victaulic's pipe fittings available for sale in the U.S. bear either no country-of-origin marking, or are marked "Made in the U.S.A." Compl. ¶ 25.  CFI therefore concludes that Victaulic has knowingly failed to mark or has mismarked its imported pipe

---

has concealed from or misrepresented to CBP the origin of its imported products, or falsified customs entry documents with regard to country-of-origin.  Hr'g Tr. 29.  (And in fact, CFI could not have determined the volume of foreign imports from Zepol if Victaulic's customs entry documents had not identified China and Poland as countries of origin.)

fittings, and has falsified its customs entry documents to avoid paying marking duties.

   C.   CFI's Investigation

      In its briefing in opposition to Victaulic's motion to dismiss, CFI provides further detail as to how it reached its conclusions regarding the quantity of pipe fittings imported during the relevant time period, the percentage of Victaulic's annual U.S. sales that consist of imported pipe fittings, and its determination that only a "miniscule fraction" of Victaulic's pipe fittings sold in the U.S. bear foreign markings.

      First, CFI examined shipping manifests from 2003-2012 using a paid subscriber database called Zepol. Zepol collects and makes available to its subscribers the shipping manifest and import information collected by CBP. CFI's "Import Analysis" showed that, since 2003, Victaulic has imported approximately eighty-three million pounds of pipe fittings from China and Poland by ship.[4]

      After calculating Victaulic's average annual imports for the years 2010-2012, reviewing Victaulic's pricing lists,

---

[4]  Victaulic also imports pipe fittings from Mexico, but as these are generally imported overland, Mexican imports do not appear on shipping manifests. Woodings Decl. ¶ 11.

and accounting for standard industry discounts, CFI calculated that the average price of these imported pipe fittings was $10.00 to $15.00 per pound.  CFI calls this portion of its analysis its "retail price cross-check."  Based on this average price per pound, CFI concluded that the sales value of Victaulic's imports from China and Poland in 2011 was approximately $152 million.

CFI concedes that, because Victaulic is a privately held company, CFI has not been able to find any information from Victaulic itself regarding its annual U.S. or global sales.  CFI alleges that other unidentified sources suggest that Victaulic's annual U.S. sales are somewhere between $250 million and $281.1 million.  Woodings Decl. ¶ 27.  Therefore CFI concludes that, based on an average price of $10.00 per pound, imported pipe fittings could have accounted for fifty-four to sixty-one percent of Victaulic's 2011 U.S. sales.  Assuming a higher average price of $15.00 per pound, imported pipe fittings could have accounted for eighty-two to ninety-one percent of U.S. sales.

From August and September 2012, and from November 2012 to February 2013, CFI tracked advertisements for pipe fittings for secondary sale (i.e., for resale, not for sale by Victaulic itself) on the internet auction and sale site eBay ("CFI's

9

Product Study"). Ms. Woodings's declaration explains CFI's efforts to control for incorrectly listed products, second-hand products, older products, and provides various reasons why eBay should be considered a valid source of secondary U.S. sales information in the pipe-fitting industry. Woodings Decl. ¶¶ 31-39.

Ultimately, CFI selected for further examination 221 eBay listings from approximately eighty-one sellers describing their products as new Victaulic pipe fittings. Woodings Decl. ¶¶ 40-41 & Ex. H. CFI did not examine any listings that were not accompanied by photographs, because CFI used the photographs provided by the sellers to determine whether and how the products were marked.

Of the 221 listings selected, CFI determined that twenty-four products were marked, labeled, or described by the seller as having been made in the United States. Of the listings that were unclear as to markings, or where markings could not be seen clearly in photographs, CFI selected approximately nine pipe fittings to purchase for physical examination. Of those purchases, three pipe fittings were marked as having been made in China, four were marked as made in the United States, and two were unmarked. Of the pipe fittings marked as made in China, one was properly marked with a cast-in-

mold marking, but the other two were stenciled in ways that CFI asserts do not conform to Tariff Act requirements for marking pipe fittings.  Woodings Decl. ¶¶ 41-43.  The remaining eBay listings examined by CFI online are described as: "Product description and photos examined; no country of origin markings evident."  Woodings Decl., Ex. H.

Based on these 221 listings, CFI alleges that at least seventy-five percent of the Victaulic pipe fittings available on eBay are unmarked.  CFI also alleges that the fact that only three products were marked as having been made in China, and only one of those markings was compliant with Tariff Act requirements, "strongly suggests that Victaulic is engaging in an intentional practice of leaving its foreign-made pipe fittings unmarked."  Woodings Decl. ¶ 45.

CFI further alleges that it "has reason to believe that Victaulic has been falsifying its entry documents and otherwise misrepresenting to CBP that no marking duties are owed on these imports," "[b]ased on CFI's knowledge and expertise regarding CBP's operations."  Woodings Decl. ¶ 46.  Namely, because CBP "physically inspects only a tiny fraction of shipments arriving in the United States" and "importers normally pay marking duties only if CBP detects a marking violation after [thirty days after entry]," CFI concludes that "it is highly

unlikely that Victaulic imported and introduced into U.S. commerce the quantities of unmarked foreign goods found by CFI by truthfully representing and paying the amount or marking duties owed."  Woodings Decl. ¶¶ 47-48.

       D.   <u>Customs Entry Documents</u>

       At the time of importation of foreign merchandise, an importer is required to file various entry documents with CBP, which enable CBP to "determine whether the merchandise can be released from the custody of [CBP];" to "properly assess duties on the merchandise;" and to "determine whether any other applicable requirement of law . . . is met."  19 U.S.C. §§ 1484(a)(1)(A), (a)(1)(B)(i), (a)(1)(B)(iii).  Entry documents typically include descriptions and value of the products imported, country of origin, and other information which would affect the duty or tariff charged at importation.

