IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CIVIL ACTION |
| *ex rel.* CUSTOMS FRAUD | : | |
| INVESTIGATIONS, LLC | : | |
| v. | : | |
| | : | |
| VICTAULIC COMPANY | : | NO. 13-2983 |

MEMORANDUM

McLaughlin, J.                                    April 10, 2015

Customs Fraud Investigations, LLC ("CFI"), a company that conducts research and analysis on possible customs fraud, initiated this action against Victaulic Company ("Victaulic"), to recover damages and civil penalties on behalf of the United States as a *qui tam* relator pursuant to the False Claims Act, 31 U.S.C. §§ 3729, et seq. ("FCA").[1]  In a September 4, 2014 memorandum and order, the Court dismissed CFI's complaint with prejudice because CFI failed to state a claim.  CFI has filed a motion to alter or amend that judgment and for leave to file an amended complaint.  The Court will deny the motion because amendment would be inequitable and futile.

---

[1] CFI describes itself as a company that "conducts confidential research and analysis related to potential customs fraud." Compl. ¶ 7.  It is not clear from the record whether CFI conducts research and analysis in contexts other than *qui tam* litigation, or whether its sole purpose is to hunt for possible FCA violations such as the one alleged in this case.

I.    <u>Background and Procedural History</u>[2]

On May 30, 2013, CFI filed a nine-page, conclusory complaint against Victaulic, a producer of iron and steel pipe fittings manufactured in the United States, China, Poland, and Mexico.  CFI, a corporate stranger to Victaulic, alleged that Victaulic violated the FCA by failing to mark and improperly marking its foreign-made pipe fittings as required under the United States Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. §§ 1304(a) and (c), and by falsifying customs entry documents such as CBP Form 7501, to avoid an obligation to pay "marking duties" owed on unmarked or improperly marked foreign products.  Because unmarked pipe fittings are assumed in the industry to be U.S.-made, CFI surmised that Victaulic was importing unmarked foreign-made pipe fittings and passing them off as U.S.-made. Approximately two months after CFI filed its complaint, the United States declined to intervene, and the complaint was unsealed.


A.    <u>Marking Requirements and Marking Duties</u>

The Tariff Act requires that, with some exceptions,

---

[2] Most of the background and procedural history discussed here can be found in the Court's September 4, 2014 memorandum granting Victaulic's motion to dismiss.  As an understanding of that background is necessary for the disposition of CFI's current motion, the Court will recount much of it here.

"every article of foreign origin . . . imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article . . . will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article." 19 U.S.C. § 1304(a).  The Act imposes specific marking requirements for pipe fittings, which "shall be marked with the English name of the country of origin by means of die stamping, cast-in-mold lettering, etching, engraving, or continuous paint stenciling." Id. § 1304(c)(1).

        If imported goods are not marked with the proper country of origin in the prescribed manner, an importer may owe "marking duties" under 19 U.S.C. § 1304(i), which states in relevant part:

> If at the time of importation any article . . . is not marked in accordance with the requirements of this section, and if such article is not exported or destroyed or the article . . . marked after importation in accordance with the requirements of this section . . . , there shall be levied, collected, and paid upon such article a duty of 10 per centum ad valorem, which shall be deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause.

19 U.S.C. § 1304(i).  The United States Bureau of Customs and Border Protection ("CBP") is responsible for collecting marking duties owed by an importer.  The circumstances under which an

importer comes to owe marking duties is disputed by the parties, and will be discussed further below.

> B.    Victaulic's Motion to Dismiss and CFI's Opposition

On October 10, 2013, Victaulic filed a motion to dismiss the complaint for failure to state a claim.  Victaulic argued that the failure to pay marking duties does not constitute a FCA violation, and that CFI failed to satisfy the pleading standards of Federal Rules of Civil Procedure 8(a) and 9(b).[3]

In connection with its opposition to the motion, CFI submitted a declaration by its President, Rebecca L. Woodings, with numerous exhibits attached.  Doc. No. 18-1 ("Woodings Decl.").  Ms. Woodings's declaration revealed that CFI's claims concerning Victaulic's failure to mark its foreign products were entirely predicated on a comparison of two sets of data: (1) an analysis of shipping manifests allegedly establishing that Victaulic imports a significant portion of its pipe fittings (CFI's "import analysis"); and (2) a survey of 221 listings for Victaulic pipe fittings on the internet auction and sale site

---

[3]Victaulic also moved to dismiss on the basis that the FCA's "public disclosure bar," deprived the Court of jurisdiction. See 31 U.S.C. § 3730(e)(4)(A).  The Court held that the public disclosure bar neither deprived the Court of jurisdiction nor mandated dismissal of the complaint.  The public disclosure bar is not at issue in CFI's current motion.

eBay from which CFI could allegedly determine that at least seventy-five percent of the fittings were unmarked (CFI's "product study").  Woodings Decl. ¶¶ 7-8 & 41.

CFI conducted its import analysis by examining shipping manifests from 2003-2012 using a paid subscriber database.  The analysis led CFI to conclude that Victaulic imported approximately eighty-three million pounds of pipe fittings from China and Poland by ship during that time period, with 15.2 million pounds imported annually from 2010-2012. Woodings Decl. ¶¶ 20 & 22.  Using Victaulic's 2011 General Price List for the Americas and accounting for standard industry discounts, CFI estimated the average price of Victaulic's pipe fittings in 2011 to be $10.00 per pound at a minimum.  Id. ¶ 26. CFI multiplied that estimate by Victaulic's estimated annual imports for 2011 to conclude that, at minimum, the sales value of Victaulic's imports from China and Poland in 2011 was $152 million.  Id. ¶ 27.  Spreadsheets underlying CFI's analysis were attached to Ms. Woodings's declaration as exhibits.  Id. Exs. B-G.

As Victaulic is privately held, CFI could not find any direct information from the company concerning its sales. Accordingly, CFI estimated from "other sources" that Victaulic's annual sales are between $250 million and $281.1 million. Woodings Decl. ¶ 27.  CFI divided the $152 million in estimated

sales for 2011 by the high and low estimates for Victaulic's
annual sales, to conclude that, at minimum, Victaulic's foreign
imports represent fifty-four to sixty-one percent of its
national sales.  Using a higher estimate of $15.00 average cost
per pound, Victaulic's foreign imports would represent eighty-
two to ninety-one percent of its national sales.

     CFI conducted its product study by tracking
advertisements for pipe fittings for secondary sale (i.e., for
resale, not for sale by Victaulic itself) on eBay from August to
September 2012, and from November 2012 to February 2013.
Woodings Decl. ¶ 35.  Ms. Woodings's declaration provided
various reasons why she believed eBay should be considered a
valid source of secondary U.S. sales for Victaulic pipe
fittings, and explained CFI's efforts to control for incorrectly
listed products and older products.  Id. ¶¶ 32-33 & 39.

     After eliminating from consideration those listings
that did not contain any photographs of the listed product, CFI
reviewed 221 eBay listings for "new" iron and steel Victaulic
pipe fittings that contained at least one photograph of the
product being sold.  Woodings Decl. ¶¶ 38 & 41.  Primarily by
observing those photographs and supplementing with product
purchases, CFI concluded that only three pipe fittings had
foreign country-of-origin markings and that at least seventy-

five percent of the Victaulic pipe fittings were unmarked.[4]  Id.
¶¶ 41 & 44.  According to CFI, in light of Victaulic's
significant imports from China and Poland, one would expect to
see a higher percentage of pipe fittings bearing foreign
country-of-origin markings in the listings it reviewed if
Victaulic were complying with the Tariff Act.  Id. ¶ 9.  CFI
also concluded that two of the three pipe fittings on eBay
containing foreign country-of-origin markings were marked in a
manner that did not comply with the Tariff Act.  Id. ¶¶ 42-43.


