IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES *ex rel*. CUSTOMS FRAUD INVESTIGATIONS, LLC<br><br>               Plaintiff/Relator,<br><br>    v.<br><br>VICTAULIC COMPANY<br><br>               Defendant. | Civil Action No. 13-2983 |

**SUPPLEMENTAL DECLARATION OF JONATHAN K. TYCKO IN SUPPORT OF RELATOR'S MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**

I, Jonathan K. Tycko, do hereby declare and state as follows:

1. This declaration is made in further support of Relator's Motion for Award of Attorneys' Fees and Expenses (the "Motion For Fees"), and to respond to Victaulic's brief in opposition to the Motion For Fees. I have personal knowledge of the facts stated herein, based on my active participation in this case, and, if called as a witness, I could and would competently testify thereto.

2. In this Supplemental Declaration, I set forth only a small sample of the evidence that was amassed during discovery in this case. My purpose in so doing is to rebut Victaulic's contentions that it was "wrongly accused of fraud," Dkt. No. 128 at 1, that the Relator's claims were "baseless," *id*., that discovery in this case was a "fishing expedition," *id*. at 4, that there was "no evidence" supporting Relator's claims, *id*., that those claims were "frivolous," *id.* at 10, and that Victaulic is a "victim." Quite to the contrary, if the case had not settled, but instead had gone to trial, we would have presented substantial evidence that Victaulic knowingly imported large quantities of pipe fittings from both China and Poland that either were not marked with

1

country of origin, or that were marked with a method (inconsistent, barely legible, ink jet printing on the inside of the fittings) that was not lawful.

3.      As discussed in our Reply Brief, being filed this same day, the Court need not try to determine how a jury would have found if this case had gone to trial.  I note that the vast majority of Victaulic's opposition brief is devoted *not* to discussing the actual evidence of Victaulic's conduct, but instead to rehashing its complaints about how the case was developed *before* it was filed and, implicitly, about how the Third Circuit ruled in the appeal.

4.      The evidence actually developed in discovery is broader and deeper than I will lay out in this Supplemental Declaration.  But my hope is that this Supplemental Declaration will provide the Court with the flavor of what type of evidence would have been offered at a trial, so that the Court understands that Victaulic's protestations of innocence are entirely self-serving and inaccurate.

5.      If the case had gone to trial, the key witness would have been Allen Roberts.  As part of discovery in this case, I took a deposition of Mr. Roberts.  The transcript of that deposition, and the documents that were marked as exhibits at the deposition, are attached hereto as EXHIBIT A, and referred to herein as "Roberts Dep."

6.      Mr. Roberts is Victaulic's Global Trade and Compliance Manager, a position he has held since 2012.  Roberts Dep. at 7.  He was the first person to have a full-time position at Victaulic devoted to trade compliance issues; before 2012, that position did not exist at Victaulic.  *Id*. at 14-17.  Among Mr. Roberts' duties is to oversee Victaulic's compliance with country-of-origin marking requirements.  *Id*. at 16.  Mr. Roberts was the Victaulic executive who verified all of Victaulic's interrogatory answers in this case, and he was personally involved in addressing Victaulic's *non*-compliance with the country-of-origin marking requirements, and as well as

2

Victaulic's efforts to conceal that non-compliance from U.S. Customs and Border Protection ("CBP"), the agency that enforces the country-of-origin marking requirements.

7.  Victaulic has a foundry in Poland know as Victaulic Polska or Victaulic Poland, and a foundry in China known as Dalian Bingshan Metal Technology ("DBMT").  Roberts Dep. at 26-28.  The evidence developed through discovery showed that Victaulic imported unmarked pipe fittings into the United States from both facilities.  In addition, with respect to DBMT, Victaulic imported into the United States fittings that were marked with the word CHINA on the inside of the fittings using an ink jet printer process that Victaulic knew, since at least October of 2013, was, at best, inconsistent and that often failed to mark the products at all, and frequently applied only partial or illegible marks.  I will separately address the evidence relating to Poland and China.

### The Evidence That Victaulic Knowingly Imported Pipe Fittings Manufactured At Victaulic Poland That Had No County-Of-Origin Marks

8.  Although Victaulic now claims that there was "no evidence" supporting Relator's claims, in fact Relator had close to an open-and-shut case with respect to the Poland-manufactured fittings.