       In its complaint, CFI alleges that "Victaulic is able to successfully (albeit unlawfully) import its unmarked pipe fittings into the United States by knowingly failing to pay or disclose to CBP the marking duties the company owes as a result of importing unmarked or improperly marked foreign goods. Victaulic commits this fraud on the U.S. Government by, among other things, falsifying its entry documents and otherwise

concealing the foreign source of its pipe fittings such that CBP will not detect the company's fraud." Compl. ¶ 26.

At the hearing, CFI explained this allegation in further detail. Specifically, CFI asserts that Victaulic has falsified customs entry summary form 7501, which requires an importer or consignee to report in several places any and all duties, tariffs, or other fees that may be required by law. Compl. ¶ 20; Hr'g Tr. 28, 58-59. For example, the instructions for Column 29 of Form 7501 direct the importer to "identify any other fee, charge or exaction that applies. Examples include the beef fee, honey fee, pork fee, cotton fee, harbor maintenance fee (HMF), sugar fee, and merchandise processing fee (MPF)." CBP Form 7501 Instructions at 16. For Block 34, the instructions direct the importer to "[r]ecord the estimated duty, AD/CVD [Anti-dumping/Countervailing Duty], I.R. tax, and any other fees or charges calculated . . . ." Id. at 20. For Block 39 ("Other Fee Summary"), the importer must "[r]ecord the total estimated AD/CVD or other fees, charges, or exactions paid." Id. at 22. Also for Block 39, "[f]or entries subject to payment of AD/CVD and/or any of the various fees, each applicable fee must be indicated in this area, and the individual amount of each fee must be shown on the corresponding line. . . . The applicable collection code must be indicated on

13

the same line as the fee or other charge or exaction." Id. at 20-21.[5]

CFI argues that phrases such as "estimated duty" and "any other fees or charges" in the instructions require an importer to report not only the listed fees, but also, if applicable, the ten percent marking duties for improperly marked products.  On information and belief, CFI alleges that Victaulic has not reported on these customs entry forms that it owes marking duties, and has therefore misrepresented, omitted, or avoided its marking duties, in violation of the False Claims Act.[6]  Victaulic contends that Form 7501 does not provide any mechanism to report potential marking duties, that the list of

---

[5]  Collection codes are provided for the following:  "AD, CVD, Tea Fee, Misc. Interest, Beef Fee, Pork Fee, Honey Fee, Cotton Fee, Pecan Fee, Sugar Fee, Potato Fee, Mushroom Fee, Watermelon [Fee], Blueberry [Fee], Avocado [Fee], Mango [Fee], Informal Entry MPF, Dutiable Mail Fee, Merchandise Processing Fee (MPF), Manual Surcharge, and Harbor Maintenance Fee (HMF)." CBP Form 7501 Instructions at 21.

[6]  For example, on the sample Form 7501 provided to the Court by the defendant at the hearing, the country of origin is identified as China, but a dollar amount for "marking duties" does not appear anywhere on the form.  CFI does not allege that it has examined Victaulic's 7501 forms or other customs entry documents, because the forms themselves are apparently not accessible through Zepol or another public source.  "Rather, it is only due to CFI's knowledge and expertise regarding CBP's operations that CFI is able to allege in good faith that Victaulic falsified its entry documents," such as Form 7501. Pl.'s Opp'n at 24.

fees in the instructions for Form 7501 is exclusive, and that all the fees listed are of a type that are due at the time of importation, unlike marking duties.

II. Analysis

    A.   The Public Disclosure Bar of the False Claims Act

        Victaulic has moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, because § 3730(e)(4)(A) of the FCA - a subsection known as the "public disclosure bar" - requires dismissal of an action if substantially the same allegations or transactions as alleged by the *qui tam* relator were publicly disclosed, unless the relator is an "original source" of the information.

        The public disclosure bar of the FCA "'[s]eek[s] the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own.'" Graham Cnty. Soil & Water Conservation Dist. V. U.S. ex rel. Wilson, 559 U.S. 280, 294 (2010) (quoting U.S. ex rel. Springfield Terminal R. Co. v. Quinn, 14 F.3d 645, 649 (D.C. Cir. 1994)).  To that end, Congress enacted the bar "in an effort to strike a balance

between encouraging private persons to root out fraud and
stifling parasitic lawsuits" based on publicly available
information.  Id.


>    1.   2010 Amendments to the FCA

First, the parties dispute whether the public
disclosure bar remains "jurisdictional" after certain amendments
to the FCA made in 2010 as part of the Patient Protection and
Affordable Care Act, Pub. L. 111-148, § 10104(j)(2), 124 Stat.
119, 901-02.  The parties also disagree as to which version of
the bar should apply in this case, because the alleged conduct
took place both before and after the effective date of the
amendments.

> Before the 2010 amendments, the FCA stated:

>> No court shall have jurisdiction over an action
>> under this section based upon the public
>> disclosure of allegations or transactions in a
>> criminal, civil, or administrative hearing, in a
>> congressional, administrative, or Government
>> Accounting Office report, hearing, audit, or
>> investigation, or from the news media, unless the
>> action is brought by the Attorney General or the
>> person bringing the action is an original source
>> of the information.