        C.  Hearing on Victaulic's Motion to Dismiss

        On January 23, 2014, the Court held a hearing on
Victaulic's motion to dismiss.  At the outset of the hearing,
the Court explained that, although it could not consider Ms.
Woodings's declaration and attached exhibits in determining
whether the complaint stated a claim, it would consider the
information "in deciding, if [the Court] do[es] decide the
complaint should be dismissed, whether that [dismissal] should
be with or without prejudice."  Hr'g Tr. 4 (Doc. No. 28).  The
Court was explicit with CFI about its assessment of the

---

[4] CFI attached a table describing each of the 221 listings as
exhibit H to Ms. Woodings's declaration.  A review of the table
suggested that CFI purchased seven items—listed at picture
numbers 127, 140, 146, 150, 160, 200, and 221—three of which
were unmarked and four of which bore markings establishing that
they were made in the United States, even though the initial
review of the picture was unclear. Woodings Decl. Ex. H.

complaint, twice stating that the pleading was "bare bones," and observing that it was based on "conclusory kinds of facts that . . . under <u>Twombly</u> and <u>Iqbal</u> really don't carry the day." <u>Id.</u> at 5-6. During a later discussion about CFI's product study, the Court again remarked on the absence of factual detail in the complaint. <u>Id</u>. at 39-40. CFI responded that it believed its complaint stated a claim but hoped to amend if the Court disagreed. <u>Id</u>. at 40.

In an effort to demonstrate the limitations of CFI's product study, Victaulic presented the Court with four photographs of one of its pipe fittings, each taken from a different angle. <u>Id.</u> at 13. The fitting was marked as originating from China on the inside rim of the product, but the marking was only visible in one of the four pictures. <u>Id.</u> at 13-14. Accordingly, Victaulic argued that, even if the eBay listings examined by CFI contained two or three pictures of a product for sale, the images do not necessarily reveal whether the product was marked. Upon viewing the photographs presented at the hearing, CFI took the position that the marking on the product was unlawful because it was not done in one of the five means required by the Tariff Act. <u>Id.</u> at 34-36.

D.   <u>CBP Form 7501</u>

CFI alleged in its complaint that Victaulic failed to

8

disclose marking duties owed on unmarked merchandise in connection with documentation filed with CBP such as CBP Form 7501. Compl. ¶¶ 20 & 27. That form, which is part of the paperwork an importer files with CBP to enable proper assessment of duties owed on imported merchandise, requires an importer to report any duties, tariffs, or other fees required by law that are due upon importation. Id. ¶¶ 19-20. At the hearing, Victaulic provided the Court with a copy of CBP Form 7501 and instructions for completing the form.[5] Hr'g Tr. at 15. Although the form does not expressly require an importer to disclose marking duties, CFI argued in its complaint and at the hearing that an importer's obligation to report "other" fees or charges on the form applies to marking duties. Compl. ¶ 20; Hr'g Tr. at 58-59.

There are three locations on CBP Form 7501 where an importer is required to report "other" fees or duties not disclosed elsewhere on the form. The instructions for column 29 of Form 7501 direct an importer to "identify any other fee, charge or exaction that applies. Examples include the beef fee,

_____

[5] CBP Form 7501 and related instructions are available on CBP's website. See U.S. Customs and Border Protection, Dep't of Homeland Security, Entry Summary CBP Form 7501, available at http://www.cbp.gov/sites/default/files/documents/CBP%20Form%207501_0.pdf ("CBP Form 7501"); id., CBP Form 7501 Instructions (updated July 24, 2012), available at http://www.cbp.gov/sites/default/files/documents/CBP%20Form%207501_Instructions.pdf ("CBP Form 7501 Instructions").

honey fee, pork fee, cotton fee, harbor maintenance fee (HMF),
sugar fee, and merchandise processing fee (MPF)."  CBP Form 7501
Instructions at 16.  For Block 34, the instructions direct the
importer to "[r]ecord the estimated duty, AD/CVD [Anti-
dumping/Countervailing Duty], I.R. tax, and any other fees or
charges calculated . . . ."  Id. at 20.  Block 39 calls for a
summary of the "other fee[s]" owed by an importer.  Id.  The
instructions for that block require the importer to "[r]ecord
the total estimated AD/CVD or other fees, charges or exactions
paid," i.e., "the amounts actually being paid."  Id. at 22.
Also for Block 39, "[f]or entries subject to payment of AD/CVD
and/or any of the various fees, each applicable fee must be
indicated in this area, and the individual amount of each fee
must be shown on the corresponding line . . . .  The applicable
collection code must be indicated on the same line as the fee or
other charge or exaction."  Id. at 20-21.  The instructions
provide collection codes for specific fees, none of which is for
marking duties.


          E.   The Court Dismisses CFI's Complaint With Prejudice

               On September 4, 2014, more than eight months after the
hearing, the Court issued a memorandum and order dismissing
CFI's complaint with prejudice for failure to state a claim.
The Court explained that CFI's initial complaint was comprised

almost entirely of unsupported conclusory allegations insufficient to state a plausible claim under Rule 8(a) of the Federal Rules of Civil Procedure.  U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co., Civ. A. No. 13-2983, 2014 WL 4375638, at *14 (E.D. Pa. Sept. 4, 2014).  In accordance with its previously-expressed intentions, the Court considered the additional facts provided by CFI in connection with its briefing to determine whether CFI should be permitted to amend its complaint to incorporate those additional facts.  Id. at 1 n.1.

Even considering the facts set forth in Ms. Woodings's declaration, the Court found CFI's allegations insufficient to state a claim under the FCA.  That conclusion rested on two observations.  First, even assuming that eBay constituted a representative secondary market for Victaulic pipe fittings and that the limited time period during which CFI performed its product study could be extrapolated to draw conclusions about a decade of imports, CFI failed to allege facts establishing that any unmarked pipe fittings it observed on eBay were not U.S.-made, as U.S.-made fittings need not be marked.  Id. at *15. Second, even if Victaulic failed to mark or improperly marked its foreign-made pipe fittings, those facts do not lead to the conclusion that Victaulic knowingly concealed or avoided an obligation to pay marking duties.  Id.

As an aside, the Court noted additional flaws in CFI's product study.  Id. at *15 n.22.  The study excluded listings without photographs, potentially excluding any number of foreign-marked products.  Additionally, the sellers on eBay may not have described the product or its country of origin accurately, and their photographs may not have depicted the areas where the products were marked.  Finally, if U.S.-made products command higher prices, one would expect to observe more U.S.-made products in the secondary sale market, which would suggest that the unmarked products were U.S.-made.

As CFI failed to satisfy the pleading standard set forth in Rule 8(a), the Court declined to address whether the failure to pay marking duties constitutes a FCA violation. However, the Court expressed doubt that CBP Form 7501 gives rise to an obligation to report marking duties owed on unmarked goods, as well as uncertainty as to when "Victaulic could plausibly be said to have knowingly concealed or avoided an obligation to pay marking duties, or made a false statement or deliberate omission in connection with its alleged avoidance." Id. at *13.


F.   CFI's Motion and Proposed First Amended Complaint

In response to the dismissal, CFI filed a motion to alter or amend judgment and for leave to file an amended

12

complaint.  As with the initial complaint, the first amended
complaint submitted with the motion ("FAC") alleges that
Victaulic either misrepresented to CBP that no marking duties
were owed on its unmarked or improperly-marked foreign imports
or failed to declare the marking duties owed, thereby avoiding
and concealing an obligation to pay the Government in violation
of the FCA.  FAC ¶¶ 1, 11 & 110-13.

     The FAC is primarily based on the theory that
Victaulic has been sneaking unmarked, foreign-made pipe fittings
into the country in order to pass them off as U.S.-made to take
advantage of higher prices for U.S.-made merchandise and
opportunities limited to U.S.-made merchandise.  FAC ¶¶ 87-91.
CFI's allegation that Victaulic does not mark its foreign-made
fittings is predominately predicated on a comparison of its
import study (from which CFI concluded that Victaulic's foreign-
made pipe fittings account for a majority of its U.S. sales) to
its product study (from which CFI concluded that a majority of
Victaulic pipe fittings in the secondary sale market were
unmarked).  FAC ¶¶ 5, 8 & 55.  The FAC describes CFI's import
analysis and product study essentially in the manner set forth
in Ms. Woodings's declaration, but with additional factual
detail.