9.  When Relator's counsel reviewed the massive number of documents that Victaulic produced, we eventually discovered a series of emails from 2013 and 2014 that showed that Victaulic had imported unmarked fittings from Victaulic Poland, possibly for many years, and that Mr. Roberts—the person supposedly in charge of "compliance" at Victaulic—had allowed unmarked fittings to continue to be imported even after the issue was brought to his attention.  Moreover, instead of alerting CBP to the issue (which is what the law required), Victaulic tried to cover it up by hand-stamping thousands of Polish-made fittings that had amassed in one of Victaulic's warehouses in Pennsylvania.  This was happening while Victaulic

was trying to get this case dismissed, presumably hoping that it would never have to engage in discovery and risk being found out.

10.     At his deposition, Mr. Roberts admitted that, in the fall of 2013, he was conducting an audit at one of Victaulic's warehouses when "we came across parts without county-of-origin marking on them."  Roberts Dep. at 184-85.  He testified that as the audit looked at more and different parts that had been imported from Poland the "universe got a little bigger," *id*. at 186, meaning that they found more and more parts with no country-of-origin mark.

11.     He then reached out to a Victaulic employee based in Poland, Adriana Bugara.  The first email between Mr. Robert and Ms. Bugara on this subject is dated September 10, 2013, *see* Roberts Dep. at Exh. 15—only 12 days after the original Complaint in this case was served on Victaulic.  *See* Dkt. No. 9.  Ms. Bugara readily admitted to Mr. Roberts that Victaulic Poland had been manufacturing a variety of fittings bound for the United States that had absolutely no country-of-origin marks.  Roberts Dep. at 186-92 & Exh. 15.

12.     Mr. Roberts sent a follow-up email on September 17, 2013, in which he asked: "what records can you give me on the parts that were not marked, back to 2003?  I'm looking for a way to quantify what we may have brought in unmarked, partcode, quantity, date value (cost)." *Id*. at 192-93 & Exh. 15.  Mr. Roberts testified that the reason he made that request was that "the case was brought to my attention at that point and I think I was being asked to quantify it . . . [b]y our lawyers." *Id*. at 194-95.  In other words, Victaulic knew that it had a problem on its hands, and its lawyers had drafted Mr. Roberts to help quantify Victaulic's exposure.  Mr. Roberts went on to testify that he was not ever able to quantify it exactly because he was unable to determine how far back in time Victaulic had been importing unmarked Polish-made

fittings. *Id*. at 195-96. However, he did ultimately do a calculation that he provided to Victaulic's lawyers, although he claimed not to recall the outcome of that calculation when asked about it at his deposition. *Id*. at 206.

13. On September 30, 2013, Ms. Bugara sent Mr. Roberts a spreadsheet in which she listed all of the parts made by Poland Victaulic for export to the United States, and for each part indicating whether or not those parts had been, or were currently, being marked with country-of-origin. Roberts Dep. at 196-206 & Exh. 16.

14. Two days later, on October 1, 2013, Victaulic did a spot check of certain Polish-made parts that were then in the inventory at one of its warehouses. Of the five parts checked, four had no country-of-origin mark. Roberts Dep. at 207-08 & Exh. 17.

15. A few weeks later, on October 25, 2013, Ms. Bugara sent Mr. Roberts a more extensive spreadsheet cataloguing the numerous parts made by Victaulic Poland for export to the United States that were not, or had not been, being marked with country-of-origin. Roberts Dep. at 215-21 & Exh 19.

16. Despite now being fully aware of the issue with the Poland products, and which products were not properly marked with country-of-origin, Victaulic continued to knowingly import unmarked products coming from Poland. We know this from other emails produced by Victaulic. For example, on November 27, 2013, the manager of one of Victaulic's Pennsylvania warehouses sent an email to Mr. Roberts reporting that, just that morning, they had received two containers containing 136 crates of fittings from Poland, and stating: "[w]e need to stamp COO on 29 crates of products from these containers." Roberts Dep. at Exh. 22.

17. Mr. Roberts admitted in his testimony that Victaulic knew at that time that it was continuing to import unmarked products from Poland—an intentional decision made with full

5

knowledge of the situation. Robert Dep. at 229-30. When asked if he informed CBP, he testified "[a]t that point we did not." *Id*. at 230. When asked if there was a reason he decided not to inform CBP, he testified that "we had sought advice and we were going through with the plan that we discussed with out counsel at that point." *Id*. at 231. In other words, the evidence suggests that Victaulic's lawyers were in on a plan to hide these obvious violations from CBP, while at the same time seeking to have this case dismissed in the hopes that the violations would never come to light.