31 U.S.C. § 3730(e)(4)(A) (2006).  Section 3730(e)(4)(A) now
provides:

>> The court shall dismiss an action or claim under
>> this section, unless opposed by the Government,

> if substantially the same allegations or
> transactions as alleged in the action or claims
> were publicly disclosed—
> (i)    in a Federal criminal, civil, or
>        administrative hearing in which the
>        Government or its agent is a party;
> (ii)   in a congressional, Government
>        Accountability Office, or other Federal
>        report, hearing, audit, or investigation;
>        or
> (iii) from the news media,
> unless the action is brought by the Attorney
> General or the person bringing the action is an
> original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2010).[7]

Before the 2010 amendments, courts placed the burden on the relator to establish jurisdiction, and were entitled to consider and weigh evidence outside the pleadings, because the jurisdictional challenge was to the actual facts supporting the claim, not to how the claim was pleaded.  See, e.g., U.S. ex rel. Atkinson v. PA. Shipbldg. Co., 473 F.3d 506, 514 (3d Cir. 2007).  CFI argues that the amended language of the FCA no longer deprives this Court of jurisdiction over a claim based on publicly disclosed information, and that any challenge to a complaint under this subsection is now an affirmative defense to

---

[7]    An "original source" means "an individual who either (i) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or actions . . . ."  31 U.S.C. § 3730(e)(4)(B) (2010).

be pleaded and proved by the defendant.  Alternatively, CFI
argues that a such a challenge must be evaluated under a Rule
12(b)(6) standard for failure to state a claim, rather than
under a Rule 12(b)(1) analysis for lack of jurisdiction.

An issue arises as to whether the public disclosure
bar remains a question of jurisdiction after the 2010
amendments, or what allegations are now sufficient to survive a
motion to dismiss based on subsection 3730(e)(4)(A).  Recently,
the Fourth Circuit held that, by "delet[ing] the unambiguous
jurisdiction-removing language previously contained in
§ 3730(e)(4) and replac[ing] it with a generic, not-obviously-
jurisdictional phrase ('shall dismiss'), while at the same time
retaining jurisdiction-removing language in §§ 3730(e)(1) and
(e)(2)," Congress had "ma[d]e it clear that the public
disclosure bar is no longer a jurisdiction-removing provision."
U.S. ex rel. May v. Purdue Pharma L.P., 737 F.3d 908, 916 (4th
Cir. 2013).  Cf. U.S. ex rel. Absher v. Momence Meadows Nursing
Ctr., Inc., --- F.3d ---, 2014 WL 4092258, at *4 (7th Cir. 2014)
(noting that it is no longer clear that § 3730(e)(4) is a
jurisdictional requirement).

This Court is persuaded by the reasoning in Purdue
that the deliberate removal of the jurisdictional language from

18

this subsection suggests that Congress intended to change the jurisdictional nature of the public disclosure bar.

This Court, however, also believes that under the plain language of the amended statute, which commands that a court "shall dismiss" any action based on an enumerated disclosure, the public disclosure bar remains at least a threshold question for dismissal.  The bar's stated purpose of discouraging opportunistic lawsuits would largely be defeated by shifting the entire public disclosure analysis to a later stage of litigation.[8]

The parties also dispute which version of the FCA should apply to the claims at issue here.  Victaulic argues that the pre-amendment jurisdictional version of the public disclosure bar applies, and the Court should look to facts outside the complaint in conducting a Rule 12(b)(1) analysis.  CFI contends that, even though a majority of the relevant time period as defined by CFI (2003 to January 9, 2013) elapsed before the March 23, 2010 effective date of the amendments, the bulk of the imports on which it has based its claims took place after the effective date of the amendments.

---

[8] But see, e.g., U.S. ex rel. Beauchamp v. Academi Training Ctr., Inc., 933 F. Supp. 2d 825, 839 n.23 (E.D. Va. 2013) ("If the public disclosure bar [were] not jurisdictional, then it would be an affirmative defense and would be appropriately addressed at the summary judgment stage.").

The Supreme Court has twice held that the 2010 FCA
amendments are not applicable to cases pending before the
effective date of the amendments.  See Graham Cnty., 559 U.S. at
283 n.1; Schindler Elevator Corp. v. U.S. ex rel. Kirk, 131
S.Ct. 1885, 1889 n.1 (2011).  In Purdue, the Fourth Circuit held
that the amendments are also inapplicable to claims arising from
conduct that took place before the effective date, even if the
complaint was filed after that date.  Purdue, 737 F.3d at 915
(citing Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994)).

The Court is persuaded by the reasoning in Purdue that
the 2010 amendments should not apply to claims based on conduct
before March 23, 2010.  And under either standard, the plaintiff
must allege at least some facts to show that substantially the
same allegations or transactions have not been publicly
disclosed by way of a listed source.  Therefore, the Court will
consider the additional facts set forth in the parties' briefing
and at the hearing in determining whether the action is barred.

2.  Public Disclosure of an Allegation or Transaction
     of Fraud

The pre-amendment version of the public disclosure bar
provides that no court shall have jurisdiction over an action
"based upon the public disclosure of allegations or transaction

20

in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information."  31 U.S.C. § 3730(e)(4)(A) (2006).

The post-amendment version provides that a court shall dismiss an action or claim "if substantially the same allegations or transactions as alleged in the action or claims" were disclosed by way of certain sources: "(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media." 31 U.S.C. § 3730(e)(4)(A) (2010).

The Third Circuit has "adopted a formula to represent when information publicly disclosed in a specified source qualifies as an allegation or transaction of fraud: 'If X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements.  In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed.'"  U.S. ex rel. Zizic

21

v. Q2Administrators, LLC, 728 F.3d 228, 236 (3d Cir. 2013)

(quoting U.S. ex rel. Dunleavy v. Cnty. of Del., 123 F.3d 734,

741 (3d Cir. 1997)).  Thus, the public disclosure bar applies

"if either Z (fraud) or both X (misrepresented facts) and Y

(true facts) are disclosed by way of a listed source."