     With regard to the product study, CFI reviewed

listings for Victaulic pipe fittings on eBay and eliminated listings that were for "old stock" or that were not for Victaulic products.  FAC ¶ 66.  CFI then eliminated approximately twenty percent of the relevant listings, because those listings did not incorporate any photographs of the products for sale.  FAC ¶ 67.  Of the 221 remaining listings, approximately eighty-two percent included at least one photograph that CFI characterized as "clear," from which CFI could allegedly "determine with 95% confidence whether a marking was present or not."  FAC ¶¶ 68 & 70.  CFI notes that it was able to view some of the photographs with a "zoom" option, and that it copied and enlarged other photographs to view the image more closely.  FAC ¶ 68.

The FAC alleges that forty listings (approximately eighteen percent) contained limited or unclear photographs.  FAC ¶ 74.  CFI purchased ten products from nine of those listings for physical examination.  FAC ¶¶ 74-75.  One of the items purchased did not contain a Victaulic logo and was excluded from the study, four items were unmarked, four items bore U.S.-markings, and one item "was packed with a U.S. origin label, but did not appear to have a permanent origin marking."  FAC ¶ 75.  CFI also purchased one of the three Chinese-marked products it identified in its product study to inspect the marking.  FAC ¶ 73.  Based on its review of the 221 listings from seventy-five

sellers and the purchase of nine products from among those listings, CFI concluded that at least seventy-five percent of Victaulic pipe fittings sold on eBay were unmarked and less than two percent (a total of three products) bore foreign country-of-origin markings. FAC ¶¶ 7, 56, 76-77 & Ex. 8. A spreadsheet describing the 221 listings, which was provided with Ms. Woodings's declaration, is attached as an exhibit to the FAC. FAC Ex. 8. CFI also attached as exhibits copies of 196 of the listings and many of the photographs underlying its product study. FAC Ex. 9.

In an effort to bolster its conclusion that Victaulic is failing to mark its foreign-made pipe fittings, CFI attached to the FAC a declaration of Abraham J. Wyner, a Professor of Statistics, and incorporated many of Wyner's conclusions into the factual allegations of the FAC. FAC ¶ 57 & Ex. 7 (Wyner Decl.). Wyner opined that, based on the results of CFI's product study, he "would be more than 99.9% confident that Victaulic is improperly marking a significant portion of its imports." Wyner Decl. ¶ 12. That opinion is based on two assumptions: (1) that imported pipe fittings have comprised a significant portion of Victaulic's U.S. sales in the last decade, and (2) that "the slice of the secondary market for Victaulic pipe fittings represented by eBay contains a proportion of imported products at least approximately similar

to the proportion of imported products among all U.S. sales and that any significant deviation is caused only by chance." Wyner Decl. ¶¶ 10-11; FAC ¶ 57. Wyner acknowledged that the second assumption might not hold true if, for example, the eBay market were heavily favored toward U.S. products. Wyner Decl. ¶ 11.

CFI also alleges that a witness "who has worked for many years in the pipe and tube industry, recalls a customer procuring Victaulic pipe fittings that the company represented were 100% U.S. manufactured." FAC ¶ 83. The witness allegedly observed that none of the pipe fittings were marked with a foreign country-of-origin, but a packing list "at the bottom of one box of Victaulic inventory[] . . . indicated that the products had originated from Poland." FAC ¶ 83.

Although CFI's primary theory of liability is that Victaulic failed to pay marking duties on unmarked foreign merchandise, the FAC also alleges Victaulic has evaded payment of marking duties owed on improperly-marked foreign merchandise. CFI claims that two of the Chinese-marked pipe fittings it observed on eBay had markings that appeared to be a stamp or stencil, but not a die stamp or continuous stenciling as required by the Tariff Act. FAC ¶ 73. For one of those items, which CFI purchased, the marking was on the interior wall of a coupling, such that it was allegedly insufficiently conspicuous because the marking would not be visible when the coupling is in

use.  Id. CFI further contends that the picture Victaulic submitted at the hearing on its motion to dismiss reflected that Victaulic is improperly marking its pipe fittings because the word "China" appears inside the fitting (which is allegedly insufficiently conspicuous) and because the marking "appears to be a single stenciled marking, not a continuous stencil as required by U.S. law."  FAC ¶ 84.

CFI contends that Victaulic was obligated to pay marking duties on its unmarked and improperly marked pipe fittings at the time of importation, and that Victaulic was obligated to disclose those marking duties to CBP in documentation such as CBP Form 7501.  FAC ¶¶ 92-101.  As "CBP physically inspects only a tiny fraction of shipments arriving in the United States," CFI contends that, by failing to disclose marking duties to CBP, Victaulic is able to evade paying marking duties owed on its noncompliant merchandise.  FAC ¶ 100. According to CFI, the very fact that unmarked or improperly-marked foreign-made pipe fittings have entered into U.S. commerce establishes that Victaulic failed to disclose marking duties and violated the FCA because, upon proper disclosure, CBP would have ordered proper marking, destruction, or exportation of the merchandise.  FAC ¶¶ 99 & 102.

II.  <u>Discussion</u>

    A.  <u>Standard of Review</u>

        When a plaintiff files a timely motion to alter or amend judgment pursuant to Rule 59(e) seeking leave to file an amended complaint, the motion is governed by the standard set forth in Federal Rule of Civil Procedure 15(a).  <u>Burtch v. Milberg Factors, Inc.</u>, 662 F.3d 212, 230-31 (3d Cir. 2011). Although Rule 15(a) generally favors amendment, a district court may deny leave to amend upon a finding of undue delay, bad faith, dilatory motive, prejudice to the non-moving party, or futility.  <u>U.S. ex rel. Schumann v. Astrazeneca Pharm. L.P.</u>, 769 F.3d 837, 849 (3d Cir. 2014).  "A District Court has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them."  <u>Krantz v. Prudential Invs. Fund Mgmt. LLC</u>, 305 F.3d 140, 144 (3d Cir. 2002).

        "An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted."  <u>Alvin v. Suzuki</u>, 227 F.3d 107, 121 (3d Cir. 2000).  To survive dismissal for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570

(2007)).  In deciding whether dismissal is appropriate, a court may consider the allegations of the complaint, exhibits attached to the complaint, matters of public record, and "document[s] integral to or explicitly relied upon in the complaint." Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotations omitted) (emphasis omitted).  Although a court must accept any well pled factual allegations as true, it need not credit legal conclusions couched as factual allegations. Iqbal, 556 U.S. at 678.

B.   CFI Unduly Delayed Seeking Amendment

Victaulic argues that CFI unduly delayed seeking amendment by waiting until after the Court entered final judgment despite having been on notice of the defects in its complaint from the time Victaulic moved for dismissal. According to Victaulic, a finding of undue delay is further supported by the fact that the FAC does not rely on newly-discovered information.

"Delay may become undue 'when a movant has had previous opportunities to amend a complaint' but instead 'delays making a motion to amend until after [judgment] has been granted to the adverse party,' . . . ." Jang v. Boston Scientific Scimed, Inc., 729 F.3d 357, 368 (3d Cir. 2013) (quoting Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 273 (3d Cir.

2001)) (alteration in original).  In determining whether a party has unduly delayed seeking amendment, a district court should consider the reasons for the delay.  Cureton, 252 F.3d at 273. A district court may also consider "whether new information came to light or was available earlier to the moving party."  In re Adams Golf, Inc., Sec. Litig., 381 F.3d 267, 280 (3d Cir. 2004). Additionally, "[d]elay becomes 'undue,' and thereby creates grounds for the district court to refuse leave, when it places an unwarranted burden on the court . . . ."  Bjorgung v. Whitetail Resort, L.P., 550 F.3d 263, 266 (3d Cir. 2008).