18. One week later, on December 4, 2013, Mr. Roberts received notice that more containers were on the way from Poland that contained unmarked products. In an email of that date, an employee of Victaulic Poland stated: "I believe you will receive containers with goods w/o COO [meaning, without country-of-origin marks]. We started marking products last Thursday." Another email in that chain indicated that Victaulic Poland had not started marking all of its products with country-of-origin until November 27 (which would have been two-and-a-half months after the issue came to Mr. Robert's attention) and that there were "containers on water" (meaning, on ships that had not yet reached the United States) containing unmarked products. Roberts Dep. at 232-36 & Exh. 23.

19. Victaulic could have turned those ships around, or could have informed CBP that unmarked fittings were about to arrive in the United States so that CBP could have taken the legally required steps (*i.e.*, requiring proper marking, destruction, or re-export of the goods under CBP's supervision, *see* 19 U.S.C. § 1304(i), 19 C.F.R. § 134.51(a)). Victaulic did neither. Two days later, on December 6, 2013, the Pennsylvania warehouse received another 43 crates, containing at least 5,800 fittings, of unmarked Polish-made products. Victaulic's plan was to secretly hand-stamp those all in the Pennsylvania warehouse without CBP knowing what was

going on.  This plan was known to, and approved by, Mr. Roberts.  Roberts Dep. at 236-39 & Exh. 24.

20. While this was happening in Pennsylvania, Victaulic Poland was still scrambling to add country-of-origin markings to the products it was sending to the United States.  Ultimately, at least with respect to some parts, Victaulic Poland chose a method—using an ink stamp—that, while easy and cheap, clearly did not comply with U.S. law.  Mr. Roberts knew that Victaulic Poland was using ink stamping, and knowingly allowed those ink-stamped products to continue to be imported into the United States.  Roberts Dep. at 239-40 & Exh. 25; id. at 247-48.

21. As late as October 10, 2016, Victaulic was still occasionally importing unmarked fittings from Victaulic Poland, and then hand-stamping those products with country-of-origin in the warehouse in Pennsylvania.  Roberts Dep. at 247-49 & Exh. 28.

22. Victaulic never paid any marking duties on pipe fittings made at Victaulic Poland and imported into the United States.  *See* Stipulation of Undisputed Facts for Purposes of Discovery, Dkt. No. 92, at ¶ 18.

### The Evidence That Victaulic Knowingly Used A Marking Process At DBMT That Was Both Unlawful And That Resulted In The Importation Of Unmarked Pipe Fittings

23. At Victaulic's foundry in China, DBMT, fittings intended for import into the United States were ineffectively and unlawfully marked with country-of-origin using an ink jet printer that printed the word "China" on the inside of the fittings.  DBMT began using this process in 2009.  Roberts Dep. at 49-50.  Mr. Roberts testified that they used a printer called a VideoJet 1510.  *Id*. at 62-63.

24. Victaulic never communicated with CBP about whether inkjet printing was a compliant method of country-of-origin marking.  Roberts Dep. at 66.  But in April of 2011, Victaulic received from CBP a so-called "Notice To Mark."  Robert Dep. at Exh. 2.  That is a

form that CBP completes and delivers to an importer when CBP catches the importer attempting to import goods that are not properly marked with country-of-origin.  In this case, the Notice to Mark related to steel flanges (a type of pipe fitting) that Victaulic was attempting to import into the United States from China.  According to the Notice to Mark, when CBP conducted an inspection of a container, it discovered that the flanges were not marked with country-of-origin.  Importantly, CBP also told Victaulic, in the Notice to Mark, that the nature of its goods "requires specific marking," and that the law requires "WITHOUT EXCEPTION, that all pipe, tube, tube and pipe fittings of iron or steel be marked to indicate the proper country of origin by means of: (1) die stamping, (2) cast-in-mold lettering, (3) etching, or (4) engraving."

25.     Mr. Roberts admitted in his deposition that he was aware of this Notice to Mark in 2011.  He also agreed that inkjet printing was not one of the four marking methods specified in the Notice to Mark.  Roberts Dep. at 71-73.

26.     At his deposition, Mr. Robert was asked whether he ever learned that the inkjet printing process at DBMT was resulting in fittings being imported into the United States without a country-of-origin mark.  Mr. Robert responded: "I wouldn't characterize it as without a country-of-origin mark, no."  Roberts Dep. at 81.