Atkinson, 473 F.3d at 519.[9]

　　　　Here, Victaulic argues that both the true state of

facts (that Victaulic imports many millions of pounds of pipe

fittings from China and Poland) and the allegedly

"misrepresented" facts (customs data forms on which Victaulic

allegedly omitted to state that marking duties were due on its

imported goods) have been publicly disclosed in either the "news

media" or in Federal or administrative reports.

---

[9]  The pre-2010 version of the section barred actions "based upon" publicly disclosed transactions or allegations of fraud. Some courts held that this language meant the plaintiff must have "actually derived" his claims from the publicly disclosed source.  See, e.g., Purdue, 737 F.3d at 917.  The Third Circuit, however, has long held that "to be 'based upon' the publicly revealed allegations or transactions the complaint need only be 'supported by' or 'substantially similar to' the disclosed allegations and transactions."  Atkinson, 473 F.3d at 519 (quoting U.S. ex rel. Mistick v. Hous. Auth. of Pittsburgh, 186 F.3d 376, 385-88 (3d Cir. 1999) (rejecting a rule that "based upon" means "actually derived from," because such a rule would render the original source exception superfluous)).  The post-2010 version, which requires only that "substantially the same allegations or transactions as alleged in the action or claims were publicly disclosed," appears to codify the Third Circuit's interpretation.

CFI, on the other hand, contends that (1) the Zepol database is not "news media," and is not generally available to the public because subscribers pay a substantial fee to access its information; and (2) even if the import data is publicly disclosed, CFI's claims are based in large part on the sales information CFI extracted from eBay advertisements, which — although certainly readily accessible to the general public — do not fall within any of the categories of public disclosure listed in § 3730(e)(4)(A).

This action does not fit neatly into the X + Y = Z formula articulated by the Third Circuit.  Here, the alleged fraud "Z" is that Victaulic knowingly misrepresented its obligation to pay marking duties, and knowingly failed to pay marking duties that it owed.  Assuming for the sake of argument that Victaulic was required to report marking duties on certain customs entry forms, then misrepresented fact "X" is Victaulic's alleged omission of marking duties from the forms.  "Y-1" is the true fact that Victaulic imports millions of pounds of pipe fittings from China and Poland.  But these two facts do not create any inference of fraud without the additional allegation that only a small percentage of Victaulic's pipe fittings in the United States bear foreign markings (allegedly true fact "Y-2").

23

Absent "Y-2", the alleged omission of marking duties
on customs entry forms is equally consistent with the inference
that Victaulic's imported pipe fittings were, in fact, properly
marked, and no marking duty was owed.  Only the additional
allegation regarding the small percentage of pipe fittings with
foreign markings on eBay creates any inference that Victaulic
did not mark some imported pipe fittings.[10]  Accordingly, CFI's
action is not barred unless both Zepol and eBay qualify as
sources of public disclosure under § 3730(e)(4)(A).

The Supreme Court has held that the "sources of public
disclosure in § 3730(e)(4)(A), especially 'news media,' suggest
that the public disclosure bar provides 'a broa[d] sweep.'"
Schindler Elevator Corp., 131 S.Ct. at 1891 (quoting Graham
Cnty., 130 S. Ct. at 1404) (alteration in original)).
Nevertheless, not all information in the public domain is
publicly disclosed within the meaning of the FCA.

Several courts have held that information obtained
through a publicly available website implicates the public
disclosure bar of the FCA.  See, e.g., U.S. ex rel. Repko v.
Guthrie Clinic, P.C., No. 04-1556, 2011 WL 3875987, at *7 (M.D.
Pa. Sept. 1, 2011) ("Generally accessible websites are available

---

[10]   Whether that inference is sufficient to give rise to an
inference that Victaulic did not pay marking duties is a
separate question, which the Court will address below.

to anyone with an internet connection and a web browser, and access is not restricted.  Though they are not traditional news sources, they serve the same purpose as newspapers or radio broadcasts, to provide the general public with access to information.  They are easily accessible and any stranger to a fraud transaction could discover the relevant information on them."), <u>aff'd</u>, 490 F. App'x 502 (3d Cir. Aug. 1, 2012).[11]

In <u>Repko</u>, for example, the district court held that four websites that collected and disseminated financial information and information about non-profits to the public, both for free and for a subscription fee, and which provided searchable on-line databases of information and articles, were

---

[11]   See also <u>U.S. ex rel. Brown v. Walt Disney World Co.</u>, No. 06-1943, 2008 WL 2561975, at *4 (M.D. Fla. June 24, 2008) (finding that Wikipedia qualifies as the news media); <u>U.S. ex rel. Davis v. Prince</u>, 753 F. Supp. 2d 569, 585 (E.D. Va. 2011) (finding that a government audit report was disclosed, because report was generally available to the public after it was posted on a website maintained by the "online publication Talking Points Memo"); <u>U.S. ex rel. Barber v. Paychex, Inc.</u>, No. 09-20990, 2010 WL 2836333, at *8 (S.D. Fla. July 15, 2010) ("newspaper and magazine articles, court decisions, cable news shows, securities filings, analyst reports and internet websites — constitute the kind of 'public disclosure' covered by" the FCA).  <u>But see</u> <u>U.S. ex rel. Liotine v. CDW Gov't, Inc.</u>, No. 05-33, 2009 WL 3156704, at *6 n.5 (S.D. Ill. Sep. 29, 2009) ("hesita[ting] to find that *any* posting on the internet constitutes 'news media'" and holding that an internal memorandum archived on a University purchasing services website was "not easily available to the public" and thus not a public disclosure).

"news media" for purposes of the public disclosure bar.  Id. at *8.