          CFI's failure to seek amendment until after entry of final judgment, despite having been notified that the Court was considering a dismissal with prejudice, constitutes undue delay. CFI was on notice of the defects in its complaint once Victaulic moved for dismissal.  See Schumann, 769 F.3d at 849.  More importantly, the Court was explicit with CFI at the hearing about the defects in its initial pleading.  The Court twice referred to the complaint as "bare bones" and indicated that the complaint failed to state a claim under governing precedent. Hr'g Tr. at 5-6, 39.  CFI was also on notice that the Court was considering a dismissal with prejudice depending on whether CFI could satisfy the pleading standard based on the additional factual information set forth in Ms. Woodings's declaration and further developed at the hearing.  Id. at 4.

20

CFI expressed an intention to amend in the event of dismissal, but it never filed a motion with a proposed amendment in the eight months that passed before the Court entered final judgment.  Hr'g Tr. at 40.  Instead, CFI stood on its complaint, its briefing, and the record from the hearing, and waited for the Court to rule.  The Court effectively considered CFI's verbal request for amendment by ruling on the sufficiency of the complaint as pled and as potentially amended to include the other information in the record.  Only after the Court found that amendment would be futile did CFI seek leave to amend and present the Court with an amended pleading.[6]

Such a "wait-and-see approach to pleading" is disfavored in this Circuit and weighs against amendment.  Jang, 729 F.3d at 368; see also Ca. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 165 (3d Cir. 2004) (leave to amend was not required when "Plaintiffs chose at their peril not to heed the District Court's guidance and avail themselves of an opportunity to rectify the deficiencies of the Amended Complaint"); In re Adams Golf, Inc., Securities Litig., 381 F.3d at 280 ("Plaintiffs relied at their peril on the possibility of adding to their complaint, but in doing so they clearly risked the prospect of the entry of a final dismissal order.").  The Court has already

---

[6] In light of the Court's consideration of the additional factual information provided in CFI's briefing and at the hearing, the FAC is essentially CFI's second effort at amendment.

spent considerable resources evaluating CFI's claims and thinking through whether any deficiencies in the complaint could be cured.  By waiting for the Court to rule and then filing for leave to amend after the entry of final judgment, CFI is imposing an unwarranted burden on the Court by requiring the Court to waste judicial resources revisiting issues that could have been addressed earlier.

In that regard, a finding that CFI's delay is undue is bolstered by the fact that the FAC rests almost entirely on information that was already before the Court or that CFI could have presented to the Court prior to dismissal.  See Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993).  The FAC reasserts the same factual allegations set forth in Ms. Woodings's declaration and relies on many of the same exhibits.  Although the FAC is more specific and incorporates a majority of the eBay listings and photographs underlying CFI's product study, that information could have been included with CFI's initial filing, its opposition to Victaulic's motion to dismiss, or in response to the Court's concerns after the hearing.

The only potentially new information included in the FAC is a lone allegation concerning a witness who allegedly observed conduct consistent with CFI's theory of liability.  It is not clear when CFI learned of that information, although it is apparent that CFI's investigation into Victaulic is ongoing.

However, it was CFI's choice to file this action when it did, on the apparent belief that it had a sufficient factual basis to justify a FCA action against Victaulic based on its import analysis and product study.  CFI's misjudgment of the strength of its case does not justify its belated effort at amendment.

CFI contends that amendment would not be inequitable, despite any delay, because Victaulic cannot establish prejudice. However, a finding of undue delay is not dependent on a finding of prejudice.  See Estate of Olivia ex rel. McHugh v. New Jersey, 604 F.3d 788, 803 (3d Cir. 2010).  CFI has offered no cogent reason for the delay, and any "misplaced confidence" in its assessment of its case does not justify its failure to seek amendment in the face of clear notification from the Court that dismissal with prejudice was a likely possibility.[7]  In re Adams Golf, Inc. Securities Litig., 381 F.3d at 280; see also CMR D.N. Corp. v. City of Phila., 703 F.3d 612, 629 (3d Cir. 2013) ("[W]e have refused to overturn denials of motions for leave to amend where the moving party offered no cogent reason for the delay in seeking the amendment.").  The Court therefore concludes that

---

[7]Victaulic also argues that amendment should be denied because CFI has acted in bad faith by improperly including an expert declaration as an exhibit to its FAC and misrepresenting Victaulic's statements at the hearing.  The Court disagrees that CFI's inclusion of an expert declaration or its discussion of the hearing reflect bad faith that would preclude amendment.

CFI's delay in this case was undue, but will also decide whether amendment would be futile.

### C.   Amendment Would be Futile

Victaulic also contends that amendment would be futile because the alleged failure to pay marking duties on unmarked or improperly marked merchandise does not constitute a FCA violation.  Alternatively, Victaulic argues that amendment would be futile because the factual allegations in the FAC do not cure the defects in CFI's initial pleading.  The Court agrees that amendment would be futile.

### 1.   Victaulic's Alleged Failure to Pay Marking Duties Does Not Violate the FCA

CFI's theory of liability is predicated on its allegations that unmarked or improperly marked merchandise is subject to marking duties at the time of importation, and that any marking duties owed on such merchandise must be disclosed in entry documentation such as CBP Form 7501.  FAC ¶¶ 92-108. Victaulic relies on American Textile Manufacturers Institute, Inc. v. The Limited, Inc., 190 F.3d 729 (6th Cir. 1999) ("ATMI"), for the proposition that the FAC does not state a claim because any obligation to pay marking duties arose after the alleged false statements were made.  Victaulic also argues

that no false claims could have been made in this case because
nothing in Customs law or CBP Form 7501 requires an importer to
report marking duties at the time merchandise is imported.

### a.   Marking Duties Accrue After Importation

When and under what circumstances an importer owes
marking duties is not necessarily straightforward.  See
Victaulic Co., Civ. A. No. 13-2983, 2014 WL 4375638, at **1-2.
However, after reviewing the Tariff Act, Customs regulations,
and relevant case law, the Court concludes as a matter of law
that an importer does not owe marking duties upon importation of
unmarked or mismarked merchandise.  To the contrary, an
obligation to pay marking dues arises only if unmarked or
improperly marked goods are entered into the country and are not
subsequently remarked, exported, or destroyed.

To understand how an importer comes to owe marking
duties, a basic understanding of the process by which imported
merchandise enters the country is necessary.  Merchandise
arriving by ship is considered "imported" on the date the ship
arrives at a U.S. port with the intention to unload the
merchandise.  19 C.F.R. § 101.1.  To clear the merchandise
through CBP, an importer must "make entry" upon or shortly after
importation by filing entry documentation with CBP so that CBP
can assess the duties owed on the merchandise prior to releasing

25

it.  See 19 U.S.C. § 1484(a); 19 C.F.R. § 141.0a(a)-(b).  At the same time or shortly after "making entry," an importer must file an "entry summary," which includes CBP Form 7501 or an electronic equivalent.  19 C.F.R. §§ 141.0a(b), 142.2 & 142.11. An importer is obligated to use reasonable care in connection with the entry process.  19 U.S.C. § 1484(a)(1).

In general, entry documentation requires an importer to provide information such as the value of the products imported and the country of origin to allow for an accurate assessment of duties owed at the time of importation.  See 19 U.S.C. § 1484(a); 19 C.F.R. § 141.1(a).  An importer generally deposits estimated duties owed to CBP at the time entry summary documentation is filed.  See 19 U.S.C. § 1505(a); 19 C.F.R. § 141.101(a) & 141.103.  Upon receipt of the relevant documentation and an importer's deposit of estimated duties, CBP will release the merchandise.  Although CBP has authority to examine the goods, it may release them without inspection and later request samples or additional examination of released goods.  See 19 C.F.R. § 151.1; 19 C.F.R. § 151.11; see also United States v. So's USA Co., No. 97-05-00922, 1999 WL 675408, at *2 (Ct. Int'l Trade Aug. 26, 1999).  Entries remain open or "unliquidated" for a period of time during which CBP or the importer can review and revise the entry information if necessary.  Absent any revisions, the entry will "liquidate" at

the duty rate estimated by the importer.  See 19 U.S.C. §
1504(a); 19 C.F.R. § 159.11(a).