27.     But, in fact, documents Victaulic produced in discovery clearly showed the opposite, namely, that on *numerous* occasions the ink jet printing process at DBMT failed, resulting in a large quantity of fittings being imported into the United States either without any country-of-origin mark, or with only partial or illegible marks. Moreover, Mr. Roberts became aware of this by no later than October, 2013, and yet no significant changes were made to the ink jet printing process at DBMT until 2017 at the earliest.

28. The original Complaint was served on Victaulic on August 29, 2013. *See* Dkt. No. 9. Approximately one month later, on or about October 1, 2013, Mr. Roberts learned that an audit at one of Victaulic's West Coast distribution centers (located in California) had discovered, pipe fittings manufactured at DBMT without country of origin marks on them. We know this because on October 1, 2013, Mr. Roberts sent an email to an employee in China, Rita Yang, telling her of this discovery. *See* Roberts Dep. at 81-90 & Exh. 3.

29. When Mr. Roberts reached out to Ms. Yang, he asked her to check at her end to see if the parts were being marked with country of origin at DBMT. She responded by telling him, in an email, that some of the CHINA marks were "not very clear" but that "our people think that is just your expectation." *See* Roberts Dep at Exh. 5. In a later email, Mr. Yang told Mr. Roberts that DBMT was making the marks "very thin." *Id*. at Exh. 6; *see also* Roberts Dep. at 114-20. These emails are evidence that DBMT was intentionally making the country-of-origin marks hard to see on the products because that is what Victaulic wanted them to do ("that is just your expectation").

30. Indeed, the country-of-origin marks on the DBMT fittings were so hard to see that even Mr. Roberts himself could not find the country-of-origin mark when he was shown a DBMT-manufactured fitting at his deposition, and conceded that a customer looking at the product would not be able to tell what country it had been manufactured in. Roberts Dep. at 178-84. After being woodshedded by Victaulic's lawyers during a break in the deposition, Mr. Roberts attempted to walk back that testimony, but even then admitted that the country of origin mark could only be seen using a flashlight, and that the mark was "inconsistent" at best. *Id*. at 210-15. And although he is the Victaulic executive in charge of global compliance, he

claimed to have "no opinion" on whether the country-of-origin mark that he was shown on an actual DBMT fitting was or was not compliant. *Id*. at 214-15.

31. Within a few weeks of the October, 2013 "discovery" of the unmarked DBMT fittings, and Mr. Roberts' emails with Ms. Yang, Mr. Roberts sent an email to another Victaulic employee, Ben Lampi, with the subject line "Printer for DBMT." In that email, Mr. Roberts asked Mr. Lampi "were you able to find anything on the printer you helped them set up for COO marking?" And Mr. Roberts told Mr. Lampi that he needed information about that printer to "confirm we are using a valid method to mark our products." *See* Roberts Dep. at Exh. 7.

32. The problems with the country-of-origin marking process at DBMT were not remedied in 2013 or, indeed, for at least the next several years. Internal emails produced by Victaulic during discovery showed that in March of 2016 the exact same issue was still on Mr. Roberts' plate. According to those emails, fittings that had been manufactured at DBMT, but that had no country-of-origin marks, were found at a distribution center in Pennsylvania. DBMT fittings with incomplete country-of-origin marks were also found. Mr. Roberts acknowledge in one of those internal emails that the DBMT country-of-origin marking process was "inconsistent," Roberts Dep. at 128-42 & Exhs. 8-10, something he had known since 2013. In his deposition testimony, Mr. Roberts somewhat bizarrely claimed that he had not seen any unmarked fittings in 2016, even though in two different, contemporaneous emails he had described the fittings as either "unmarked" or "non-marked." *Id*. at 146-47.

33. On April 6, 2016, Mr. Roberts sent another email in which he again stated that DBMT's country-of-origin marking process was "inconsistent" and that the country-of-origin marks were "sometimes none [sic] existent." Roberts Dep. at Exh. 10. In his deposition, when confronted with that email, Mr. Roberts again tried to disown his own words, testifying that

although he had written "non-existent" what he actually meant was "light and seemingly non-existent." *Id*. at 150-52.

34. Faced with this problem of non-existent (or, if one believes Mr. Robert's testimony, "inconsistent" or "light") country-of-origin marks on DBMT-made fittings that Victaulic had imported into the United States from China, Victaulic decided to try to hide the problem by using a hand ink-stamp to manually put the word "China" on the fittings before they left the warehouse. Mr. Robert authorized that process, but could not recall how many fittings were part of that remarking project and could not say whether it was more or less than 10,000. Roberts Dep. at 141-42. But despite the potentially enormous scope of that remarking project, Victaulic did not inform CBP of the re-marking of the imported fittings (as Victaulic was legally required to do if the fittings had entered the United States without proper country-of-origin marks). When asked why Victaulic did not inform CBP, Mr. Roberts testified that, because of this litigation, he was told by Victaulic's lawyers not to. Roberts Dep. at 152-61.