In U.S. ex rel. Simpson v. Bayer Corp., No. 05-3895, 2013 WL 4710587 (D.N.J. Aug. 30, 2013), however, the district court held that informal on-line message boards and community forums did not qualify as sources of public disclosure under § 3730(e)(4)(A).  Id. at *7 ("[W]hile it is certainly the case that websites may constitute news media in certain instances, not everything posted on the internet qualifies.").  The court in Simpson distinguished Repko, explaining that "the sources involved in Repko were well recognized or industry specific outlets which contained articles, a comprehensive database, and a number of other tools geared toward the dissemination of reliable information.  Unlike an article on a website maintained by a recognized news outlet, a trade journal, or even a promotional website geared toward the dissemination of information, the anonymous postings in [Simpson] amounted to nothing more than vague allegations in an informal forum discussion without any indicia of reliability or substantiation."  Id.

This Court agrees that, at minimum, a publicly available website may qualify as "news media" where the information provided is to some extent curated – that is, where

26

the authors or editors of the website actively gather and
disseminate information, provide search tools for the public to
analyze data, provide some editorial content, or exercise some
control over the information provided – and where the
information bears at least some of the "indicia of reliability
or substantiation" common to more traditional news media
sources.

a.   <u>Zepol</u>

Victaulic argues that Zepol, which collects import
data from CBP and provides it to subscribers in a searchable
database, qualifies as both "news media" and "administrative
reports" or "Federal reports" for purposes of the public
disclosure bar.[12]

The District Court for the District of Columbia
recently held that shipping manifest information disclosed on an
on-line database similar to Zepol was publicly disclosed for
purposes of the FCA.  <u>U.S. ex rel. Doe v. Staples, Inc.</u>, 932 F.

---

[12]  <u>See</u> http://www.zepol.com/products/tradeiq-import.aspx
("Zepol's TradeIQ Import online database contains over 134
million U.S. import bills of lading, received directly from U.S.
Customs.  Easily see who is importing what products to the
United States, within days of arrival. . . . Filter search
criteria by imported product, U.S. importer, overseas exporter,
country of origin, and much more to find exactly the information
you need.")

Supp. 2d 34, 40 (D.D.C. 2013).  In <u>Staples</u>, the relator based its allegations that the defendant had misrepresented the country of origin of imported pencils on "shipping data obtained from reports published by PIERS Global Intelligence Solutions ("PIERS"), a company which 'compiles manifest information submitted to Customs by all shippers'."  <u>Id.</u>  The district court held that "[w]hile not a traditional news source, [PIERS] qualifies as 'news media' in light of the ample precedent in favor of broad construction of the channels of public disclosure listed in § 3730(e)(4)(A). . . ." in large part because the PIERS reports are "readily accessible to the public on the PIERS website."  <u>Id.</u>[13]

This Court does not need to decide whether a website that simply collects raw data and makes it available through a searchable database without exercising editorial control over the contents would qualify under a traditional definition of news media, because, like the financial analysis websites at issue in <u>Repko</u>, Zepol also purports to provide data, analysis, and articles to many media outlets worldwide.[14]

---

[13] Although CFI relied on Zepol, the underlying data on which CFI bases its claims would also be available through PIERS, or other websites that collect and disseminate the data made available to the public through CBP's Automated Manifest System.

[14] <u>See</u> http://www.zepol.com/about/news-events/news.aspx.

Moreover, like the data collected by PIERS in <u>Staples</u>, the manifest data that CFI obtained from Zepol is collected and made available for purchase to both the press and the public by CBP itself.  <u>See</u> 19 C.F.R. § 103.31(a) (describing the manifest information and data that may be examined and reported to the public by the press) <u>and</u> 19 C.F.R. § 103.31(e) (explaining that manifest data acquired from AMS is available to the public on CD-ROM).  The data made available by CBP includes, among other things, the carrier code, vessel country code, district/port of unlading, estimated arrival date, bill of lading number, foreign port of lading, manifest quantity, manifest units, weight, weight unit, shipper name, consignee name, piece count, and a description of goods.  <u>See</u> 19 C.F.R. § 103.31.  In short, CBP collects and disseminates to the public all the information that CFI relied upon in formulating its "Import Analysis."  The Court therefore finds that the shipping manifest data has been publicly disclosed in either the "news media" or "administrative reports" or "federal reports" within the meaning of 31 U.S.C. § 3730(e)(4)(A).[15]

---

[15]   <u>See</u> <u>Staples</u>, 932 F. Supp. 2d at 40.  <u>See also</u> <u>Schindler Elevator Corp.</u>, 131 S.Ct. at 1893 (holding that a written agency response to a FOIA request is a "report," as are any records attached to the response, regardless of whether the record itself is a report).  In <u>Schindler</u>, the records attached to the DOL's FOIA response were VETS-100 Reports submitted to the

b.   eBay

The Court does not find, however, that the information
CFI obtained through sales listings on eBay has been publicly
disclosed by way of an enumerated source.  The Supreme Court has
explained that, where the statute does not define a term, a
court should "look first to the word's ordinary meaning" and
"consider the [public disclosure bar]'s 'entire text,' read as
an 'integrated whole.'"  Schindler Elevator Corp., 131 S.Ct. at
1891 (quoting Graham Cnty., 130 S.Ct. at 1406 n.12)).  But eBay,
an on-line auction site and marketplace, does not qualify as
"news media" under even a generous interpretation of the term.
As the defendant conceded at oral argument, if the products
listed for sale on-line on eBay were instead available in a
brick-and-mortar storefront, the information obtained from
observing the products would not be publicly disclosed within
the meaning of § 3730(e)(4)(A).