In the event CBP discovers before release that
imported merchandise is not properly marked with country-of-
origin information, it will require proper marking, exportation,
or destruction of the merchandise.  19 C.F.R. § 134.51(a).  Even
if CBP conditionally releases the merchandise to the importer,
it may request redelivery for proper marking, export, or
destruction within a limited time period if it is later revealed
that the merchandise was not marked.  19 C.F.R. §§ 134.3(b)
141.113(a)(2); see also 19 C.F.R. §§ 141.0a(i).

If an article is not marked in accordance with marking
requirements at the time of importation, "and if such article is
not exported or destroyed or . . . marked after importation,"
then "there shall be levied, collected, and paid upon such
article a duty of 10 per centum ad valorem, which shall be
deemed to have accrued at the time of importation."  19 U.S.C. §
1304(i).  Although marking duties are "deemed to have accrued at
the time of importation," they are only "levied, collected, [or]
paid" if the unmarked article is not exported, destroyed, or
marked after importation.  A CBP regulation confirms that
"[a]rticles not marked as required . . . shall be subject to
additional duties of 10 percent of the final appraised value
unless exported or destroyed under Customs supervision prior to

liquidation of the entry . . . ."  19 C.F.R. § 134.2 (emphasis
added).  Case law supports this interpretation of the statute
and regulations.[8]

Marking duties are therefore not a duty owed to the
Government upon the importation of foreign merchandise.  They
are, rather, additional duties imposed after the fact on
noncompliant merchandise that has been erroneously released into
the stream of commerce.  Indeed, an importer arriving at a U.S.
port with unmarked merchandise does not have the option of
paying marking duties to enter that merchandise into the

---

[8] See Pentax Corp. v. Robison, 125 F.3d 1457, 1463 (Fed. Cir.
1997)("The act of culpably mismarking goods cannot be said to
have deprived the government of the 10 percent *ad valorem* duty
assessed under 1304(f). To the contrary, but for the mismarkings
(followed by the failure to export, destroy, or remark the
articles in accordance with section 1304), the duty could not
have arisen."), amended on reh'g by, 135 F.3d 760 (Fed. Cir.
1998); Frontier Ins. Co. v. United States, 185 F. Supp. 2d 1375,
1379 (Ct. Int'l Trade 2002) ("As Customs correctly concludes, §
1304 mandates the assessment of a 10% marking duty when (1) at
the time of importation an article is not marked in accordance
with the provisions of § 1304(a) and (2) the merchandise is not
exported, destroyed or re-marked under the supervision of
Customs prior to the liquidation of the entry."); United States
v. Golden Ship Trading Co., No. 97-09-01581, 2001 WL 65751, at
*3 (Ct. Int'l Trade Jan. 24, 2001) ("Plaintiff correctly notes
that 19 U.S.C. § 1304 requires that marking duties accrue if
merchandise has been mismarked and has entered into the commerce
of the United States."); United States v. Pentax Corp., 69 F.
Supp. 2d 1361, 1363 (Ct. Int'l Trade 1999) ("Had the mismarking
been discovered before release by Customs, the goods would not
have been admitted as marked. Remarking, exportation, or
destruction, would have been required. If none of these measures
were accomplished and if the mismarking had been discovered
before liquidation, marking duties would have been assessed."
(citations and footnote omitted)).

country.[9]  Rather, as discussed above, the importer will be obligated to remark, export, or destroy the merchandise.  Only when none of those three things occurs does an importer's obligation to pay marking duties arise.

CFI appeared to embrace this understanding of marking duties at the hearing.  See Hr'g Tr. at 23-27, 31-32.  Indeed, CFI acknowledges in its current briefing that "the only circumstance in which an importer actually pays marking duties is if the importation of unmarked goods is detected after-the-fact, and after Customs has the ability to require marking, destruction or re-export."  Doc. 37 at 11.  Nevertheless, CFI also takes the position that marking duties are owed upon importation and suggests that the Court must defer to its factual allegation as to when marking duties are owed.

When and the circumstances under which an importer

---

[9] The Tariff Act provides that "[n]o imported article held in customs custody . . . shall be delivered until such article . . . , whether or not released from customs custody, shall have been marked in accordance with the requirements of this section or until the amount of duty estimated to be payable under subsection (i) of this section [i.e., marking duties] has been deposited."  19 U.S.C. § 1304(j); see also 19 C.F.R. § 134.3(a).  That language arguably suggests marking duties may be paid in lieu of marking.  To the contrary, that provision does not afford an importer a choice to either pay marking duties or surrender the merchandise for proper marking, exportation, or destruction.  See Globemaster, Inc. v. United States, 340 F. Supp. 974, 977 (Cust. Ct. 1972); see also Hr'g Tr. at 17-18, 23-27; FAC ¶ 99.

owes marking duties is dictated by statute and regulations.  It is a legal issue rather than a factual matter, and the Court owes no deference to CFI's legal conclusions.  See Iqbal, 556 U.S. at 678.  CFI ignores the statutory provisions and regulations discussed above and appears to rely exclusively on the language that marking duties are "deemed to have accrued at the time of importation."  19 U.S.C. § 1304(i).  Notably, the statute does not say that marking dues are "owed" or "due" upon importation, but rather "deems" them "to have accrued at the time of importation."  That language accords with the notion that marking duties accrue after importation absent remarking, exportation, or destruction, but are retroactively "deemed" to have accrued at importation, presumably to fix a point in time at which to value the imported merchandise so as to calculate the ten-percent marking duty.

CFI's interpretation that marking duties are owed at the time of importation cannot be squared with the language of the statute and regulations.  If marking duties were owed upon importation, as CFI alleges, an importer would owe marking duties on noncompliant merchandise even if that merchandise were subsequently remarked, exported, or destroyed in connection with the entry process or after entry.  To the contrary, as explained above, marking duties are additional duties owed on noncompliant

merchandise that has <u>not</u> been remarked, exported, or destroyed after entry into commerce.  <u>See</u> 19 U.S.C. § 1304(i).

    b. <u>CBP Form 7501 Does Not Require an Importer to Report Marking Duties</u>

   As noted in the Court's earlier opinion, nothing in CBP Form 7501 requires an importer to report marking duties that may be owed on unmarked merchandise.  <u>Victaulic</u>, Civ. A. No. 13-2983, 2014 WL 4375638 at *13.  The form and its instructions do not mention marking duties at all.  Furthermore, the location on the form where an importer is instructed to summarize "other" fees requires the importer to denote the "applicable collection code" from a list of codes provided in the instructions.  <u>See</u> <u>supra</u> § I.D.  None of those collection codes refers to marking duties.  There is simply no location on the form where an importer is required to disclose marking duties in accordance with the form instructions.

   CFI's construction of Form 7501 is not only inconsistent with the language of the form and related instructions, but it makes no sense in light of when marking duties are owed.  Under CFI's interpretation, an importer would be obligated to disclose marking duties owed on merchandise before any marking duties had in fact accrued.  If CBP were notified upon entry—via Form 7501 or in connection with other

entry documentation—that imported merchandise did not comply with marking requirements, it would order remarking, exportation, or destruction of the merchandise prior to releasing it.  CFI acknowledges that fact.  FAC ¶ 102; see also Hr'g Tr. at 31.  In that case, however, the importer would not owe marking duties because no obligation to pay marking duties would have accrued.  Any prior disclosure of marking duties, to the extent one was made, would have therefore been erroneous.