35. Despite his intense focus on the problem with the DBMT marking process in March of 2016, Mr. Roberts was unable to say that those problems had ever been fixed. In November of 2016, Mr. Roberts travelled to China and met with DBMT to discuss the marking problems, and potential changes to the marking process used at DBMT. Roberts Dep. at 167-70. Then, on January 5, 2017, a China-based employee, Jun Shi, sent an email to Mr. Roberts stating that DBMT had a "plan to improve" the process with the "hope this reform can improve marking definition and reduce omission." Roberts Dep. at Exh. 13; *see also id*. at 170-75. Thus, according to that email, the problems had not yet been fixed as of that date, and those problems included the "omission" of country-of-origin marks. When asked at his deposition (which took

place on October 25, 2018—about 22 months after that email) whether the problems at DBMT had now been fixed, Mr. Roberts testified that did not know.  *Id*. at 175-78.

36.     Accordingly, even as late as October of 2018—more than five years into this litigation—the Victaulic executive with responsibility for assuring compliance with the country-of-origin marking requirement could not say whether the pipe fittings Victaulic imported into the United States from its DBMT facility in China were consistently marked with country-of-origin.  And the evidence discussed above strongly suggests that at least a significant portion of those fittings were not.

37.     Victaulic never paid any marking duties on pipe fittings made at DBMT and imported into the United States.  *See* Stipulation of Undisputed Facts for Purposes of Discovery, Dkt. No. 92, at ¶ 18.

**Relator's Damages Calculations And Expert Report**

38.     In its opposition brief, Victaulic argues that Relator sought in excess of $1 billion in this case.  That is not accurate.  Although this case was filed in 2013, because of the lengthy litigation over Victaulic's motion to dismiss, we did not get any documents or data from Victaulic until 2018.  Part of the information we requested immediately at the start of discovery was reports from Victaulic's databases showing what types of fittings were imported into the United States from which foreign countries during the period of time covered by this case.  It took Victaulic's counsel quite some time to provide us with a complete set of those reports; we received the last of them in May of 2018, almost a year after we had made the requests.  It was not until we had those reports, and had conducted other discovery intended to clarify which Victaulic products had been imported either unmarked or improperly marked, that we were able, working with our client, to arrive at damages numbers.

39. We completed the calculations, and provided them to Victaulic's counsel, on November 21, 2018, in accordance with the schedule set by the Court. Using very conservative assumptions, we were prepared to offer evidence that Victaulic imported at least $5.4 million worth of unmarked fittings from Poland, and that Victaulic imported at least $25.9 million worth of unmarked or improperly marked fittings from China. In addition, discovery revealed that Victaulic had also knowingly imported a small amount of unmarked fittings made by a third-party vendor, Keddco, worth approximately $372,000. In total, we were prepared to offer evidence that Victaulic owed marking duties on a total of approximately $31,750,665 worth of fittings. Marking duties are 10%; therefore, the unpaid marking duties was approximately $3,175,067. Trebled (as is mandatory under the FCA), the total damages that we would have sought at trial was approximately $9,525,000. The basis for these calculation was explained to Victaulic in our Notice Under Fed. R. Evidence 701, served on November 21, 2018, a copy of which is attached hereto as EXHIBIT B.

40. We also retained an expert to testify on various issues relating to Victaulic's use of ink jet printing to mark the fittings made in China at the DBMT facility. That expert was Paul Vandevert, an attorney who spent his entire career advising major industrial concerns on customs matters, including 17 years as an in-house international trade attorney for Ford Motor Company. In his report, Mr. Vandevert opined that had CBP known of Victaulic's use of an ink jet printer, and the placement of the marks on the inside of the fittings, CBP would have concluded that this violated U.S. country-of-origin marking requirements, and that Victaulic's failure to inform CBP about Victaulic's use of ink jet printing, and the problems Victaulic faced with that printing method, was "material" to CBP. A copy of Mr. Vandevert's report is attached hereto as EXHIBIT C.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this 3rd day of July, 2019.

/s/ Jonathan K. Tycko
Jonathan K. Tycko