The Court concludes that, because the product
information on which CFI's allegations largely depend was not
publicly disclosed by way of a source listed in § 3730(e)(4)(A),

_____

Secretary of Labor by the defendant, which were later requested
from the DOL by the plaintiff under FOIA.

the action is not barred under either the current or pre-amendment versions of the FCA.[16]

    B.   <u>Marking Duties Under the False Claims Act</u>

       Victaulic has also moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), on the grounds that a failure to properly mark goods or to pay marking duties under § 1304(i) of the Tariff Act does not give rise to any claim under the False Claims Act.

       Before 2009, the reverse-false-claim[17] provision of the FCA provided that any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government," is liable under the Act. 31 U.S.C. § 3729(a)(7) (2008).  Subsection (b) did not define "obligation."

---

[16]   Because the Court has determined that not all the information was publicly disclosed under § 3730(e)(4)(A), the Court need not address CFI's status as an "original source" under § 3730(e)(4)(B).

[17]   "Reverse false claims are centered around an alleged fraudulent effort to reduce a liability owed to the government rather than to get a false or fraudulent claim allowed or paid." <u>Atkinson</u>, 473 F.3d at 513 n.12.

31 U.S.C. § 3729 was amended as part of the Fraud Enforcement and Recovery Act of 2009 ("FERA").  The current version states that any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government," shall be liable under the Act.  31 U.S.C. § 3729(a)(1)(G).  The amendments also added a definition of the term "obligation."  31 U.S.C. § 3729(b)(3).

Before the 2009 amendments, a number of courts held that a violation of a statute that creates only a "contingent" obligation to pay money to the government (i.e., an obligation that might accrue in the future, once penalties or fees were assessed), does not implicate the FCA.  See, e.g., Am. Textile Mfrs. Inst. v. The Limited, Inc., 190 F.3d 729, 738 (6th Cir. 1999) ("ATMI").

ATMI involved claims under the FCA for the avoidance of penalties under various statutes, including 19 U.S.C. § 1592, and for the avoidance of marking duties under 19 U.S.C. § 1304(h) (now codified at § 1304(i)).  The Sixth Circuit held that "contingent obligations" were not within the scope of the reverse-false-claims provision.  The court defined "contingent

32

obligations" as "those that will arise only after the exercise
of discretion by government actors," such as "those arising from
civil and criminal penalties that impose monetary fines after a
finding of wrongdoing."  ATMI, 190 F.3d at 738.  Accordingly,
the court held that penalties under 19 U.S.C. § 1592 were
"contingent" and could not be recovered under the FCA.  Id. at
741.

        The Sixth Circuit also held that, although the claim
regarding marking duties "present[ed] the most difficulty,"
those too could not be recovered under the FCA.  Id. at 741-42.
See also Hoyte v. Am. Nat'l Red Cross, 518 F.3d 61, 67 (D.C.
Cir. 2008) ("an unassessed potential penalty for regulatory
noncompliance does not constitute an obligation that gives rise
to a viable FCA claim"); U.S. ex rel. Bain v. Ga. Gulf Corp.,
386 F.3d 648, 657-58 (5th Cir. 2004) ("the reverse false claims
act does not extend to the potential or contingent obligations
to pay the government fines or penalties which have not been
levied or assessed").

        The parties dispute whether ATMI, Hoyte, and Bain
remain good law after FERA.  The 2009 amendments expanded the
language of the reverse-false-claim provision to impose
liability for any knowing concealment or avoidance of an
obligation, whether or not a false statement or record was made

                              33

or used in connection with the avoidance.  See 31 U.S.C.
§ 3729(a)(1)(G).  The post-FERA version also defines
"obligation" as "an established duty, whether or not fixed,
arising . . . from statute or regulation . . . ."  31 U.S.C. §
3729(b)(3).

As discussed above, the Tariff Act states that duties
for failure to mark are "10 per centum ad valorem, which shall
be deemed to have accrued at the time of importation, shall not
be construed as penal, and shall not be remitted wholly or in
part nor shall payment thereof be avoidable for any cause."  19
U.S.C. § 1304(i).  CFI argues that the plain language of
§ 1304(i) creates an established duty (if not necessarily a
fixed duty) to pay money that becomes due automatically at the
time of importation, which is not a penalty.  Victaulic
contends, on the other hand, that marking duties under § 1304(i)
are merely fines that Victaulic might owe if it imported
unmarked or mismarked products and subsequently failed to
export, destroy, or properly mark them.[18]

---

[18]  Victaulic analogizes marking duties to penalties a
company might have to pay if it were discovered to have violated
an environmental regulation.  Under those circumstances,
Victaulic argues, the company's concealment of its environmental
violation might give rise to some additional penalties, but
would not state a claim under the False Claims Act, because no
penalty has yet been assessed, and therefore no obligation has
been avoided.  Hr'g Tr. 95-97.

In its reply brief, Victaulic argues that the term "obligation" as defined post-FERA may apply to tariff-based customs duties recoverable under 19 U.S.C. § 1592, but not to marking duties under 19 U.S.C. § 1304(i). In its surreply, CFI argues that any ambiguity in the plain language of the statute is resolved by the legislative history of FERA.[19]

In support of its argument that the 2009 amendment was intended to bring marking duties within the scope of the False Claims Act, CFI also notes that one of the stated purposes of the amendment was to "overrule" the Sixth Circuit's <u>ATMI</u> decision.[20] CFI argues that, if the amendments were designed to

---

[19] <u>See</u> S. Rep. 111-10, S. Rep. No. 10, 111th Cong., 1st Sess. 2009, 2009 WL 787872, at *13-14. ("The term 'obligation' is now defined under new Section 3729(b)(3) and includes fixed and contingent duties owed to the Government -- including fixed liquidated obligations such as judgments, and fixed, unliquidated obligations such as tariffs on imported goods. It is also noteworthy to restate that while the new definition of 'obligation' expressly includes contingent, non-fixed obligations, the Committee supports the position of the Department of Justice that current section 3729(a)(7) speaks of an 'obligation,' not a 'fixed obligation.' By including contingent obligations such as, implied contractual, quasi-contractual, grantor-grantee, licensor-licensee, fee-based, or similar relationship, this new section reflects the Committee's view . . . that an 'obligation' arises across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that results in a duty to pay the Government money, whether or not the amount owed is yet fixed.") (internal quotation marks omitted).