CFI nevertheless claims that deference is due to its factual allegation that an importer must disclose marking duties on Form 7501.  The FAC explicitly relies on form 7501 in connection with its allegation that Victaulic is falsifying entry documentation.  FAC ¶ 96.  Accordingly, the court may properly consider the form in deciding whether the FAC states a claim.  See Schmidt, 770 F.3d at 249.  To the extent a document properly before the court "contradict[s] the Complaint's factual allegations, the document[] will control."  Goldenberg v. Indel, Inc., 741 F. Supp. 2d 618, 624 (D.N.J. 2010) (citing ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 n. 8 (3d Cir. 1994)).  Accordingly, no deference is due to CFI's erroneous allegation that Form 7501 requires disclosure of marking duties.

c.   <u>Victaulic's Alleged Failure to Pay Marking Duties
Does Not Give Rise to a Claim Under the FCA</u>

Prior to 2009, the FCA imposed liability on whoever
"knowingly makes, uses, or causes to be made or used, a false
record or statement to conceal, avoid, or decrease an obligation
to pay or transmit money or property to the Government."  31
U.S.C. § 3729(a)(7).  Claims brought pursuant to that provision
were known as "reverse false claims" because they concerned use
of a false record to reduce or avoid a monetary obligation to
pay the government rather than fraudulent efforts to cause
payment on a false claim.  <u>U.S. ex rel. Schmidt v. Zimmer, Inc.</u>,
386 F.3d 235, 242 (3d Cir. 2004).  In its current form, the FCA
imposes liability on whoever "knowingly makes, uses, or causes
to be made or used, a false record or statement material to an
obligation to pay or transmit money or property to the
Government, or knowingly conceals or knowingly and improperly
avoids or decreases an obligation to pay or transmit money or
property to the Government."  31 U.S.C. § 3729(a)(1)(G)
(effective May 20, 2009).  The amended version of the reverse
false claim provision applies to conduct that occurred after its
enactment on May, 20, 2009.  <u>See</u> <u>U.S. ex rel. Ahumada v. NISH</u>,
756 F.3d 268, 280 n.7 (4th Cir. 2014) (citing Fraud Enforcement
and Recovery Act of 2009, Pub. L. No. 111-21, § 4(f), 123 Stat.
1617, 1625).

The Sixth Circuit's opinion in ATMI, supra, is particularly relevant to whether CFI can state a cognizable claim under the FCA based on Victaulic's alleged failure to pay marking duties. The defendants in that case were alleged to have mismarked merchandise by labeling articles produced in China as having been produced in Hong Kong, and misrepresenting the country of origin in paperwork filed with Customs to avoid textile quotas. The relator claimed that the defendants' conduct subjected them to fines, liquidated damages, and marking duties, and that their filing of false documentation concealed those monetary obligations in violation of the pre-2009 version of the FCA's reverse false claim provision.

The Sixth Circuit relied on two basic principles to conclude that the allegations vis-à-vis marking duties did not state a claim. First, "a plaintiff may not state a reverse false claim unless the pertinent obligation attached *before* the defendant made or used the false record or statement." 190 F.3d at 734. Second, "[w]here an obligation arises if and only if a defendant makes a false statement or files a false claim . . . , an action under the False Claims Act will not lie . . . ." Id. After looking to relevant case law on marking duties, the Sixth Circuit concluded that "the marking duty applies only when a defendant engages in conduct that the statute defines as wrongful" and rejected the reverse false claim on that basis.

34

Id. at 741.  Additionally, the relator's claims failed as a matter of law because any false statements were necessarily made before any obligation to pay marking duties attached.

The Court agrees with the logic of ATMI that a defendant cannot be liable for a reverse false claim based solely on conduct necessary to create the obligation that the defendant allegedly avoided or concealed.  For liability to attach under the pre-2009 version of the reverse false claim provision, a defendant had to knowingly make a false statement or use a false record to "conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(7).  Under the current version, a defendant is liable if it "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government," regardless of whether a false statement is made.

In interpreting statutory language, a court should determine the statute's plain meaning, and may use a dictionary to determine the ordinary meaning of the words.  See, e.g., Aleynikov v. Goldman Sachs Grp., Inc., 765 F.3d 350, 359 (3d Cir. 2014).  The word "avoid" means "to prevent the occurrence or effectiveness of [something]."  Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/avoid. "Conceal" is defined as "to prevent disclosure or recognition of" or "to

place out of sight." Id. http://www.merriam-webster.com/dictionary/conceal.  The word "decrease" is defined as "to grow progressively less (as in size, amount, number, or intensity)" or "to cause to decrease." Id. http://www.merriam-webster.com/dictionary/decrease.

When a course of conduct is necessary to create an obligation to pay the Government, that same course of conduct cannot also be said to "conceal," "avoid," or "decrease" the obligation within the ordinary meaning of those words, even if the conduct giving rise to the obligation is fraudulent. Otherwise, the instant an obligation arises by virtue of a defendant's fraudulent conduct, the defendant could also be said to have concealed, avoided, or decreased that same obligation without doing anything else.  The ordinary meaning of the words conceal, avoid, and decrease indicate that a defendant must take some other action to prevent disclosure of or payment on the obligation or to cause that obligation to decrease after the obligation accrues.

CFI contends that "[i]f Victaulic has imported unmarked fittings, then it concealed, withheld, and avoided an obligation to pay the 10% marking duties on those imports, including by failing to provide necessary documentation to CBP for their release and failing to deposit the duties at or before the time of release, as required by statute, as well as by not

36

marking the products in the first place . . . ."  Doc. 43 at 14;
see also FAC ¶ 102 ("[I]f Victaulic successfully imported and
distributed into the stream of commerce unmarked pipe fittings,
then it necessarily falsified information on its entry documents
and failed to pay marking duties owed.").  As explained above,
there are no marking duties to report at the time of importation
or entry because an importer does not owe marking duties unless
he enters unmarked or improperly marked merchandise into the
country and that merchandise is not otherwise remarked,
exported, or destroyed.   Any obligation to pay marking duties
on Victaulic's pipe fittings necessarily accrued after
importation and entry, such that there would be no duties to
report or deposit upon importation or entry.

          Accordingly, Victaulic cannot be liable on a reverse
false claim based solely on the fact that it allegedly imported
unmarked or improperly marked merchandise because that conduct
is necessary to create the obligation in question.  Whether an
importer comes to owe marking duties by negligently or
intentionally skirting marking requirements and entering
noncompliant merchandise into the country, the marking duties
would not be owed but for that conduct.  For the reasons
discussed above, the same conduct that gives rise to the
obligation to pay marking duties cannot also be said to avoid,
conceal, or decrease those duties so as to give rise to a

reverse false claim under either version of the statute. Accordingly, amendment would be futile because CFI's claims fail as a matter of law.[10]

### 2.   The FAC Does Not Satisfy Rule 9(b)

Amendment would also be futile because the FAC fails to satisfy Rule 9(b).  Federal Rule of Civil Procedure 9(b) requires a party alleging fraud, including a relator in a FCA action, to "state with particularity the circumstances constituting [the] fraud."  Fed. R. Civ. P. 9(b); U.S. ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 301 n.9 (3d

---

[10] Victaulic also alleges that a failure to pay marking duties is essentially a regulatory violation that does not give rise to a claim under the FCA.  Several courts, including the Sixth Circuit in ATMI, held that, under the pre-2009 version of the FCA, unassessed civil and criminal penalties for regulatory violations were "contingent" obligations that could not form the basis of a reverse false claim.  190 F.3d at 738; see also Hoyte v. Am. Nat'l Red Cross, 518 F.3d 61, 67 (D.C. Cir. 2008); U.S. ex rel. Bain v. Ga. Gulf Corp., 386 F.3d 648, 657 (5th Cir. 2004).  The 2009 amendments to the FCA added a definition of "obligation," to include "an established duty, whether or not fixed, arising . . . from statute or regulation."  See 31 U.S.C. § 3729(b)(3). It is apparent from the legislative history that Congress considered "customs duties for mismarking country of origin" to be encompassed within the new definition. S. Rep. 111-10, at n.10, S. Rep. No. 10, 111th Cong., 1st Sess. 2009, 2009 WL 787872, at *24.  However, although certain contingent obligations may now form the basis of a reverse false claim, it is still not clear that an unassessed civil or criminal penalty for a regulatory violation constitutes an obligation under the statute.  See John T. Boese, Civil False Claims and Qui Tam Actions § 2.01[L] (citing 155 Cong Rec. S. 4539 (daily ed. Apr. 22, 2009) (statement of Sen. Kyl)).  The Court declines to address this issue, having resolved the matter on other grounds.