[20] <u>See</u> S. Rep. No. 111-10, at n.10, 2009 WL 787872, at *24. ("The new definition of the term 'obligation' in S. 386 does not

address the narrow definition of "obligation" used in <u>ATMI</u>, then
the current definition of "obligation" must include "either
marking duties under 19 U.S.C. § 1304, or penalties under 19
U.S.C. § 1592, or both."  Pl.'s Surreply at 23.[21]

Whether the 2009 amendments to the FCA capture
country-of-origin mismarking or failure to pay marking duties is
apparently a novel question.  Amicus Curiae Br. 4 (Doc. No. 24-1
at 7).  Although instructive, neither the legislative history of
the amendments nor pre-FERA case law from other circuit courts

---

include specific reference to 'customs duties for mismarking
country of origin,' which was a singular type of obligation
referred to in S. 2041.  The Committee originally included this
language in S. 2041 in response to the decision in [<u>ATMI</u>] where
the Sixth Circuit Court of Appeals narrowly defined the term
'obligation' to apply reverse false claims to only fixed
obligations and dismissing a claim for false statements made by
importers to avoid paying customs duties. . . . After subsequent
discussion with the Department of Justice, the Committee decided
to remove the 'customs duties' language in S. 386, as the
Committee believes that customs duties clearly fall within the
new definition of the term 'obligation' absent an express
reference and any such specific language would be
unnecessary.").

[21]  Victaulic also argues that this Court should apply pre-
FERA statutory language and case law to CFI's claims because the
majority of the relevant time period of importation, as defined
by CFI, falls before the amendments' effective date of May 20,
2009.  CFI contends that (1) the current statutory language
should apply because the majority of the pipe fittings which
serve as the basis for its claims were imported after May 2009;
and (2) even if this Court were to hold that the 2009 amendments
do not apply in this instance, the plain language of the pre-
amendment version of the FCA also covered marking duties.

is binding on this Court's interpretation of the current language of the statute.

As the Court discussed above, the language of the Tariff Act itself is not very clear as to precisely when the obligation to pay marking duties arises, even if the duty is "deemed to have accrued at importation." It is difficult to determine, therefore, at what point an importer may be said to have "avoided" or "concealed" an "established" duty to pay marking duties arising under § 1304(i).

Nor is it clear that CBP Form 7501 gives rise to an obligation to report that goods are unmarked, or that an importer may owe marking duties. CFI contends that the "any fee" language in the instructions for Form 7501 requires Victaulic to report whether it owes or may owe marking duties, and that Victaulic's omission of a dollar figure for marking duties therefore constitutes a false statement under the FCA.

The Court observes that CBP Form 7501 and its instructions do not refer to marking obligations or duties, and do not provide any collection code under which an importer could report estimated marking duties. Nor does Form 7501 ask the importer to state whether the goods described in the form are properly marked. The form does require the importer to identify a country of origin for the relevant goods, but CFI does not

37

contend that Victaulic has ever misstated that information.  In short, the Court is unsure from CFI's allegations at what point Victaulic could plausibly be said to have knowingly concealed or avoided an obligation to pay marking duties, or made a false statement or deliberate omission in connection with its alleged avoidance.

Ultimately, however, the Court need not decide whether the pre- or post-FERA version of the FCA applies to these claims, or whether a failure to mark imported goods or to pay marking duties under the Tariff Act gives rise to a claim under either version of the FCA, because the Court finds that CFI has failed to allege that Victaulic did not properly mark its pipe fittings or avoided any obligation to pay marking duties.

C.   Failure to State a Claim for Marking Violations

Victaulic has moved to dismiss the complaint under Rule 12(b)(6) on the grounds that, even if a failure to mark goods or to pay marking duties under the Tariff Act gives rise to a claim under the False Claims Act, CFI has failed to state a claim for such violations under the pleading standards of either Rule 8(a) or Rule 9(b) of the Federal Rules of Civil Procedure. The Court agrees.

38

Although Federal Rule of Civil Procedure 8(a) requires that a complaint contain only "a short and plain statement of the claim showing that the pleader is entitled to relief," to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," the plaintiff must nonetheless plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." Id. Naked assertions devoid of further factual enhancement will not suffice. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 557). Nor is the court "bound to accept as true a legal conclusion couched as a factual allegation." Id.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "While the plausibility standard does not impose a 'probability requirement,' it does demand 'more than a sheer possibility that a defendant has acted unlawfully.'" In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012) (quoting Iqbal, 556 U.S. at

678).  "Where a complaint pleads facts that are merely
consistent with a defendant's liability, it stops short of the
line between possibility and plausibility of entitlement to
relief."  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at
557) (quotation marks omitted).