Cir. 2011).  To satisfy Rule 9(b), a relator must "allege 'particular details of a scheme to submit false claims [or otherwise violate the FCA] paired with reliable indicia that lead to a strong inference that claims were actually submitted [or the FCA violated in the manner alleged].'"  Foglia v. Renal Ventures Mgmt., LLC, 754 F.3d 153, 156 (3d Cir. 2014) (quoting U.S. ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)).  Although a relator need not plead "representative samples" of fraudulent conduct "specifying the time, place, and content of the acts and the identity of the actors," he must describe more than "a mere opportunity for fraud."  Id. at 155 & 158.

"In cases of fraud, Rule 9(b) . . . stand[s] as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later."  Grubbs, 565 F.3d at 185.  Its particularity requirement is intended "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior."  Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). "[A] claim brought under the [FCA] that rests primarily on facts learned through the costly process of discovery is precisely what Rule 9(b) seeks to prevent."  U.S. ex rel. Nathan v. Takeda

Pharm. N. Am., Inc., 707 F.3d 451, 456 (4th Cir. 2013) (internal quotations and alterations omitted)).

CFI's primary theory of liability is that, from 2003-2012, Victaulic failed to mark its foreign-made pipe fittings, snuck those unmarked fittings into the country by failing to disclose them to CBP, and passed them off as U.S.-made to command higher profits.[11]  That theory rests almost entirely on a comparison of CFI's import analysis to its product study and Dr. Wyner's related statistical analysis.[12]  According to CFI, one can conclude that Victaulic is failing to mark its foreign-made pipe fittings because a considerable portion of the Victaulic products sold on the secondary market (eBay) are unmarked, such that some of those products must be foreign-made in light of the fact that imports account for a significant portion of Victaulic's sales.

Although studies and statistics may be used to satisfy Rule 9(b) in the FCA context, those studies and statistics must

---

[11] Victaulic, pointing to its price list, suggests that it has no motive for fraud because it charges the same price for its foreign-made and U.S.-made products.  However, the FAC explains that certain legislation created a market for U.S.-made products, which could provide a motive for the fraud alleged by CFI.  CFI also alleges that the price list is irrelevant, to some extent, in light of industry discounts commonly provided on pipe fittings.

[12] Victaulic alleges that it was improper for CFI to submit an expert report at this stage of the litigation, and that the Court should not consider it.  However, CFI's claims fail even taking Wyner's declaration into account.

be reliable in the sense that they give credence to the relator's allegations of fraud. See U.S. ex rel. Ge v. Takeda Pharm. Co., Ltd., 737 F.3d 116, 123-24 (1st Cir. 2013) (explaining that, in some contexts, a relator can satisfy Rule 9(b) by "providing factual or statistical evidence to strengthen the inference of fraud beyond possibility without necessarily providing details as to each false claim" (internal quotations omitted)); U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 (5th Cir. 1997) (relator's allegations based on statistical studies failed to satisfy Rule 9(b) when there was "no indication[] . . . that [the] studies directly implicate[d] defendants").

CFI's product study is insufficiently reliable to support its conclusion that Victaulic failed to mark foreign products because it uses unreliable methods. The inherent unreliability of the product study stems from the fact that CFI's conclusions rest on the assumption that it was able to discern from photographs on the internet whether a given product was marked. Of the 221 listings considered by CFI, eighty-two percent allegedly had one or more "clear" photographs (a subjective assessment) from which CFI "was able to determine with 95% confidence whether a marking was present or not."[13]   FAC

---

[13] Nothing in the FAC or CFI's briefing explains how CFI derived its conclusion that, for the majority of listings, it could

¶ 68.  But reviewing pictures on eBay, which are one-dimensional rather than three-dimensional, does not reliably allow one to draw a conclusion as to whether the depicted product is marked, especially since there is no indication that sellers were making an effort to display markings in the photographs.  Although CFI alleges that it used a "zoom" option and otherwise enlarged images to get a closer look at the products being sold, that matters little if the country-of-origin marking simply is not evident from the photograph.

CFI rejects the notion that it may have missed foreign markings, in particular those located inside the rim of a product (such as the marking displayed in the picture Victaulic presented at the hearing), because it identified one foreign marking inside a pipe fitting and because "approximately two-thirds of the listings provide some view of the inside or rim of a fitting."  Doc. 43 at 8.  But the fact that certain photographs provided a view of the inside of a fitting does not mean that each image illustrated the location where each product was marked, especially since CFI reviewed different types of products that may have been marked in different locations.

---

ascertain whether a depicted product was marked with ninety-five percent confidence.  That figure appears to be an assumption based on CFI's subjective assessment of its ability to make a marking determination from a photograph rather than any data. It is also not apparent from the spreadsheet attached to the FAC each of the listings that CFI deemed "unclear."  Compare FAC ¶ 74 with FAC Ex. 8.

CFI's own allegations illustrate the limits of its products study.  When CFI selected a sample of nine products to purchase from the eighteen percent of photographs it designated as "unclear," one of the products purchased was not even marked as a Victaulic product and had to be excluded from the study. FAC ¶ 75.  Furthermore, upon purchasing items for sale, CFI realized that "approximately half of the Victaulic pipe fittings CFI purchased were, in fact, marked as made in the U.S.A., although they appeared from the eBay listings to be unmarked." FAC ¶ 76.  Although CFI adjusted its results based on that finding, it does not inspire confidence about the majority of its conclusions, especially since there is no apparent factual basis for the ninety-five percent confidence level CFI attributes to its ability to discern markings from the "clear" photographs.[14]  It also does not appear as though CFI accounted for the fact that several listings were for multiple products.

Even if CFI had accurately assessed whether a given product sold on eBay was marked, its study still does not lead to the conclusion that the unmarked products are foreign made, rather than U.S.-made.  CFI alleges that eBay is a national

---

[14] The only sufficiently reliable assessments of markings are those made by CFI after purchasing the products from eBay.  But nine purchases are not a statistically significant sample from which to conclude, by virtue of a comparison to Victaulic's imports over a decade, that Victaulic is failing to mark its imported fittings.

market that includes products from different channels of
distribution and a range of Victaulic products for sale.  FAC ¶¶
62-65; Doc. 43 at 7.  But those allegations do not reliably
support an inference that one would expect to find foreign-made
and U.S.-made Victaulic products sold on eBay in the same ratio
sold by Victaulic.  Without a reliable basis for drawing such an
inference, CFI's product study cannot plausibly establish that
Victaulic is failing to mark a significant portion of its
imported fittings.  These inherent flaws in CFI's study cast
considerable doubt on its conclusions and, by extension, Wyner's
statistical analysis, rendering the study an insufficient basis
for satisfying Rule 9(b).

        The only other factual allegation supporting CFI's
theory that Victaulic failed to mark its pipe fittings relates
to a witness who worked in the pipe and tube industry.  That
witness allegedly "recall[ed] a customer procuring Victaulic
pipe fittings that the company represented were 100% U.S.
manufactured," yet observed a packing list at the bottom of "one
box" of inventory suggesting that the unmarked products
originated in Poland.  FAC ¶ 83.  This allegation is closer to
the mark, as it lends support to CFI's theory that Victaulic is
failing to mark imported merchandise.  However, the non-specific
allegations of one witness implicating one box of inventory for
an unknown customer at an unknown time does not "lead to a

strong inference" that Victaulic has perpetrated a massive fraud involving millions of pounds of product imported over the course of a decade, at least not without additional corroborating allegations.  <u>Foglia</u>, 754 F.3d at 158.  To conclude otherwise would mean that a complete stranger to a company could run to court and unlock the doors to discovery based solely on the non-specific allegations of one witness.  More is required "for a ticket to the federal discovery apparatus."  <u>Grubbs</u>, 565 F.3d at 190.