Further, because claims under the False Claims Act are
claims of fraud, CFI must also state its claims with the
heightened specificity required by Federal Rule of Civil
Procedure 9(b), which demands that a plaintiff "state with
particularity the circumstances constituting fraud or mistake."
Fed. R. Civ. P. 9(b).  Recently, in Foglia v. Renal Ventures
Management, LLC, 754 F.3d 153 (3d Cir. 2014), the Court of
Appeals determined what Rule 9(b) requires of an FCA claimant in
the Third Circuit.  Following the lead of the First, Fifth, and
Ninth Circuits, the Third Circuit took "a more nuanced reading"
of the Rule 9(b) pleading requirements, and held that "it is
sufficient for a plaintiff to allege 'particular details of a
scheme to submit false claims paired with reliable indicia that
lead to a strong inference that claims were actually
submitted.'"  Foglia, 754 F.3d at 156 (quoting U.S. ex rel.
Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009))
(rejecting the approach of circuit courts that require an FCA
plaintiff to identify "representative samples" of the alleged

40

fraudulent conduct, specifying the time, place, and content of the acts and identity of the actors).  Nevertheless, "[d]escribing a mere opportunity for fraud will not suffice." Id. at 158.

CFI's original complaint is virtually devoid of non-conclusory factual allegations.  At most, CFI alleges that based on its review of shipping manifest data, Victaulic has imported approximately 83 million pounds of pipe fittings from China and Poland between 2003 and 2012.  In the complaint itself, CFI provides no facts to support its assertions that imported pipe fittings constitute a majority of Victaulic's U.S. sales, or that only a "miniscule fraction" of Victaulic's pipe fittings for sale in the United States bear foreign markings.  Finally, CFI provides no basis for its wholly conclusory allegations that Victaulic has falsified its customs entry documents or knowingly avoided paying any required marking duties.  Assuming that such actions give rise to a claim under the FCA, the very limited factual allegations in the complaint do not state a claim.

Even taking into account the facts set forth in CFI's opposition briefing and in the declaration of Ms. Woodings, and the further explanations and details provided at oral argument, CFI has not "nudged" its claims "across the line from

41

conceivable to plausible." <u>Iqbal</u>, 556 U.S. at 680 (quotations omitted).

The facts alleged in Ms. Woodings's declaration regarding Victaulic's 2003-2012 imports and CFI's price-per-pound estimates reasonably support an inference that imported pipe fittings have comprised a significant portion of Victaulic's U.S. sales in the last decade.  These additional facts do not, however, support CFI's conclusions that the majority of Victaulic's imported pipe fittings for sale in the United States are unmarked, or that Victaulic has knowingly failed to mark its imported products.

Even if the Court accepts CFI's assertion that eBay listings constitute a reasonable representative sample of the secondary sale market for pipe fittings in the United States, or that an examination of 221 advertisements from eighty-one sellers over a six-month period could provide data from which to draw accurate wider conclusions about millions of pounds of product imported over a decade, and even assuming that CFI has accurately identified, dated, and examined every Victaulic pipe fitting on eBay, CFI has alleged no facts to show that any of the unmarked pipe fittings on eBay are not, in fact, U.S.-made.[22]

---

[22]  Victaulic has identified various other flaws in CFI's eBay product study which give the Court pause.  For example, CFI

CFI has not identified, for example, any pipe fitting on eBay that is described by a seller as foreign-made, but does not appear to be marked.  Nor, unlike the Chinese-made pencils for sale in Staples, has CFI identified characteristics of the unmarked pipe fittings suggesting they are of Chinese or Polish origin.

Based on the large number of pipe fittings imported by Victaulic in recent years, it is certainly possible that some of the unmarked pipe fittings for sale on eBay are foreign-made. But that possibility is not sufficient to support a reasonable inference that Victaulic has deliberately failed to mark the vast majority of its imported pipe fittings.

More importantly, the absence of markings on imported pipe fittings (or presence of inadequate markings, such as the two that CFI apparently found) is not dispositive with regard to

---

eliminated from examination any eBay listing that did not contain photographs, and therefore did not take into account any number of products that may have had foreign markings.  Further, there is no guarantee that the sellers' descriptions of their products are accurate or reliable; the products shown may not be Victaulic products at all, and sellers may have falsely described the country of origin.  In addition, the photographs examined by CFI may not have depicted the areas where the products were marked.  If, as CFI has alleged, U.S.-made pipe fittings command higher prices, sellers would be motivated to conceal (if not actively misrepresent) the foreign origin of the pipe fittings.  Moreover, if U.S.-made products command higher prices, one would also expect to observe a higher percentage of U.S.-made products in the secondary sale market.

the payment of marking duties.[23]  Even if CFI were able to prove that the unmarked pipe fittings available for sale on eBay were Victaulic imports, that fact shows only a failure to mark the products under 19 U.S.C. §§ 1304(a) and (c).  It tells the Court nothing about Victaulic's payment of marking duties under § 1304(i), much less whether Victaulic knowingly avoided or concealed an obligation to pay the duties.[24]

Where, as here, the complaint pleads facts that are "merely consistent with" a defendant's liability, the plaintiff has failed to state a claim.[25]

III. Conclusion

Because CFI has failed to allege facts in either its complaint or its opposition briefing sufficient to support a plausible claim that Victaulic has failed to mark its imported pipe fittings, that Victaulic falsified customs entry documents,

---

[23]  Because, for example, Victaulic may have paid marking duties on those pipe fittings, if CBP discovered the marking failure after distribution.  See, supra, note 2.

[24]  Similarly, the fact the Victaulic did not report estimated marking duties on a customs entry form is equally consistent with the conclusion that its imported goods were, in fact, properly marked, as it is with the conclusion that Victaulic deliberated omitted to report duties owed.

[25]  Because the Court finds that CFI has failed to state a claim even under the less demanding requirements of Rule 8(a), the Court will not address the sufficiency of the pleadings under Rule 9(b).

that Victaulic owed marking duties, or that Victaulic knowingly concealed or avoided any obligation to pay marking duties, the motion to dismiss is granted, and the complaint is dismissed with prejudice.

An appropriate order shall issue.