It is worth noting that CFI is essentially a stranger to Victaulic.  It has no inside information, unlike the typical *qui tam* relator, who has usually seen direct or indirect evidence of a fraudulent scheme.  A current or former employee of a defendant, or an individual who is otherwise in a position to have inside information about a defendant's practices and conduct, bears some level of reliability when he acts as a *qui tam* relator because he was in a position have observed the alleged fraud through personal experience.  <u>See</u> <u>Grubbs</u>, 565 F.3d at 191-92 (relator alleged scheme to improperly bill for patient visits based on "first-hand experience" and direct communications with other participants in the scheme); <u>U.S. ex rel. Heater v. Holy Cross Hosp., Inc.</u>, 510 F. Supp. 2d 1027, 1036 (S.D. Fla. 2007) ("Heater's personal experience with the

billing process can provide the 'indicia of reliability' required to survive Holy Cross's Motion to Dismiss.")

When a relator is a complete stranger to the defendant who has constructed a case of fraud entirely from the outside, his allegations do not necessarily bear the same reliability. That is not to say that a corporate outsider cannot function as a relator.  However, any outside investigation into a private company's fraud must, in accordance with Rule 9(b), supply the Court with a level of reliable information that strongly supports an inference a FCA violation has occurred.  For the reasons above, CFI has not done so here with respect to its claim that Victaulic is failing to mark its foreign-made products.  See Ebeid ex rel. U.S. v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010) ("To jettison the particularity requirement simply because it would facilitate a claim by an outsider is hardly grounds for overriding the general rule, especially because the FCA is geared primarily to encourage insiders to disclose information necessary to prevent fraud on the government.").

In a secondary theory, CFI alleges that, even when Victaulic marks its foreign-made products, those markings do not technically comply with marking requirements because they are done by an improper method and/or are not conspicuous.  That theory is based on one foreign pipe fitting CFI purchased from

eBay in connection with its product study, a review of another listing from eBay, and the picture of a Victaulic pipe fitting that Victaulic submitted at the hearing.  FAC ¶¶ 9, 72-73, 84-85 & Ex. 10; Doc. No. 43 at 11; Doc. No. 37-19 at 6 & 29.

It is not clear that any of the products in question fail to comply with the requirement that merchandise must be marked "in a conspicuous place . . . in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article."  19 U.S.C. § 1304(a).  "The 'ultimate purchaser' is generally the last person in the United States who will receive the article in the form in which it was imported."  19 C.F.R. § 134.1(d).  A marking is "conspicuous" if it is "capable of being easily seen with normal handling of the article or container" and if the ultimate purchaser can easily find the marking and read it without strain.  19 C.F.R. § 19 C.F.R. §§ 134.1(k) & 134.41(b); Customs Ruling No. N1 95078 (Dec. 15, 2011).[15]  Whether a marking is conspicuous is determined by looking at "the size of the marking, the location of the marking, whether the marking stands out, and the legibility of the marking," although no factor is conclusive on its own.  Customs Ruling HQ 734718 (Apr. 22, 1993).  The purpose of the marking requirements is so that "at the time of purchase the ultimate purchaser may, by knowing

_____

[15] Customs rulings can be found online at http://rulings.cbp.gov/.

where the goods were produced, be able to buy or refuse to buy them, if such marking should influence his will." United States v. Friedlaender & Co., 27 C.C. Pa. 297, 302 (C.C.P.A. 1940).

The markings with which CFI takes issue are visible on the interior of the products. However, they are not "hidden from sight" as CFI alleges, as the black marking contrasts with the orange color of the product. FAC ¶ 84; see also FAC Ex. 10; Doc. No. 37-19 at 6 & 29. CFI further contends that Victaulic's markings do not comply with the Tariff Act because they would not be visible when the product is "in use." FAC ¶ 73. But if a marking is sufficiently conspicuous to convey to an ultimate purchaser where the goods were produced, it is not clear why the marking must also be visible when the product is in use to comply with the law. Cf. Customs Ruling No. NY N045657 (Dec. 24, 2008) (label inside neck on men's garment was conspicuous).

CFI also claims that the three Victaulic products in question are not marked by one of the five methods required by the Tariff Act—die stamping, cast-in-mold lettering, etching, engraving, or continuous paint stenciling. 19 U.S.C. § 1304(c)(1). According to CFI, the picture Victaulic produced at the hearing reflects a product with a foreign marking that "appears to be a single stenciled marking, not a continuous stencil as required by U.S. law." FAC ¶ 84. However, in response to Victaulic's assertion that the product in the

photograph was marked by a laser etching (which complies with
the Tariff Act), CFI admitted that the manner of marking "cannot
be determined simply by looking at the photograph."  Doc 43 at
11.  CFI's allegation therefore does not provide a reliable
basis for concluding that Victaulic failed to mark this
particular product in a lawful manner.[16]  In any event, given
CFI's assertion that "the marking in [the] photograph is not
representative of Victaulic's actual practices during the time
period covered by this case," it is not clear why CFI would
point to the photograph in support of its FCA claim.  Doc. 43 at
12.

        The Court is left with two Chinese-made products—one
of which CFI purchased and one of which it viewed via a
photograph—that CFI contends are "stenciled or stamped in black
ink (not etched)" in a manner that does not comply with the
Tariff Act.  Doc. 43 at 11.  It is possible that, even if
Victaulic's manner of marking does not technically comply with
the marking statute, CBP would accept the marking as compliant.
See Customs Ruling No. HQ 734795 (Oct. 26. 1994) (concluding
that ink stenciling "is sufficiently permanent that it is the
equivalent of paint stenciling and, therefore, meets the

---

[16] That Victaulic's foreign-made products may be marked by a
different method than its U.S.-made products is irrelevant if
the foreign markings comply with the law.

requirements of 19 U.S.C. 1304(c)").  In any event, CFI's
allegations that Victaulic has failed to correctly mark two of
its products do not support the vast fraudulent scheme alleged
in the FAC.

    To the extent anything can be extrapolated from the two
products, they at most support an inference that some unknown
portion of Victaulic's Chinese-made imports are not marked in
one of the five manners set forth in the Tariff Act.  The
allegations do not plausibly support CFI's scheme that Victaulic
engaged in fraudulent conduct as to all of its Chinese and
Polish imports over the course of a decade.[17]  But improperly
marking foreign-made products does not provide an opportunity to
pass those products off as U.S.-made (as in the case of unmarked
products), which CFI contends is the motivation driving
Victaulic's fraud.  In any event, even if CFI could fashion a
second amended complaint more narrowly tailored to its theory
that Victaulic is marking certain of its Chinese imports in a
manner that does not comply with the Tariff Act, amendment would

_____

[17] As CFI acknowledges that one of the Chinese-marked products it
viewed on eBay was properly marked, Victaulic's alleged marking
failures do not appear to pervade every type of product
manufactured in China.  Additionally, as Victaulic did not start
manufacturing in China until 2005, any alleged fraud with
respect to Chinese-made products could not have occurred before
then.  See FAC ¶ 45.  It is not appear as though CFI uncovered
any specific information concerning how Victaulic marks its
Polish-made products.

be futile because Victaulic's failure to pay marking duties on improperly marked products does not constitute a violation of the FCA.[18]  See supra § II.C.1.


III.    Conclusion

        For the foregoing reasons, the Court will deny CFI's motion to alter or amend judgment, and for leave to file an amended complaint.  Amendment would be inequitable because CFI unduly delayed seeking amendment.  Amendment would also be futile because the FAC does not allege a cognizable claim under the FCA and, in any event, does not satisfy Rule 9(b)'s requirement that fraud must be pled with particularity.


        An appropriate order shall issue.

---

[18] CFI asserts that it should not be required to plead with particularity that Victaulic failed to pay marking duties because that information is in the hands of Victaulic.  In Foglia, the Third Circuit, in a "close case," held that when a relator provided patient logs showing that the defendant was using less of a certain medicine than would have been required unless it complied with certain regulations, the court was required to credit the allegation that the defendant failed to comply with those regulations because the defendant "had access to the documents that could easily prove the claim one way or another."  754 F.3d at 158.  The allegations of fraud in that case were far more reliable than the allegations here.